**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BP PRODUCTS NORTH AMERICA INC.,** | ) | |
| 150 W. Warrenville Rd. | ) | |
| Naperville, IL 60563 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. _____ |
| | ) | |
| **BAUMAN OIL DISTRIBUTORS, INC.,** | ) | |
| 1503 Commercial Blvd. | ) | **JURY TRIAL DEMANDED** |
| Herculaneum, MO 63048 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR BREACH OF CONTRACT

Plaintiff BP Products North America Inc. ("Plaintiff" or "BPPNA") comes before the Court to file its Complaint against Defendant Bauman Oil Distributors, Inc. ("Defendant" or "Bauman") and states as follows:

## PARTIES

1.      BPPNA is a Maryland corporation in good standing, whose principal place of business is in Illinois.

2.      BPPNA was formerly known as Amoco Oil Company. On December 31, 1972, The American Oil Company changed its name to the Amoco Oil Company. On October 1, 2011, the Amoco Oil Company changed its name to BP Products North America Inc.

3.      Defendant is a Missouri corporation in good standing, whose principal place of business is in, Jefferson County, Missouri.

4.      Defendant was founded in 1980 and specializes in distributing fuel and lubricants.

5.     Defendant has a strong presence in the greater St. Louis area and distributes fuel and lubricants throughout a seven-county area with a fleet of tank wagons and transports.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1), because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States.

7.     This Court is the proper venue pursuant to 28 U.S.C. § 1391 and Local Rule 2.07, because it is the federal judicial district embracing Jefferson County, Missouri, where Defendant has its principal place of business.

## GENERAL ALLEGATIONS

8.     BPPNA incorporates all preceding paragraphs of this Complaint and all attached exhibits as if set forth fully herein.

9.     A jobber is a wholesaler of gasoline, diesel fuel, and other petroleum products that delivers those products to third parties.

10.     A jobber contract, or wholesaler contract, is an agreement where a buyer purchases quantities of refined fuel from refining companies to sell to retailers, such as gas stations, or directly to users, such as industrial operations. *See generally* Exhibit A.

11.     In the 1980s, Newcomer Service Co. ("Newcomer") entered into successive jobber contracts with BPPNA to haul and distribute fuel and other materials refined by BPPNA. *See* Exhibit A (1981-1984 contract), Exhibit B (1984-1987 contract), and Exhibit C (1987-1990 contract).

12.     In May 1989, Defendant purchased Newcomer's business, including Newcomer's jobber contract with BPPNA.  *See* Exhibit D[1].

13.     The Newcomer purchase agreement was contingent on Defendant successfully securing Newcomer's jobber contract with BPPNA. *Id.* at 2.

14.     To secure Newcomer's jobber contract, Defendant expressed that it would cooperate fully with BPPNA's requirements.  *Id.*

15.     Defendant successfully acquired Newcomer's jobber contract with BPPNA as well as Newcomer's business.  *Id.* at 1.

16.     Upon information and belief, by purchasing Newcomer's business, Defendant acquired the liabilities and obligations of Newcomer, including the liabilities and obligations in Newcomer's jobber contracts with BPPNA.

17.     BPPNA and Defendant have continued the jobber contract relationship.

18.     At all relevant times, the jobber contracts have consistently required the buyer (i.e., Defendant) to indemnify the seller (i.e., BPPNA).  *See* Exhibit A at ¶ XVII; Exhibit B at ¶ XVII; Exhibit C at ¶ XVI.

19.     In addition to the indemnity provision, the jobber contracts have consistently required that the jobber (i.e., Defendant) follow applicable laws and indemnify the seller (i.e., BPPNA) for liabilities arising from any associated failures.  *See* Exhibit A at ¶ XI; Exhibit B at ¶ XI; Exhibit C at ¶ XI.

20.     Further, Defendant is also obligated to purchase and maintain insurance covering all business-related operations and name BPPNA as an additional insured.  *See* Exhibit E (2017-2020 contract) at ¶ 15. The 2017 jobber contract specifically requires that Defendant "at any time

---

[1] Exhibit D includes both the offer and the affirmation of acceptance.

requested by [BPPNA]" provide proof of coverage, "including, but not limited to certificates of insurance or copies of the policies themselves." *See* Exhibit E at ¶ 15(c).

## Matthew Eaton Lawsuit (17-L-644)

21.     On May 24, 2017, BPPNA and Defendant were first named as defendants in a personal injury lawsuit, *Matthew Eaton v. Turtle Wax, Inc., et al.*, in Madison County, Illinois (17-L-644), in which the Plaintiff alleges that exposure to fuel distributed by Defendant caused Matthew Eaton to develop Acute Myeloid Leukemia.   *See* Exhibit F (Fourth Amended Complaint).

22.     Matthew Eaton alleges that "[f]rom 1979 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Plaintiff during his employment at Eaton's Service Center, used and worked around petrochemical products that were produced, manufactured, distributed, and/or sold by Defendant Bauman."  Exhibit F at ¶ 32.

23.     Plaintiff further claims that he was "exposed to fumes emanating from the Bauman Oil tanker trucks and by the fuel from the trucks."   Exhibit G (Plaintiff's First Supplemental Responses to Defendant 3M Company's Interrogatories) at p. 3.

24.     The fuel to which Matthew Eaton claims exposure was distributed by Defendant pursuant to jobber contracts in place with BPPNA during the periods of Matthew Eaton's alleged exposure.

25.     On March 15, 2018, Defendant demanded that BPPNA defend, hold harmless and indemnify it in the *Matthew Eaton* lawsuit (17-L-644) pursuant to the jobber contracts at issue.

26.     On June 14, 2018, BPPNA rejected Defendant's demand and requested that Defendant (1) defend, hold harmless, and indemnify BPPNA pursuant to the jobber contract and (2) provide proof of insurance coverage during the relevant time period.

27.     On February 4, 2019, BPPNA again requested that Defendant (1) defend, hold harmless, and indemnify BPPNA and (2) provide proof of insurance coverage.

28.     On multiple occasions between June 2018 and February 28, 2019, counsel for BPPNA attempted to contact counsel for Defendant regarding the demand to (1) defend, hold harmless, and indemnify BPPNA and (2) provide proof of insurance coverage.

29.     On February 28, 2019, Defendant refused to defend or indemnify BPPNA pursuant to the jobber contracts or provide proof of insurance coverage.

30.     On October 22, 2021, Defendant refused to defend or indemnify BPPNA or provide proof of insurance coverage for a third time.

**Aimee Eaton, et al. Lawsuit (20-L-1081)**

31.     On July 31, 2020, Aimee Eaton (Matthew Eaton's spouse), Joyce Eaton (individually and as special representative of the Estate of Walter Eaton), Douglas Dickey, and Dawn Dickey filed a lawsuit (20-L-1081) naming BPPNA as a defendant and Bauman Oil Distributors, Inc. as the sole respondent in discovery.  *See* Exhibit H.

32.     Aimee Eaton originally alleged that "[a]s a result of the injuries sustained by Plaintiff Matthew Eaton, Case 2017 L 00644, [she] has suffered a loss of services, society, consortium, and companionship arising out of their marital relationship."  Exhibit H at ¶ 106.  Aimee Eaton subsequently voluntarily dismissed her claims.

33.     Joyce Eaton alleges that Walter Eaton was diagnosed with "Lymphoma" in August 2018 due to exposure to various benzene-containing products at the Phillips 66 gas station he owned in Potosi, Missouri, from 1978 to 1985 and the "Standard/Amoco/BP" gas station he owned in Potosi, Missouri, from 1985 to 2003.  Exhibit H at ¶¶ 19, 37-50.

34.    Doug and Dawn Dickey allege that Mr. Dickey was diagnosed with "Acute Myelogenous Leukemia" in June 2019 due to exposure to various benzene-containing products at his parents' Phillips 66 gas station in Potosi, Missouri, from 1975 to 1982, and at his parents' car dealership in Potosi, Missouri, from 1982 to 1988.  Exhibit H at ¶¶ 20, 30-36.

35.    The plaintiffs in 20-L-1081 allege that Bauman Oil Distributors, Inc. was "a supplier of petroleum products to Eaton 66 and Eaton's Service Center at times material to [their] allegations . . . ." Exhibit H at ¶ 50.

36.    The fuel at issue for the various claims in 20-L-1081 was distributed by Defendant pursuant to jobber contracts in place with BPPNA during the periods relevant to the alleged exposures.

37.    On October 22, 2021, Defendant refused to defend or indemnify BPPNA for the allegations in 20-L-1081 or provide proof of insurance coverage.

## COUNT I—BREACH OF CONTRACT
### Case No. 17-L-644

38.    BPPNA incorporates all preceding paragraphs of this Complaint and all attached exhibits as if set forth fully herein.

39.    BPPNA and Defendant are parties to valid and enforceable contracts that are supported by adequate consideration, contain the essential terms, may be enforced as written, and are definite, certain, and complete.

40.    BPPNA performed its obligations and stands ready, willing, and able to perform its obligations under the contracts.

41.    Defendant is obligated to indemnify BPPNA under the jobber contracts.

42.    Defendant breached the contracts by refusing to indemnify BPPNA in case number 17-L-644 or provide proof of insurance coverage.

43.     As a direct and proximate result of Defendant's breaches of contract, BPPNA has incurred damages, including but not limited to attorneys' fees and costs, and BPPNA will continue to incur damages in the defense and resolution of case number 17-L-644 filed by Matthew Eaton.

Plaintiff BP Products North America, Inc. requests that this Court grant judgment in favor of Plaintiff and against Defendant for the following:

(a)     all damages already incurred;

(b)     defense of case number 17-L-644;

(c)     indemnity for any future attorneys' fees, costs, settlement, and/or judgment in case number 17-L-644;

(d)     reasonable and necessary attorneys' fees in the instant litigation;

(e)     pre-judgment and post-judgment interest as provided by law;

(f)     costs of court; and

(g)     such other and further relief, at law or in equity, to which Plaintiff is justly entitled.

## COUNT II—BREACH OF CONTRACT
### Case No. 20-L-1081

44.     BPPNA incorporates all preceding paragraphs of this Complaint and all attached exhibits as if set forth fully herein.

45.     BPPNA and Defendant are parties to valid and enforceable contracts that are supported by adequate consideration, contain the essential terms, may be enforced as written, and are definite, certain, and complete.

46.     BPPNA performed its obligations and stands ready, willing, and able to perform its obligations under the contracts.

47.     Defendant is obligated to indemnify BPPNA under the jobber contracts for the claims alleged in Case No. 20-L-1081.

48.     Defendant breached the contracts by refusing to indemnify BPPNA in case number 20-L-1081 or provide proof of insurance coverage.

49.     As a direct and proximate result of Defendant's breaches of contract, BPPNA has incurred damages, including but not limited to attorneys' fees and costs, and BPPNA will continue to incur damages in the defense and resolution of case number 20-L-1081.

Plaintiff BP Products North America, Inc. requests that this Court grant judgment in favor of Plaintiff and against Defendant for the following:

(a)     all damages already incurred;

(b)     defense of case number 20-L-1081;

(c)     indemnity for any future attorneys' fees, costs, settlement, and/or judgment in case number 20-L-1081;

(d)     reasonable and necessary attorneys' fees in the instant litigation;

(e)     pre-judgment and post-judgment interest as provided by law;

(f)     costs of court; and

(g)     such other and further relief, at law or in equity, to which Plaintiff is justly entitled.

**JURY TRIAL DEMANDED ON ALL COUNTS**

**HUSCH BLACKWELL LLP**

*/s/ Shmuel B. Shulman*
Shmuel B. Shulman, #71175
8001 Forsyth Boulevard, Suite 1500
St. Louis, Missouri  63105
(314) 480-1500
(314) 480-1505 (fax)
Shmuli.Shulman@huschblackwell.com

***Attorney for Plaintiff***

# EXHIBIT A



**Amoco Oil Company**

RECEIVED
MAR 30 1981
PETROLEUM PRODUCTS DEPT.

FEB 25 1981

**Jobber Contract**
Form 26-930 (2-79)

This **Contract**, dated the ___5th___ day of ___April___, 19 _81_, between **Amoco Oil Company**, a Maryland corporation, with General Offices at 200

E. Randolph Drive, Chicago, Illinois 60601, hereafter called **"Seller"**, and ___Homer Newcomer___

Newcomer Service Co.

of Potosi, Mo.

jointly and severally, if more than one, hereinafter called **"Buyer"**.

**Witnesseth:**

**I. — Products and Quantities: Seller** agrees to sell, and **Buyer** agrees to purchase and receive from **Seller**, the products specified below, subject to the respective minimum and maximum quantities stated in the attached Schedule A.

**Products Specifically Covered By This Contract Are Indicated By X**

( X )  **A.**  **Gasolines**

_____ Amoco Premium Lead-Free
_____ Amoco Super Lead-Free
_____ Amoco Premium (Leaded)
_____ Amoco Regular (Leaded)
_____ Amoco (Lead-Free)
_____ Naphthas

( X )  **B.**  **Distillates**

_____ Amoco Premier Diesel Fuel
_____ Amoco No.1 Diesel Fuel
_____ Amolite Diesel Fuel
_____ American No.2 Diesel Fuel
_____ Amoco Heater Oil
_____ Amoco Furnace Oil
_____ American Kerosene

_____ _____

( X )  **C.**  **Motor Oils-Automotive Lubricants**

_____ Motor Oils
_____ Automotive Lubricants

( X )  **D.**  **Industrial Oils-Greases-Waxes-Petrolatums**

_____ Industrial Oils
_____ Industrial Greases
_____ Waxes
_____ Petrolatums

( X )  **E.**  **TBA**

_____ Tires
_____ Tubes
_____ Batteries
_____ Accessories
_____ TBA Tools & Equipment
_____ Antifreeze

**II. — Term:** The term covered by this contract shall be for a period beginning on ___April 5___, 19 _81_, and ending on

___April 4___, 19 _84_.

**III. — Prices:**

**A. — Gasolines and Distillates** - The price per gallon which **Buyer** shall pay for products sold hereunder shall be **Seller's** Established Price for **Buyer's** class of trade in effect on date of shipment for said products at the destination(s) and/or terminal(s) referred to below, as recorded

at **Seller's** Regional Office at ___200 E. Randolph, Chiago, Ill___

All products covered herein shall be sold and delivered to **Buyer** and title thereto shall pass to **Buyer** f.o.b. **Buyer's** bulk plant(s) at _____

Potosi, Mo.

or, if applicable, at terminal(s) to be designated by **Seller**.

**Seller** shall make all arrangements for transport trucks or tank cars.

**Seller** may at its option deliver to **Buyer** such products as **Seller** may elect, into **Buyer's** truck transports at shipping points designated by **Seller**, in which case, if product is billed on a delivered basis, **Seller** shall allow **Buyer** an amount equivalent to the lesser of: (i) the lowest legal freight rate for Truck Transport/Tank Car quantities then in effect or (ii) such amount as **Seller** may establish from time to time. The allowance shall apply to each gallon so carried by **Buyer** to **Buyer's** bulk plant(s) or to **Buyer's** actual point of unloading. In order that **Seller** may grant **Buyer** the correct freight allowance, **Buyer** shall certify to **Seller** the actual point of unloading if it is different than **Buyer's** destination(s) listed above. In no event shall any allowance exceed the allowance which would have been given for carriage to **Buyer's** applicable bulk plant.

As an alternative to (i) and (ii) above, **Seller**, at its option, may price to **Buyer** on all such deliveries into **Buyer's** Truck Transports at a uniform price f.o.b. each applicable shipping point, available to all customers in **Buyer's** class of trade at such shipping point on a nondiscriminatory basis. Title shall pass to **Buyer** upon delivery into **Buyer's** transport equipment, and **Buyer** shall assume full responsibility for such products at such time.

**B. — Motor Oils, Automotive Lubricants, Industrial Oils, Greases, Waxes and Petrolatums** - The prices which **Buyer** shall pay for products purchased hereunder shall be the prices specified in **Seller's** price list(s) for **Buyer's** class of trade in effect on date a written order shall be received by **Seller** at its order receiving location(s) specified to **Buyer** from time to time. With certain exceptions, all products shall be sold and delivered to **Buyer**, and title thereto shall pass to **Buyer**, f.o.b. **Buyer's** bulk plant(s) above. Title to those certain products sold f.o.b. shipping point(s) and title to all other products if and when delivered into **Buyer's** transportation equipment at shipping point, at **Seller's** option, shall pass to **Buyer** f.o.b. **Seller's** shipping point, in which event the freight rate allowance for full truckload/truck transport pick-up shall be credited to **Buyer** (or **Buyer**, at **Seller's** election, shall be charged an f.o.b. shipping point price) on the terms and conditions set forth in Paragraph III-A above.

**C. — TBA and Antifreeze** - The prices which **Buyer** shall pay for products purchased hereunder shall be the prices specified in **Seller's** price list(s) for **Buyer's** class of trade in effect on date **Buyer's** order shall be received by **Seller** at its order department. All products shall be sold and delivered to **Buyer**, and title thereto shall pass to **Buyer**, f.o.b. **Buyer's** bulk plant(s) above. All prices shall include delivery to said bulk plant(s), with the exception that freight will be charged in certain instances, as stated in **Seller's** said price list(s). Title to any products delivered into **Buyer's** transportation equipment at shipping point, at **Seller's** option, shall pass to **Buyer** f.o.b. **Seller's** shipping point, in which event the freight rate allowance based on full truckload pick-up shall be credited for **Buyer** (or **Buyer**, at **Seller's** election, shall be charged an f.o.b. shipping point price) on the terms and conditions set forth in Paragraph III-A above.

**IV. — Determination Of Quantities:** The quantities of gasolines and distillates as referred to in Paragraph I-A and B delivered to **Buyer** shall be determined on the basis of the temperature thereof at sixty degrees Fahrenheit ($60^\circ$F) in accordance with "Table No. 6-ASTM-IP Petroleum Measurement Tables, American Edition U.S. Units of Measurement," or on a shell capacity (gross) basis, as determined by **Seller** for **Buyer's** class of trade in the applicable geographic area.

**V. — Taxes:** Any tax, excise (manufacturer's or otherwise), inspection fee, duty (import or export), license fee (import or export), tonnage charge, assessment, or other like charge which is levied, assessed or imposed by federal, state or local authority upon the products and/or transactions contemplated hereunder (including the delivery, sale, use or consumption of the products or privilege of doing any of same), and/or which is imposed on or measured by the price of the products or the proceeds of sale hereunder, shall be added to **Seller's** price or prices set forth herein and shall be paid by **Buyer**, unless said price or prices specifically state that they include any such charge or charges.

**VI. — Credit Terms:** Credit terms shall be as set forth in **Seller's** Terms of Sale contained in **Seller's** Price Guide or other posting at its regional office, as same are applicable to **Buyer's** class of trade for the respective product and delivery point on date of delivery. **Seller** reserves the right to change such credit terms at any time, either for the class of trade generally, or, with cause, for **Buyer** alone, and **Seller** shall have the right at any time to demand cash payment on or before delivery. Failure of **Buyer** to make payment according to authorized credit terms shall entitle **Seller** to suspend deliveries and/or to terminate this Contract, at **Seller's** election.

**Seller** shall have the right to impose a reasonable charge against **Buyer**, in conformity with its policy for **Buyer's** class of trade in **Buyer's** area, for each check, if any, which may be returned to **Seller** for Non Sufficient Funds and which may subsequently be made good by **Buyer**. Failure of **Buyer** to make good, within five (5) days after written notice is delivered by **Seller**, any check which shall be dishonored for Non Sufficient Funds shall also entitle **Seller**, at **Seller's** election, to suspend deliveries and/or terminate this contract.

In no instance shall taxes, inspection fees and the like qualify for terms of sale discounts.

**VII. — Trademarks And Trade Names: Buyer** may use **Seller's** trade names, trademarks, brand names, and color scheme ("**Seller's Marks**") only in connection with the advertising, distribution, and sale of products supplied by **Seller** under said respective **Seller's Marks**.

**Buyer** shall not use **Seller's Marks** in connection with the advertising, distribution, or sale of: (1) any mixture, blend, dilution or adulteration of a product supplied by **Seller**; (2) products not sold in **Seller's** original packages and containers or not sold in packages, containers, or through equipment approved by **Seller**; or (3) any product not supplied by **Seller**. **Seller** shall have the right at all times to inspect products in the possession or control of **Buyer** and/or **Buyer's** service station customers to determine compliance with these provisions and quality standards.

**Buyer** shall use **Seller's Marks** only in accordance with **Seller's** approved specifications and procedures, which **Seller** may change at any time. Neither **Buyer** nor any subsidiary or affiliate of **Buyer**, or agent or representative thereof, shall use **Seller's Marks** as part of a corporate or trade name or as part of **Buyer's** own trademarks.

If **Buyer** wishes to use **Seller's** Torch and Oval trademark in conjunction with **Seller's** name on transport and dispensing equipment, forms, advertising materials, and the like, **Buyer** may do so only if the word "Jobber," or "Distributor," appears above the trademark and the word "Products" appears below it so as to read:"Jobber (or Distributor) Amoco (or Standard) Products."

It is agreed between the parties that all signs and trademark identifications bearing **Seller's Marks** which are employed by **Buyer** in the performance of **Buyer's** responsibilities hereunder, and more particularly under Paragraph XVIII hereof, shall be covered by a Sign Loan Agreement, Form 26-979, a Sign Rental Agreement, Form 26-980, or a Trade-Mark Agreement, Form 26-981, whichever is applicable, and the parties hereby incorporate by reference herein the provisions of the applicable said Agreement as to any sign or trademark identification not specifically covered by such an Agreement.

Upon the expiration or termination of this agreement, for any reason whatsoever, **Buyer** shall immediately cease using **Seller's Marks** and any confusingly similar marks and shall return to **Seller** all signs and trademark identifications loaned or leased by **Seller** to **Buyer**, in accordance with the provisions of the applicable Sign Loan Agreement, Form 26-979, or Sign Rental Agreement, Form 26-980, and, at **Seller's** option, shall sell to **Seller** all signs, building letters, decals, posters, displays and other promotional and advertising materials owned by **Buyer** which bear or display any of **Seller's Marks**, in conformity to the provisions of the applicable Trade-Mark Agreement, Form 26-981, between **Buyer** and **Seller**. If **Buyer** fails to discontinue or cause to be discontinued any and all use and display of **Seller's Marks** after such expiration or termination, **Seller** is hereby expressly given the right to enter upon the premises where **Seller's Marks** are being used or displayed and remove all or any part of any signs, building letters, decals, posters, displays and other materials bearing or displaying **Seller's Marks** or obliterate **Seller's Marks**, at **Buyer's** expense and using such means as **Seller** may deem desirable, without any liability or obligation to **Buyer**.

**VIII. — Force Majeure: Seller** shall be excused from delay or nonperformance if **Seller** is unable to meet the demand for its products at **Seller's** normal and usual source points for supplying **Buyer** (regardless of whether or not **Seller** may have been forced to divert certain supplies from such source points in order to alleviate shortages at other distribution points), or in the event of failure or delay in delivery due to exhaustion, reduction or unavailability of product or stock or component necessary in the manufacture or production of such product. Either party shall be excused from delay or nonperformance in the event of any condition whatsoever beyond said party's reasonable control, including, without limitation: unavailability, failure, or delay of transportation; Acts of God; labor difficulties; fire; riots; war conditions in this or any other country; and compliance with any governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary) affecting directly or indirectly said party's ability to perform hereunder.

In the event of any of the contingencies or conditions referred to in the preceding subparagraph, **Seller** shall have the right to curtail deliveries or allocate its supply of product for sale among all of its customers in any manner which in its sole discretion is fair and reasonable in the circumstances, and **Buyer** shall not hold **Seller** responsible in any manner for any losses or damages which **Buyer** may claim as a result of any such failure, curtailment or allocation by **Seller**. **Seller** shall not be required to make up any product not so delivered.

**IX. — Discontinuance of Product or Facilities: Seller**, at its sole option exercised for good faith business reasons, at any time may: (1) discontinue the production or sale of any product covered hereby; (2) change the specifications of any such product; (3) change or completely withdraw the trademark applicable to any such product; (4) change or completely withdraw services and facilities offered in connection with any such product, including credit card privileges; (5) withdraw from the marketing of any such product in the geographic area of **Buyer's** primary marketing responsibility referred to in Paragraph XVIII hereof and/or in which **Buyer's** bulk plants referred to in Paragraph III hereof are located; and/or the like. **Seller** shall not be liable to **Buyer** by reason of any such discontinuance, change or withdrawal.

**X. — Demurrage: Buyer** shall pay any and all demurrage accruing on any barges, tank cars, truck transports or other means of transportation at the prevailing rates therefor, at the time of the particular delay. **Buyer** shall also pay to **Seller** a tank car and/or truck transport rental of $20.00 per day for each chargeable demurrage day.

**XI. — Compliance With Laws: Buyer** shall comply fully with all applicable laws and regulations of any governmental authority and with all safety and quality control directives of **Seller** regarding the receipt, handling, storage, dispensing, packaging, labeling, applying, advertising and promotion of the products purchased hereunder. Without limiting the foregoing, **Buyer** shall comply and require **Buyer's** dealers and customers to comply with all requirements of occupational, health and safety agencies and of environmental protection agencies concerning the receipt, storage and dispensing of motor fuels, the disposal of waste materials, and other activities, including particularly those governing recovery of vapors, segregated storage for unleaded gasolines, nozzle sizes for unleaded gasolines, and the like. **Buyer** shall indemnify **Seller** and save **Seller** harmless from any and all penalties, losses or liabilities of every nature whatsoever resulting from **Buyer's** failure to do so.

**XII. — Lead-Free Products: Buyer** shall comply at all times with **Seller's** established procedures for controlling the quality of **Seller's** branded lead-free products. **Buyer** shall indemnify **Seller** against any penalty, loss or liability of any nature whatsoever resulting from failure of **Buyer** or those to whom **Buyer** resells to maintain lead-free specifications of **Seller's** lead-free products.

**XIII. — Containers:** All containers on which **Seller** charges a deposit shall remain **Seller's** property, shall be used only for the original contents and shall be returned promptly in their delivered condition, less ordinary wear, to **Seller's** terminal or warehouse, as **Seller** may direct, freight collect. Deposit charges are payable, without discount, when payment for contents is due and shall be refunded or credit memorandum issued when said containers are returned.

**XIV. — Claims:** Any claim for deficiency in quantity or quality shall be waived unless at time of delivery **Buyer** confirms the claim by written notice to **Seller** and gives **Seller** an opportunity to inspect the original package or material.

**XV. — Deliveries:** Unless otherwise specified on the Schedules and Riders attached hereto, deliveries of each product hereunder shall be in relatively equal monthly quantities. **Seller** shall not be obligated to deliver in any given month more than one-twelfth (1/12) of the respective 12-month quantity for such products. Should **Buyer** at any time or for any month order in quantities less than such one-twelfth figure, **Seller** shall not be obligated to deliver the deficiency at any future time. Should **Buyer** at any time or for any month require more than said one-twelfth figure, **Seller** shall have the right, at its option, to supply such excess requirement, but if **Seller** supplies same it shall not be obligated to do so again in the future.

**Seller** shall have the right to specify minimum delivery quantities and either to refuse to make smaller deliveries or to charge extra for so doing.

**Seller** shall have the right at any time or times to change terminal assignments for serving **Buyer** hereunder, based on transportation costs, weather conditions, local inventory conditions, and the like.

**XVI. — Default:** In the event of any breach of any provision of this contract by either party or in the event of any failure of either party to exert good faith efforts to carry out the provisions hereof, the other party, at its option, may terminate this contract on 90 days' prior written notice setting forth the nature of the default. In circumstances where 90 days' notice is unreasonable, the notice shall be given on the earliest date which is reasonably practicable. With respect to the first such default only for which such a notice is given, the notice shall become ineffective to terminate this contract if the other party shall cure the default within 15 days after the date of service of the notice, as determined under Paragraph XXI hereof.

The above remedy shall be without prejudice to all other remedies of the aggrieved party, at law or in the equity. Specific performance of this contract shall be an appropriate remedy for any breach.

For purposes of emphasis and elaboration, and without limitation, it is specifically understood that the following shall contitute a breach or lack of good faith for purposes of the foregoing: (1) failure of **Buyer** to purchase the applicable minimum quantity of any product during any twelve-month period, as set forth on Schedule A, or to purchase the one-twelfth (1/12) proration thereof under Paragraph XV hereof, except for limited seasonal variations; (2) failure of **Buyer** to pay any sum to **Seller** hereunder when due; (3) death of **Buyer**, physical or mental incapacity of **Buyer**, filing of voluntary or involuntary bankruptcy proceedings against **Buyer** or determination of insolvency of **Buyer**; and/or (4) fraud or criminal misconduct of **Buyer** relevant to **Buyer's** operations hereunder, specifically under Paragraph XVIII hereof.

No waiver by either party of any default or defaults, and no course of dealing, shall affect said party's rights with respect to any subsequent default. All rights and remedies of either party are cumulative. Any termination of this contract shall be without prejudice to the accrued rights of the terminating party hereunder.

**XVII. — Indemnity: Buyer** shall indemnify **Seller** against all liabilities, losses and claims for death, personal injury or property damage (including the parties and their employees) and all social security taxes or old age benefits or disability benefits that may be applicable to **Buyer** or its employees arising out of or in connection with the performance of this contract, or the shipment, delivery, storage, handling, use, or sale of any and all products covered by this contract, or the use by **Buyer** of any of **Seller's** property, whether real or personal.

**XVIII. — Marketing Efforts: Buyer** shall use its best efforts to promote and sell the products covered by this contract within the area of primary marketing responsibility described in Schedule B. In the event that **Buyer** fails to do so, **Seller** reserves the right to make other provisions for the marketing of its products within such area. Nothing contained in this contract shall preclude **Buyer** from selling or soliciting the sale of the products covered by this contract outside such area or confer upon **Buyer** exclusive marketing rights for any such product within such area.

**Buyer** warrants and represents that in **Buyer's** activities relating to this Jobber Contract **Buyer** will: (1) operate one or more bulk storage plants for the products purchased hereunder where necessary to efficiently serve customers in **Buyer's** area of primary marketing responsibility; (2) operate a sufficient number of tank trucks to efficiently serve those customers; and (3) otherwise efficiently perform the functions of a bona fide jobber of **Seller's** products.

**XIX. — Option: Buyer** shall not sell, lease or otherwise dispose of **Buyer's** business as related to this contract, or any major segment thereof (such as the distillate segment or the gasoline segment), or all of its real or personal property used in connection therewith or any bulk plant or terminal used therein without first giving **Seller** an option to purchase or otherwise acquire the same on the same terms and conditions as those the **Buyer** is willing to enter into with any other party. **Buyer** shall promptly submit to **Seller** the complete terms and conditions of any bona fide offer received from or made to any third party which is acceptable to **Buyer**, and **Seller** shall thereafter have forty-five (45) days within which to exercise such option by written notice. Closing shall be held at a time and place mutually agreeable to the parties not earlier than the thirtieth (30th) day after **Seller's** notice exercising the option, and at the closing **Buyer** shall convey, assign, and transfer all real property with good and marketable record title to **Seller** by full covenants and warranty deeds and as to other property by assignments, bills of sale and other documents that may be necessary, in form satisfactory to **Seller**, subject only to such liens and encumbrances as are specifically acceptable to such third party.

Any failure by **Seller** to exercise any such option in any one case shall not affect this option right in any other cases thereafter, whether involving the same assets, business or others. In the event of any such sale or disposition by **Buyer**, this contract shall continue in full force and legal effect unless canceled by **Seller** on ninety (90) days' (or such lesser period of notice as is reasonably practicable in the circumstances) written notice to **Buyer**; provided, however, that where the provisions of Paragraph XXII apply, the provisions of Paragraph XXII shall control.

Sales or other dispositions by **Buyer** to any member or members of his or their immediate family or families or the immediate family or families of any stockholder or stockholders of **Buyer** shall be exempt from the aforesaid option provisions; provided, that this contract, including these option provisions, shall continue in full force and legal effect unless canceled by **Seller** on ninety (90) days' written notice (or such lesser period of notice as is reasonably practicable in the circumstances) to **Buyer**; and, further provided, that any such transaction is not merely a means or device to sell or dispose of the business or asset or assets to a third party outside of any such immediate family.

In the event **Seller** shall purchase or acquire any business or any other asset or assets in any exercise of the above option, **Buyer** agrees that for the protection of the goodwill so acquired by **Seller** in such transaction that neither **Buyer** nor any parties owning **Buyer** will engage either directly or indirectly in any business competing with **Seller** insofar as the said **Buyer** or parties owning it will sell or otherwise deal with any customer of **Buyer** at the time of such transaction in a manner competitive with **Seller's** distribution of products covered by this contract for a period of five (5) years from and after the date of such transaction, without the written consent of **Seller**.

**XX. — Deliveries for Seller:** From time to time **Seller** may request **Buyer** to make deliveries from **Buyer's** inventories of products purchased under this contract to customers sold directly by **Seller**. If **Buyer** elects to make any such delivery, **Seller** shall pay **Buyer** a handling fee mutually agreed upon. **Buyer** shall invoice **Seller** for the quantities of product delivered, at the price in effect on the date **Buyer** makes delivery for **Seller** for the respective product, plus the handling fee.

**XXI. — Notices:** All notices given under this contract shall be deemed to be properly served if delivered in writing personally or sent by certified

mail to **Buyer** at ___Route #1, Potosi, MO  63664_____

or to **Seller** at___200 E. Randolph, Chicago, ILL    60606_____

_____. Date of service of a notice served by mail shall be the postmark date.

**XXII. — Assignment: Buyer** shall not assign this contract (voluntarily or by operation of law or otherwise) without **Seller's** prior written consent; provided, however, **Seller** shall not unreasonably withhold its consent, and further provided, that in giving any consent to any assignment (voluntary or by operation of law or otherwise) , **Seller** may, at its election, condition the consent upon the agreement of the proposed assignee or transferee to: (1) enter into a Trial Franchise in conformity to the provisions of the Petroleum Marketing Practices Act; and (2) simultaneously therewith, enter into a Mutual Cancellation of this Jobber Contract. Refusal of the proposed assignee or transferee to enter into such Trial Franchise and Mutual Cancellation shall conclusively be adequate reason for **Seller** to withhold its consent to the assignment. In situations where clause 3 of the third subparagraph of Paragraph XVI is or might be applicable, the provisions of that clause shall govern and shall supersede the provisions hereinabove contained in this Paragraph XXII.

**XXIII. — Petroleum Marketing Practices Act:** Except as herein specifically modified or restricted in writing, each party hereby expressly reserves all rights under the Petroleum Marketing Practices Act (15 U.S.C. 2801), said rights being hereby incorporated herein by reference and made a part hereof, subject to any interpretations and implementations of said rights which may be contained in this contract. No omission of any reference herein to any such specific right shall constitute a waiver thereof.

**XXIV. — Franchise Relationship:** This Jobber Contract shall be construed together with all other related written agreements between the parties to determine the nature, of scope, of and rights of the parties under any franchise relationship created by the Petroleum Marketing Practices Act or other applicable federal, state or local act of similar nature. In the event of any termination or non-renewal of this Jobber Contract, said franchise relationship and all of said other agreements shall automatically terminate simultaneously herewith.

If **Buyer** for any reason whatsoever shall totally or substantially discontinue the sale of **Seller's** trade-marked motor fuels, any franchise relationship between **Seller** and **Buyer** created by this Jobber Contract shall automatically terminate without further act or notice by either party. All agreements related to the terminated franchise relationship, including this Jobber Contract, shall be subject to termination in accordance with their respective provisions.

**XXV. — Entire Agreement:** This contract cancels and supersedes all prior written and unwritten agreements and understandings between the parties pertaining to the matters covered in this contract, and contains the entire agreement between the parties. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this contract. No modification or waiver of, addition to, or deletion from, the terms of this contract shall be effective unless reduced to writing and signed by **Buyer** and a representative of **Seller** authorized to execute this contract.

In **Witness Whereof,** the parties hereto have executed this agreement the day and year first above written.

_____ Witness

_____ Witness

**Buyer:**

Name: _Newcomer Service Co_

By _H.B. Newcomer_

Title _Pres._

**Amoco Oil Company**

By _England_

Title _District Mgr._

# EXHIBIT B



Amoco Oil Company

**Jobber Contract**
Form 26-930 (2-83)

This **Contract**, dated the ___5th___ day of ___April___, 19_84_, between **Amoco Oil Company**, a Maryland corporation, with General

Offices at 200 E. Randolph Drive, Chicago, Illinois 60601, hereafter called "**Seller**", and ___Homer Newcomer___

___d/b/a Newcomer Service Co.___

of___Potosi, Missouri___
jointly and severally, if more than one, hereinafter called "**Buyer**".

**Witnesseth:**

**I.—Products and Quantities: Seller** agrees to sell, and **Buyer** agrees to purchase and receive from **Seller**, the products specified below, subject to the respective minimum and maximum quantities stated in the attached Schedule A.

#### Products Specifically Covered By This Contract Are Indicated By X

**A. Gasolines**

- ____ Amoco Premium Lead-Free/ Amoco Super Lead-Free
- ____ Amoco Regular (Leaded)
- ____ Amoco (Lead-Free)
- ____ American Aviation/ Amosol Naphtha
- ____ _____
- ____ _____

**B. Distillates**

- ____ Amoco Kerosene
- ____ Amoco No. 1 Fuel Oil/ Amoco No. 1 Diesel Fuel
- ____ Amoco No. 2 Fuel Oil/ Amoco No. 2 Diesel Fuel
- ____ Amoco Premier Diesel Fuel
- ____ _____

**C. Motor Oils and Lubricants**

- ____ Motor Oils
- ____ Industrial Oils
- ____ Waxes/Petrolatums
- ____ Greases/Gear Oils
- ____ _____

**D. TBA**

- ____ Tires
- ____ Tubes
- ____ Batteries
- ____ Accessories
- ____ TBA Tools & Equipment
- ____ Antifreeze
- ____ _____

**II.—Term:** The term covered by this contract shall be for a period beginning on___April 5___, 19_84_, and ending on

___April 4___, 19_87_.

**III.—Prices:**

**A.—Gasolines and Distillates**—The price per gallon which **Buyer** shall pay for products sold hereunder shall be **Seller's** Established Price for **Buyer's** class of trade as recorded at **Seller's** Regional Office in effect on date of shipment for the respective product at the following terminal(s):

All products covered herein shall be sold and delivered to **Buyer** and title thereto shall pass to **Buyer** f.o.b. said terminal(s).

**Seller** may at its option deliver to **Buyer** such products as **Seller** may elect, into truck transports arranged for by **Buyer** at the terminal. In such event, title shall pass to **Buyer** upon delivery into transport equipment arranged for by **Buyer**, and **Buyer** shall assume full responsibility for such products at such time.

**B.—Motor Oils, and Lubricants** —The prices which **Buyer** shall pay for products purchased hereunder shall be the prices specified in **Seller's** price list(s) for **Buyer's** class of trade in effect on date a written order shall be received by **Seller** at its order receiving location(s) specified to **Buyer** from time to time. With certain exceptions, all products shall be sold and delivered to **Buyer**, and title thereto shall pass to **Buyer**, f.o.b. **Buyer's** bulk plant(s). Title to those certain products sold f.o.b. shipping point(s) and title to all other products if and when delivered into **Buyer's** transportation equipment at shipping point, at **Seller's** option, shall pass to **Buyer** f.o.b. **Seller's** shipping point, in which event, if product is billed on a delivered basis, **Seller** shall allow **Buyer** an amount equivalent to the lesser of: (i) the lowest legal freight rate for full truckload pick-up then in effect, or (ii) such amount as **Seller** may establish, at its option, from time to time. The allowance shall apply to each item so carried by **Buyer** to **Buyer's** bulk plant(s) or to **Buyer's** actual point of unloading. In order that **Seller** may grant **Buyer** the correct freight allowance, **Buyer** shall certify to **Seller** the actual point of unloading if it is different than **Buyer's** bulk plant(s). In no event shall any allowance exceed the allowance which would have been given for carriage to **Buyer's** applicable bulk plant. As an alternative to (i) and (ii) **Seller**, at its option, may price to **Buyer** on all such deliveries at a uniform price, f.o.b. the applicable shipping point, available to all customers in **Buyer's** class of trade at such shipping point on a nondiscriminatory basis.

**C.—TBA and Antifreeze**—The prices which **Buyer** shall pay for products purchased hereunder shall be the prices specified in **Seller's** price list(s) for **Buyer's** class of trade in effect on date **Buyer's** order shall be received by **Seller** at its order department. All products shall be sold and delivered to **Buyer**, and title thereto shall pass to **Buyer**, f.o.b. **Buyer's** bulk plant(s). All prices shall include delivery to said bulk plant(s), with the exception that freight will be charged in certain instances, as stated in **Seller's** said price list(s). Title to any products delivered into **Buyer's** transportation equipment at shipping point, at **Seller's** option, shall pass to **Buyer** f.o.b. **Seller's** shipping point, in which event a freight rate allowance based on full truckload pick-up shall be credited to **Buyer** (or **Buyer**, at **Seller's** election, shall be charged an f.o.b. shipping point price) on the terms and conditions set forth in Paragraph III(B) above.

**IV.—Determination Of Quantities:** The quantities of gasolines and distillates as referred to in Paragraph I-A and B delivered to **Buyer** shall be determined on the basis of the temperature thereof at sixty degrees Fahrenheit (60°F) in accordance with the latest applicable ASTM-IP Petroleum Measurement Tables, American Edition, U.S. Units of Measurement, or on a shell capacity (gross) basis, as determined by **Seller** for **Buyer's** class of trade in the applicable geographic area.

**V.—Taxes:** Any tax, excise (manufacturer's or otherwise), inspection fee, duty (import or export), license fee (import or export), tonnage charge, assessment, or other like charge which is levied, assessed or imposed by federal, state or local authority upon the products and/or transactions contemplated hereunder (including the delivery, sale, use or consumption of the products or privilege of doing any of same), and/or which is imposed on or measured by the price of the products or the proceeds of sale hereunder, shall be added to **Seller's** price or prices set forth herein and shall be paid by **Buyer**, unless said price or prices specifically state that they include any such charge or charges.

**VI.—Credit Terms:** Credit terms shall be as recorded at Amoco's Regional Office referred to above, as same are applicable to **Buyer's** class of trade for the respective product and delivery point on date of delivery. **Seller** reserves the right to change such credit terms at any time, either for the class of trade generally or, with cause, for **Buyer** alone, and **Seller** shall have the right at any time to demand cash payment on or before delivery. Failure of **Buyer** to make payment according to authorized credit terms or to supply requested credit information or credit-related documents shall entitle **Seller** to suspend deliveries and/or to terminate this Agreement, at **Seller's** option.

**Seller** shall have the right, at its election, to assess finance charges on all amounts not paid by **Buyer** on the net due date. They shall be assessed at the monthly periodic rate applicable to **Buyer's** class of trade for the respective product which is recorded at time of assessment at **Seller's** Administrative Center.

**Seller** shall have the right to impose a reasonable charge against **Buyer**, in conformity with its policy for **Buyer's** class of trade in **Buyer's** area, for each check, if any, which may be returned to **Seller** for Nonsufficient Funds and which may subsequently be made good by **Buyer**. The issuance by **Buyer** of any check which shall be dishonored for Nonsufficient Funds shall be deemed a failure by **Buyer** to make payment, when due, according to authorized credit terms and shall entitle **Seller**, at **Seller's** election, to suspend deliveries and/or terminate this Contract.

In no instance shall taxes, inspection fees and the like qualify for terms of sale discounts.

**VII.—Trademarks And Trade Names:** Buyer may use **Seller's** trade names, trademarks, brand names, and color scheme ("**Seller's Marks**") only in connection with the advertising, distribution, and sale of products supplied by **Seller** under said respective **Seller's Marks**.

**Buyer** shall not use **Seller's Marks** in connection with the advertising, distribution, or sale of: (1) any mixture, blend, dilution or adulteration of a product supplied by **Seller**; (2) products not sold in **Seller's** original packages and containers or not sold in packages, containers, or through equipment approved by **Seller**; or (3) any product not supplied by **Seller**. **Seller** shall have the right at all times to inspect products and records in the possession or control of **Buyer** and/or **Buyer's** service station customers to determine compliance with these provisions and quality standards.

**Buyer** shall comply with **Seller's** "Policy and Jobber and Dealer Guidelines for Proper Handling of Non-AMOCO Branded Motor Fuels" in the event other suppliers' motor fuels are purchased and resold by **Buyer** in addition to **Seller's** branded motor fuels hereunder. **Buyer** shall have the right to make written request for a copy of said "Policy and Jobber and Dealer Guidelines for Proper Handling of Non-AMOCO Branded Motor Fuels" during the life of this Contract, and **Seller** shall promptly honor such request. **Seller** reserves the right to amend said policy and guidelines, at its option, from time to time.

**Buyer** shall use **Seller's Marks** only in accordance with **Seller's** approved "Trademark Guide" and other specifications and procedures, which **Seller** may change at any time. Neither **Buyer** nor any subsidiary or affiliate of **Buyer**, or agent or representative thereof, shall use **Seller's Marks** as part of a corporate or trade name or as part of **Buyer's** own trademarks.

If **Buyer** wishes to use **Seller's** Torch and Oval trademark in conjunction with **Seller's** name on transport and dispensing equipment, forms, advertising materials, and the like, **Buyer** may do so only if the word "Jobber," or "Distributor," appears above the trademark and the word "Products" appears below it so as to read: "Jobber (or Distributor) AMOCO (or STANDARD) Products."

It is agreed between the parties that all signs and trademark identifications bearing **Seller's Marks** which are employed by **Buyer** in the performance of **Buyer's** responsibilities hereunder, and more particularly under Paragraph XVIII hereof, shall be covered by a Sign Loan Agreement, Form 26-979, a Sign Rental Agreement, Form 26-980, or a Trademark Agreement, Form 26-981, whichever is applicable. **Buyer** is aware of the provisions of such agreements, and the parties hereby incorporate by reference herein the provisions of the applicable said Agreement as to any sign or trademark identification not specifically covered by such an Agreement.

Upon the expiration or termination of this Contract, for any reason whatsoever, **Buyer** shall immediately cease using **Seller's Marks** and any confusingly similar marks and shall return to **Seller** all signs and trademark identifications loaned or leased by **Seller** to **Buyer**, in accordance with the provisions of the applicable Sign Loan Agreement, Form 26-979, or Sign Rental Agreement, Form 26-980, and, at **Seller's** option, shall sell to **Seller** all signs, building letters, decals, posters, displays and other promotional and advertising materials owned by **Buyer** which bear or display any of **Seller's Marks**, in conformity to the provisions of the applicable Trademark Agreement, Form 26-981, between **Buyer** and **Seller**. If **Buyer** fails to discontinue or cause to be discontinued any and all use and display of **Seller's Marks** after such expiration or termination, **Seller** is hereby expressly given the right to enter upon the premises where **Seller's Marks** are being used or displayed and remove all or any part of any signs, building letters, decals, posters, displays and other materials bearing or displaying **Seller's Marks** or obliterate **Seller's Marks**, at **Buyer's** expense and using such means as **Seller** may deem desirable, without any liability or obligation to **Buyer**.

**VIII.—Force Majeure: Seller** shall be excused for delay or nonperformance if **Seller** is unable to meet the demand for its products at **Seller's** normal and usual source points for supplying **Buyer** (regardless of whether or not **Seller** may have been forced to divert certain supplies from such source points in order to alleviate shortages at other distribution points), or in the event of failure or delay in delivery due to exhaustion, reduction or unavailability of product or stock or component necessary in the manufacture or production of such product. Either party shall be excused from delay or nonperformance in the event of any condition whatsoever beyond said party's reasonable control, including, without limitation: unavailability, failure, or delay of transportation; Acts of God; labor difficulties; fire; riots; war conditions in this or any other country; and compliance with any governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary) affecting directly or indirectly said party's ability to perform hereunder.

In the event of any of the contingencies or conditions referred to in the preceding subparagraph, **Seller** shall have the right to curtail deliveries or allocate its supply of product for sale among all of its customers in any manner which in its sole discretion is fair and reasonable in the circumstances, and **Buyer** shall not hold **Seller** responsibile in any manner for any losses or damages which **Buyer** may claim as a result of any such failure, curtailment or allocation by **Seller**. **Seller** shall not be required to make up any product not so delivered.

**IX.—Discontinuance of Product or Facilities: Seller**, at its sole option exercised for good faith business reasons, at any time may: (1) discontinue the production or sale of any product covered hereby; (2) change the specifications of any such product; (3) change or withdraw the trademark applicable to any such product; (4) change or withdraw services and facilities offered in connection with any such product, including credit card privileges; (5) withdraw from the marketing of any such product in the geographic area of **Buyer's** primary marketing responsibility referred to in Paragraph XVIII hereof and/or in which **Buyer's** bulk plants referred to in Paragraph III hereof are located; and/or the like. **Seller** shall not be liable to **Buyer** by reason of any such discontinuance, change or withdrawal.

**X.—Demurrage: Buyer** shall pay any and all demurrage accruing on any barges, tank cars, truck transports or other means of transportation at the prevailing rates therefor, at the time of the particular delay. **Buyer** shall also pay to **Seller** a tank car and/or truck transport rental at **Seller's** then prevailing rates per day for each chargeable demurrage day.

**XI.—Compliance With Laws: Buyer** shall comply fully with all applicable laws and regulations of any governmental authority and with all safety and quality control directives of **Seller** regarding the receipt, handling, storage, dispensing, packaging, labeling, applying, advertising and promotion of the products purchased hereunder. Without limiting the foregoing, **Buyer** shall comply and require **Buyer's** dealers and customers to comply with all requirements of occupational, health and safety agencies and of environmental protection agencies concerning the receipt, storage and dispensing of motor fuels, the disposal of waste materials, and other activities, including particularly those governing recovery of vapors, segregated storage for unleaded gasolines, nozzle sizes for unleaded gasolines, and the like. **Buyer** shall indemnify **Seller** and save **Seller** harmless from any and all penalties, losses or liabilities of every nature whatsoever resulting from **Buyer's** failure to do so.

**XII.—Lead-Free Products: Buyer** shall comply at all times with **Seller's** established procedures for controlling the quality of **Seller's** branded lead-free products. **Buyer** shall indemnify **Seller** against any penalty, loss or liability of any nature whatsoever resulting from failure of **Buyer** or those to whom **Buyer** resells to maintain lead-free specifications of **Seller's** lead-free products.

**XIII.—Containers:** All containers on which **Seller** charges a deposit shall remain **Seller's** property, shall be used only for the original contents, and shall be returned promptly in their delivered condition, less ordinary wear, to **Seller's** terminal or warehouse, as **Seller** may direct, freight collect. Deposit charges are payable, without discount, when payment for contents is due and shall be refunded or credit memorandum issued when said containers are returned.

**XIV.—Rejection and Notice of Breach: Buyer** shall have 48 hours after receipt of goods to inspect and either accept or reject them. If **Buyer** retains the goods in his possession for a period in excess of 48 hours after delivery of them to him without rejecting them, this shall be regarded as an irrevocable acceptance by him of the goods. If the goods are rejected, notice must be given to **Seller** so that it will arrive no later than five business days after delivery of the goods to **Buyer**, fully specifying all claimed shortages, defects and/or nonconformities. The failure to specify any shortage, defect or nonconformity shall constitute a waiver of that defect or nonconformity.

In the event that **Buyer** accepts the goods, **Buyer** must notify **Seller** in writing of any subsequently discovered breach of warranty which could not reasonably have been discovered at the time of delivery by careful inspection. Such notice shall be given within seven days after discovery of the breach. The notice of the breach must specify the facts constituting the alleged breach of warranty. Failure to give such notice shall be deemed conclusive evidence that there is no valid claim for breach of warranty.

**XV.—Deliveries:** Unless otherwise specified on the Schedules and Riders attached hereto, deliveries of each product hereunder shall be in relatively equal monthly quantities. **Seller** shall not be obligated to deliver in any given month more than one-twelfth (1/12) of the respective 12-month quantity for such products, or, if Schedule A should set forth quantities of product on a quarterly basis, one-third (1/3) of the respective quarterly quantity (with a comparable proration if Schedule A should set forth quantities on a seasonal basis). Should **Buyer** at any time or for any month order in quantities less than such prorated figure, **Seller** shall not be obligated to deliver the deficiency at any time. Should **Buyer** at any time or for any month require more than said prorated figure, **Seller** shall have the right, at its option, to supply such excess requirement, but if **Seller** supplies same it shall not be obligated to do so again in the future.

**Seller** shall have the right to specify minimum delivery quantities and either to refuse to make small deliveries or to charge extra for so doing.

**Seller** shall have the right at any time or times to change terminal assignments for serving **Buyer** hereunder, based on transportation costs, weather conditions, local inventory conditions, and the like.

**XVI.—Default:** In the event of any breach of any provision of this Contract by either party or in the event of any failure of either party to exert good faith efforts to carry out the provisions hereof, the other party, at its option, may terminate this Contract on 90 days' prior written notice setting forth the nature of the default. In circumstances where 90 days' notice is unreasonable, the notice shall be given on the earliest date which is reasonably practicable. With respect to the first such default only for which such a notice is given, the notice shall become ineffective to terminate this Contract if the other party shall cure the default within 15 days after the date of service of the notice, as determined under Paragraph XXI hereof.

The above remedy shall be without prejudice to all other remedies of the aggrieved party, at law or in equity. Specific performance of this Contract shall be an appropriate remedy for any breach.

For purposes of emphasis and elaboration, and without limitation, it is specifically understood that the following shall constitute a breach or lack of good faith for purposes of the foregoing: (1) failure of **Buyer** to purchase the applicable minimum quantity of any product during any prorated period, as set forth on Schedule A; (2) failure of **Buyer** to pay any sum to **Seller** hereunder when due; (3) breach by **Buyer** of a material provision of a contract between the parties related hereto or to the franchise covered hereby; (4) death of **Buyer** or of an officer or employee of **Buyer** having an active role in the management of any corporate entity designated as **Buyer**; (5) physical or mental incapacity of **Buyer** or of an officer or employee of **Buyer** having an active role in the management of any corporate entity designated as **Buyer**; (6) filing of voluntary or involuntary bankruptcy proceedings against **Buyer** or determination of insolvency of **Buyer**; and/or (7) fraud or criminal misconduct of **Buyer** relevant to **Buyer's** operations hereunder, specifically under Paragraph XVIII hereof.

Paragraph XXIV hereinbelow provides for termination on thirty (30) days' notice, or a lesser period of notice where reasonable, in the circumstances therein referred to. There shall be no right to prevent a termination under Paragraph XXIV from being effective.

No waiver by either party of any default or defaults, and no course of dealing, shall affect said party's rights with respect to any subsequent default. All rights and remedies of either party are cumulative. Any termination of this Contract shall be without prejudice to the accrued rights of the terminating party hereunder.

**XVII.—Indemnity: Buyer** shall indemnify and save **Seller**, its agents and employees, harmless from and against all claims, demands, liabilities, suits or actions (including all reasonable expenses and attorney's fees incurred by or imposed on **Seller** in connection therewith) arising out of or in connection with **Buyer's** performance of this contract or the shipment, delivery, storage, handling, use or sale of the products covered by this contract or the use by **Buyer** of any of **Seller's** property, either real or personal, whether caused by a negligent act or omission of either party hereto, their agents, contractors or employees, or whether caused by the negligent acts or omissions of the customers or business associates of **Buyer**, except that **Buyer** assumes no liability for the sole negligent acts of the **Seller**.

**Buyer** shall indemnify and hold **Seller** harmless from all social security taxes, disability benefit taxes and similar payroll taxes and all tax withholdings that may be applicable to **Buyer** or its agents and employees.

**XVIII.—Marketing Efforts: Buyer** shall use its best efforts to promote and sell the products covered by this contract within the area of primary marketing responsibility described in Schedule B. In addition to the rights contained in Paragraph XVI hereof, in the event that **Buyer** fails to do so, **Seller** reserves the right to make other provisions for the marketing of its products within such area. Nothing contained in this contract shall preclude **Buyer** from selling or soliciting the sale of the products covered by this contract outside such area or confer upon **Buyer** exclusive marketing rights for any such product within such area.

**Buyer** warrants and represents that in **Buyer's** activities relating to this Jobber Contract **Buyer** will: (1) operate one or more bulk storage plants for the products purchased hereunder where necessary to efficiently serve customers in **Buyer's** area of primary marketing responsibility; (2) operate a sufficient number of tank trucks to efficiently serve those customers; and (3) otherwise efficiently perform the functions of a bona fide jobber of **Seller's** products.

**XIX.—Option: Buyer** shall not sell, lease or otherwise dispose of **Buyer's** business as related to this contract, or any major segment thereof (such as the distillate segment or the gasoline segment), or all of its real or personal property used in connection therewith or any bulk plant or terminal used therein without first giving **Seller** an option to purchase or otherwise acquire the same on the same terms and conditions as those the **Buyer** is willing to enter into with any other party. **Buyer** shall promptly submit to **Seller** the complete terms and conditions of any bona fide offer received from or made to any third party which is acceptable to **Buyer**, and **Seller** shall thereafter have forty-five (45) days within which to exercise said option by written notice. Closing shall be held at a time and place mutually agreeable to the parties not earlier than the thirtieth (30th) day after **Seller's** notice exercising the option, and at the closing **Buyer** shall convey, assign, and transfer all real property with good and marketable record title to **Seller** by full covenants and warranty deeds and as to other property by assignments, bills of sale and other documents that may be necessary, in form satisfactory to **Seller**, subject only to such liens and encumbrances as are specifically acceptable to such third party.

Any failure by **Seller** to exercise any such option in any one case shall not affect this option right in any other cases thereafter, whether involving the same assets, business or others. In the event of any such sale or disposition by **Buyer**, this contract shall continue in full force and legal effect unless canceled by **Seller** on ninety (90) days' (or such lesser period of notice as is reasonably practicable in the circumstances) written notice to **Buyer**; provided, however, that where the provisions of Paragraph XXII apply, the provisions of Paragraph XXII shall control.

Sales or other dispositions by **Buyer** to any member or members of his or their immediate family or families or the immediate family or families of any stockholder or stockholders of **Buyer** shall be exempt from the aforesaid option provisions; provided, that this contract, including these option provisions, shall continue in full force and legal effect unless canceled by **Seller** on ninety (90) days' written notice (or such lesser period of notice as is reasonably practicable in the circumstances) to **Buyer**; and, further provided, that any such transaction is not merely a means or device to sell or dispose of the business or asset or assets to a third party outside of any such immediate family.

In the event **Seller** shall purchase or acquire any business or any other asset or assets in any exercise of the above option, **Buyer** agrees that for the protection of the goodwill so acquired by **Seller** in such transaction that neither **Buyer** nor any parties owning **Buyer** will engage either directly or indirectly in any business competing with **Seller** insofar as the said **Buyer** or parties owning it will sell or otherwise deal with any customer of **Buyer** at the time of such transaction in a manner competitive with **Seller's** distribution of products covered by this contract for a period of five (5) years from and after the date of such transaction, without the written consent of **Seller**.

**XX.—Deliveries for Seller:** From time to time **Seller may request Buyer** to make deliveries from **Buyer's** inventories of products purchased under this contract to customers sold directly by **Seller**. If **Buyer** elects to make any such delivery, **Seller** shall pay **Buyer** a handling fee mutually agreed upon. **Buyer** shall invoice **Seller** for the quantities of product delivered, at the price in effect on the date **Buyer** makes delivery for **Seller** for the respective product, plus the handling fee.

**XXI.—Notices:** All notices given under this contract shall be deemed to be properly served if delivered in writing personally or sent by

certified mail to **Buyer** at ____Route #1; Potosi, Missouri  63664_____

or to **Seller** at____2211 York Road; Oak Brook, Illinois  60521_____

_____. Date of service of a notice served by mail shall be the postmark date.

**XXII.—Assignment: Buyer** shall not assign this contract (voluntarily or by operation of law or otherwise) without **Seller's** prior written consent; provided, however, **Seller** shall not unreasonably withhold its consent, and further provided, that in giving any consent to any assignment (voluntary or by operation of law or otherwise), **Seller** may, at its election, condition the consent upon the agreement of the proposed assignee or transferee to: (1) enter into a Trial Franchise in conformity to the provisions of the Petroleum Marketing Practices Act; and (2) simultaneously therewith, enter into a Mutual Cancellation of this Jobber Contract. Refusal of the proposed assignee or transferee to enter into such Trial Franchise and Mutual Cancellation shall conclusively be adequate reason for **Seller** to withhold its consent to the assignment. In situations where clause 3 of the third subparagraph of Paragraph XVI is or might be applicable, the provisions of that clause shall govern and shall supersede the provisions hereinabove contained in this Paragraph XXII.

**XXIII.—Petroleum Marketing Practices Act:** Except as herein specifically modified or restricted in writing, each party hereby expressly reserves all rights under the Petroleum Marketing Practices Act (15 U.S.C. 2801), said rights being hereby incorporated herein by reference and made a part hereof, subject to any interpretations and implementations of said rights which may be contained in this contract. No omission of any reference herein to any such specific right shall constitute a waiver thereof.

**XXIV.—Franchise Relations:** In the event of any termination or nonrenewal of this Jobber Contract, any franchise relationship created by the Petroleum Marketing Practices Act or other applicable federal, state or local act of similar nature and all other agreements significantly related to or affected by this Jobber Contract (except those relating to outstanding financial obligations of either party to the other or pertaining to commitments to buy land, vehicles, equipment, and the like), shall automatically terminate simultaneously herewith.

If **Buyer** for any reason whatsoever shall totally or substantially discontinue the sale of **Seller's** trademarked motor fuels, this Jobber Contract shall be subject to termination by either party on thirty (30) days' written notice or on such lesser length of written notice as may be reasonable in the circumstances. **Buyer** shall have no right to prevent the termination from being effective by resuming the sale of **Seller's** trademark motor fuels.

**XXV.—Entire Agreement:** This contract cancels and supersedes all prior written and unwritten agreements and understandings between the parties pertaining to the matters covered in this contract, and contains the entire agreement between the parties. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this contract. No modification or waiver of, addition to, or deletion from the terms of this contract shall be effective unless reduced to writing and signed by **Buyer** and a representative of **Seller** authorized to execute this contract.

**In Witness Whereof**, the parties hereto have executed this agreement the day and year first above written.

_____ Witness

_____ Witness
Bill Foster Jr.

**Buyer:**
Name: _Newcomer Serv. Co_
By _H. B. Newcomer_
Title _Pres_

**Amoco Oil Company**
By _N. G. England_
Title _Dist Mgr_

# EXHIBIT C



**Amoco Oil Company**

**Jobber Contract**
26-930-GD (5-86)

This Contract, dated the _9th_ day of _DEC_, 19 _86_, between Amoco Oil Company, a Maryland corporation, with General

Offices at 200 E. Randolph Drive, Chicago, Illinois 60601, "Seller", and _Homer Newcomer dba Newcomer Service Co. Inc._

_____

of _____ Potosi, Missouri _____

jointly and severally, if more than one, "Buyer".

Witnesseth:

**I.—Products and Quantities:** Seller agrees to sell, and Buyer agrees to purchase and receive from Seller, the products specified below, subject to the respective minimum and maximum quantities stated in the attached Schedule A.

**Products Specifically Covered By This Contract Are Indicated By "X":**

**A.   Gasolines**

- _X_  Amoco Premium Lead-Free/ Amoco Super Lead-Free
- _X_  Amoco Regular (Leaded)
- _X_  Amoco (Lead-Free)
- ____  American Aviation/ Amosol Naphtha
- ____  _____
- ____  _____

**B.   Distillates**

- ____  Amoco Jet Fuel (Type A)
- _X_  Amoco Kerosene
- _X_  Amoco No. 1 Fuel Oil/ Amoco No. 1 Diesel Fuel
- _X_  Amoco No. 2 Fuel Oil/ Amoco No. 2 Diesel Fuel
- _X_  Amoco Premier Diesel Fuel

**II.—Term:** The term covered by this contract shall be for a period beginning on _April 1_____, 19_87___, and ending on

_____March 31____, 19__90__, unless terminated pursuant to the provisions hereof.

**III.—Prices:** The price per gallon which Buyer shall pay for each gasoline and distillate product sold hereunder shall be Seller's Established Price for the respective product for Buyer's class of trade, as recorded at Seller's General Office, in effect on date of shipment for each of Buyer's assigned terminal(s). On the date of this Contract, Buyer's assigned terminal(s) are as follows:

_WOODRIVER    &    CAPE GIRARDEAU_

_____

_____

All gasoline and distillate products sold hereunder shall be sold to Buyer and title and risk of loss thereto shall pass to Buyer f.o.b. Buyer's assigned terminal(s).

Seller may at its option deliver to Buyer such products as Seller may elect, into truck transports arranged for by Buyer at the terminal. In such event, title and risk of loss shall pass to Buyer upon delivery into transport equipment arranged for by Buyer, and Buyer shall assume full responsibility for such products at such time.

**IV.—Determination Of Quantities:** The quantities of products sold hereunder shall be determined on the basis of the temperature thereof at 60°F in accordance with "Table No. 6B of API Standard 2540, Manual of Petroleum Measurement Standards, Chapter 11.1—Volume Correction Factors – Volume II" for any API/ASTM reissue or replacement thereof in effect at the time of measurement), or at Seller's option, on the basis of gross volume, as established by Seller for Buyer's class of trade in the applicable geographic area, or as otherwise required by law.

**V.—Taxes:** Buyer agrees to assume and pay any tax, excise (manufacturer's or otherwise), inspection fee, duty (import or export), license fee (import or export), tonnage charge, assessment or other like charge which is levied, assessed or imposed by federal, state or local authority upon the products and/or transactions contemplated hereunder (including the delivery, sale, use or consumption of the products or privilege of doing any of same), and/or which is imposed on or measured by the price of the products or the proceeds of sale hereunder.

**VI.—Credit Terms:** Credit terms shall be as recorded at Seller's General Office referred to above, as same are applicable to Buyer's class of trade for the respective product and delivery point on date of delivery. Seller reserves the right to change such credit terms at any time, either for the class of trade generally or for Buyer alone, and Seller shall have the right at any time to demand cash payment on or before delivery. Failure of Buyer to make payment according to authorized credit terms, including the giving of any N.S.F. check, or to supply requested credit information or credit-related documents shall entitle Seller to suspend deliveries, impose C.O.D. terms, enforce vendor's liens and/or terminate this Contract, in addition to exercising any other rights it may have under this Contract or at law or in equity.

In no instance shall taxes, inspection fees and the like qualify for terms of sale discounts.

Seller shall have the right, at its election, to assess finance charges on all amounts not paid by Buyer on the net due date. They shall be assessed at the monthly periodic rate applicable to Buyer's class of trade for the respective product which is recorded at time of assessment at Seller's Administrative Center.

Seller shall have the right to impose a service charge against Buyer, in conformity with its policy for Buyer's class of trade in Buyer's area, for each check, if any, which is dishonored for Nonsufficient Funds whether or not subsequently made good by Buyer. The issuance by Buyer of any check which is dishonored for Nonsufficient Funds shall be deemed a failure by Buyer to make payment, when due, according to authorized credit terms and shall entitle Seller, at Seller's election, to terminate this Contract.

VII.—Trademarks and Trade Names: Buyer may use Seller's trade names, trademarks, brand names, and color scheme ("Seller's Marks") only in connection with the advertising, distribution, and sale of products supplied by Seller under said respective Seller's Marks, and in accordance with the standards, procedures and requirements issued by Seller from time to time.

Buyer shall not use Seller's Marks in connection with the advertising, distribution, or sale of: (1) any mixture, blend, dilution or adulteration of a product supplied by Seller; (2) products not sold in Seller's original packages and containers or not sold in packages, containers, or through equipment approved by Seller; or (3) any product not supplied by Seller. Seller shall have the right at all times to inspect products and records in the possession or control of Buyer and/or Buyer's service station dealers to determine compliance with these provisions and quality standards.

Buyer shall comply with Seller's "Policy and Jobber and Dealer Guidelines for Proper Handling of Non-AMOCO Branded Motor Fuels"in the event other suppliers' motor fuels are purchased and resold by Buyer in addition to Seller's branded motor fuels hereunder. Buyer shall have the right to make written request for a copy of said "Policy and Jobber and Dealer Guidelines for Proper Handling of Non-AMOCO Branded Motor Fuels" during the term of this Contract, and Seller shall promptly honor such request. Seller reserves the right to amend said policy and guidelines, at its option, from time to time.

Buyer shall use Seller's Marks only in accordance with Seller's approved trademark guidelines and other specifications and procedures, including Seller's policies and guidelines for the maintenance, appearance and cleanliness of service station premises upon which Seller's signs and trademarks are located, which policies and guidelines Seller may change at any time. Buyer shall not use Seller's Marks as part of a corporate or trade name or as part of Buyer's own trademarks.

If Buyer wishes to use Seller's Torch and Oval trademark in conjunction with Seller's name on transport and dispensing equipment, forms, advertising materials, and the like, Buyer may do so only if the word "Jobber," or "Distributor," appears above the trademark and the word "Products" appears below it so as to read: "Jobber (or Distributor) AMOCO (or STANDARD) Products."

It is agreed between the parties that all signs and trademark identifications bearing Seller's Marks which are employed by Buyer in the performance of Buyer's responsibilities hereunder, and more particularly under Paragraph XVIII hereof, shall be covered by a Sign Loan Agreement, Form 26-979, a Sign Rental Agreement, Form 26-980, or a Trademark Agreement, Form 26-981, as applicable. Buyer is aware of the provisions of such agreements, and the parties hereby incorporate by reference herein the provisions of the applicable said Agreement as to any sign or trademark identification bearing Seller's Marks not specifically covered by such an Agreement.

Upon the expiration or termination of this Contract for any reason whatsoever, Buyer shall immediately cease using Seller's Marks and any confusingly similar marks and shall return to Seller all signs and trademark identifications loaned or leased by Seller to Buyer, in accordance with the provisions of the applicable Sign Loan Agreement, Form 26-979, or Sign Rental Agreement, Form 26-980, and, at Seller's option, shall sell to Seller all signs, building letters, decals, posters, displays and other promotional and advertising materials owned by Buyer which bear or display any of Seller's Marks, in conformity to the provisions of the applicable Trademark Agreement, Form 26-981, between Buyer and Seller. If Buyer fails to discontinue or cause to be discontinued any and all use and display of Seller's Marks after such expiration or termination, Seller is hereby expressly given the irrevocable right to enter upon the premises where Seller's Marks are being used or displayed and remove all or any part of any signs, building letters, decals, posters, displays and other materials bearing or displaying Seller's Marks or obliterate Seller's Marks, at Buyer's expense and using such means as Seller may deem desirable, without any liability or obligation to Buyer.

VIII.—Force Majeure and Allocation: Seller shall be excused from delay or nonperformance if Seller is unable to meet the demand for its products at Seller's normal and usual distribution points for supplying Buyer (regardless of whether or not Seller may have diverted certain supplies from such distribution points in order to alleviate shortages at other distribution points), or in the event of failure or delay in delivery due to exhaustion, reduction or unavailability of product, or stock or component necessary in the manufacture or production of such product. Either party shall be excused from delay or nonperformance in the event of any condition whatsoever beyond said party's reasonable control, including, without limitation: unavailability, failure, or delay of transportation; Acts of God; labor difficulties; explosions; storms; breakdown of machinery or equipment; fire; riots; war conditions in this or any other country; and compliance with any law or governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary) affecting directly or indirectly said party's ability to perform hereunder.

In the event of any of the contingencies or conditions referred to in the preceding subparagraph, Seller shall have the right to curtail deliveries or allocate its supply of product for sale among its customers in any manner which in its sole discretion is fair and reasonable in the circumstances, and shall not be obligated to obtain or purchase other supplies of product or to in any way make up any product not delivered. Buyer shall not hold Seller responsible in any manner for any losses or damages which Buyer may claim as a result of any such curtailment or allocation by Seller.

IX.—Discontinuance of Product or Services: Seller, at its sole option, at any time may: (1) discontinue the production or sale of any product covered hereby; (2) change the specifications of any such product; (3) change or withdraw the trademark applicable to any such product; (4) change or withdraw services offered in connection with any such product, including, but not limited to, credit card privileges; and/or (5) withdraw from the marketing of any such product in the geographic area of Buyer's primary marketing responsibility referred to in Paragraph XVIII hereof and/or in which Buyer's bulk plants or any of Seller's terminals referred to in Paragraph III hereof are located. Seller shall not be liable to Buyer by reason of any such discontinuance, change or withdrawal.

X.—Demurrage: Buyer shall pay any and all demurrage accruing on any barges, tank cars, truck transports or other means of transportation at the prevailing rates therefor, at the time of the particular delay. Buyer shall also pay to Seller a tank car and/or truck transport rental at Seller's then prevailing rates per day for each chargeable demurrage day.

XI.—Compliance With Laws: Buyer shall comply fully with all applicable laws and regulations of any governmental authority and with all safety and quality control directives of Seller regarding the receipt, handling, storage, dispensing, packaging, labeling, applying, advertising and promotion of the products purchased hereunder. Without limiting the foregoing, Buyer shall comply and require Buyer's dealers and customers to comply with all requirements of occupational, health and safety agencies and of environmental protection agencies concerning the receipt, storage and dispensing of motor fuels, the disposal of waste materials, and other activities, including particularly those governing recovery of vapors, segregated storage for unleaded gasolines, nozzle sizes for unleaded gasolines, and the like. Buyer shall indemnify Seller and save Seller harmless from any and all penalties, losses or liabilities of every nature whatsoever resulting from Buyer's failure to comply with the above provisions of this Paragraph XI.

XII.—Lead-Free Products: Buyer shall comply at all times with Seller's established procedures for controlling the quality of Seller's branded lead-free products. Buyer shall indemnify Seller against any penalty, loss or liability of any nature whatsoever resulting from failure of Buyer or those to whom Buyer resells to maintain lead-free specifications of Seller's lead-free products.

XIII.—Rejection and Notice of Breach: Buyer shall have 48 hours after receipt of goods to inspect and either accept or reject them. If Buyer retains the goods in his possession for a period in excess of 48 hours after delivery of them to him without rejecting them, this shall be regarded as an irrevocable acceptance by Buyer of the goods. If the goods are rejected, notice must be given to Seller so that it is received by Seller no later than five business days after delivery of the goods to Buyer, fully specifying all claimed shortages, defects and/or nonconformities. The failure to specify any shortage, defect or nonconformity shall constitute a waiver of that defect or nonconformity.

In the event that Buyer accepts the goods, Buyer agrees to notify Seller in writing of any subsequently discovered breach of warranty which could not reasonably have been discovered by careful inspection at the time of delivery. Such notice shall be given within seven days after discovery of the breach. The notice of the breach must specify the facts constituting the alleged breach of warranty. Failure to give such notice shall be deemed conclusive evidence that there is no valid claim for breach of warranty.

**XIV.—Deliveries:** Unless otherwise specified on the Schedules and Riders attached hereto, deliveries of each product hereunder shall be in relatively equal monthly quantities. Seller shall not be obligated to deliver in any given month more a prorated amount equal to one-twelfth (1/12) of the respective 12-month maximum quantity for each such product as set forth on Schedule A, or, if Schedule A should set forth quantities of product on a quarterly basis, one-third (1/3) of the respective quarterly maximum quantity. Should Buyer at any time or for any month order in quantities less than such prorated amount, Seller shall not be obligated to deliver the deficiency at any time. Should Buyer at any time or for any month require more than said prorated amount, Seller shall have the right, at its option, to supply such excess requirement, but if Seller supplies same it shall not be obligated to do so again in the future.

Seller shall have the right to specify minimum delivery quantities and either to refuse to make deliveries in quantities less than such minimum or, at Seller's option, to charge extra for so doing.

Seller shall have the right at any time or times to change terminal assignments for serving Buyer hereunder.

**XV.—Default:** In the event of any breach of any provision of this Contract by either party or in the event of any failure of either party to exert good faith efforts to carry out the provisions hereof, the other party, at its option, may terminate this Contract on ninety (90) days' (or such lesser period of notice as is reasonable in the circumstances) written notice setting forth the nature of the default. This remedy shall be without prejudice to all other remedies of the aggrieved party, at law or in equity.

For purposes of emphasis and elaboration, and without limitation, it is specifically understood that the following shall constitute a breach or lack of good faith on the part of Buyer for purposes of the foregoing: (1) failure of Buyer to purchase the applicable minimum quantity of any product during any twelve-month period, as set forth in Schedule A, or, if Schedule A should set forth quantities on a quarterly basis, failure of Buyer to purchase the applicable minimum quantity during any quarter as set forth therein; (2) failure of Buyer to pay any sum to Seller when due; (3) breach by Buyer of a provision of any contract between the parties related hereto or to the franchise covered hereby; (4) death of Buyer or of the beneficial owner of stock of any corporate entity designated as Buyer, if such death shall result in the majority of stock of said corporate entity being owned by other than a) an owner or owners of record of said stock as of the date of this Contract, or by b) any member of the immediate family of said deceased owner (i.e. spouse, child, stepchild, parent, brother or sister) of at least 21 years of age who at the date of such death, has had an active role in the management of said corporate entity for a period of at least one year; (5) physical or mental incapacity of Buyer or an officer or employee of Buyer having an active role in the management of any corporate entity designated as Buyer; (6) filing of voluntary or involuntary insolvency, receivorship or bankruptcy proceedings against Buyer or the existence of other evidence of Buyer's financial distress; and/or (7) fraud or criminal misconduct of Buyer relevant to Buyer's operations hereunder.

No failure to act on an incident of breach, and no course of dealing shall be construed as the waiver of the right to act. No waiver by either party of any breach shall be deemed a waiver of any subsequent breach of the same or other nature. All rights and remedies of either party are cumulative. Any termination of this Contract shall be without prejudice to the accrued rights of the terminating party hereunder.

**XVI.—Indemnity:** Buyer shall indemnify and save Seller, its agents and employees, harmless from and against all claims, demands, liabilities, suits or actions (including all reasonable expenses and attorney's fees incurred by or imposed on Seller in connection therewith) arising out of or in connection with Buyer's performance of this contract or the shipment, delivery, storage, handling, use or sale of the products sold hereunder or the use by Buyer of any of Seller's property, either real or personal, whether caused by a negligent act or omission of either party hereto, its agents, contractors or employees, or whether caused by the negligent acts or omissions of the customers or business associates of Buyer, except that Buyer assumes no liability for the sole negligent acts of the Seller.

Buyer shall indemnify and hold Seller harmless from all social security taxes, disability benefit taxes and similar payroll taxes and all tax withholdings that may be applicable to Buyer or its agents and employees.

**XVII.—Marketing Efforts:** Buyer shall use its best efforts to promote and sell the products covered by this Contract within the area of primary marketing responsibility described in Schedule B. In the event that Buyer fails to do so, in addition to exercising Seller's rights contained in Paragraph XVI hereof, Buyer acknowledges that Seller may make other provisions for the marketing of its products within such area. Nothing contained in this contract shall preclude Buyer from selling or soliciting the sale of the products covered by this contract outside such area or confer upon Buyer exclusive marketing rights for any such product within such area.

Buyer warrants and represents that in Buyer's activities relating to this Contract Buyer will: (1) operate one or more bulk storage plants for the products purchased hereunder where necessary to efficiently serve customers in Buyer's area of primary marketing responsibility; (2) operate a sufficient number of tank trucks to efficiently serve those customers; and (3) otherwise efficiently perform the functions of a bona fide jobber of Seller's products.

**XVIII.—Right of First Refusal:** Buyer shall not sell, lease or otherwise dispose of Buyer's business as related to this Amoco Jobber Contract, or any major segment thereof (such as the distillate segment or the gasoline segment), or all or substantially all of its real or personal property used in connection therewith or any bulk plant or terminal used therein without first giving Seller an option to purchase or otherwise acquire the same on the same terms and conditions as those the Buyer is willing to enter into with any other party. Buyer shall promptly submit to Seller the complete terms and conditions of any bona fide offer received from or made to any third party which is acceptable to Buyer, and Seller shall thereafter have forty-five (45) days within which to exercise said option by written notice. Closing shall be held at a time and place mutually agreeable to the parties not earlier than the thirtieth (30th) day after Seller's notice exercising the option, and at the closing Buyer shall convey, assign, and transfer all real property with good and marketable record title to Seller by full covenants and warranty deeds and as to other property by assignments, bills of sale and other documents that may be necessary, in form satisfactory to Seller, subject only to such liens and encumbrances as are specifically acceptable to such third party.

Any failure by Seller to exercise any such option in any one case shall not affect this option right in any other cases thereafter, whether involving the same assets, business or others. In the event of any such sale or disposition by Buyer, this Contract shall continue in full force and legal effect unless terminated by Seller on ninety (90) days' written notice to Buyer (or such lesser period of notice as is reasonably practicable in the circumstances); provided, however, that where the provisions of Paragraph XXII apply, the provisions of Paragraph XXII shall control.

Sales or other dispositions by Buyer to any member or members of his or their immediate family or families (i.e. spouse, child, stepchild, parent, brother or sister) or the immediate family or families of stockholder or stockholders of Buyer shall be exempt from the aforesaid option provisions; provided, that this Contract, including these option provisions, shall continue in full force and legal effect unless canceled by Seller on ninety (90) days' written notice (or such lesser period of notice as is reasonably practicable in the circumstances) to Buyer; and, further provided, that any such transaction is not merely a means or device to sell or dispose of the business or asset or assets to a third party outside of any such immediate family.

In the event Seller shall purchase or acquire any business or any other assets in any exercise of the above option, Buyer agrees that for the protection of the goodwill so acquired by Seller in such transaction that neither Buyer nor any parties owning Buyer will engage either directly or indirectly in any business competing with Seller insofar as the said Buyer or parties owning it will sell or otherwise deal with any customer of Buyer at the time of such transaction in a manner competitive with Seller's distribution of products covered by this Contract for a period of five (5) years from and after the date of such transaction, without the written consent of Seller.

**XIX.—Deliveries for Seller:** From time to time Seller may request Buyer to make deliveries from Buyer's inventories of products purchased under this Contract to customers sold directly by Seller. If Buyer elects to make any such delivery, Seller shall pay Buyer a handling fee mutually agreed upon. Buyer shall invoice Seller for the quantities of product delivered, at Seller's price for the respective product applicable to Buyer and in effect on the date Buyer makes delivery for Seller plus the handling fee.

**XX.—Notices:** All notices given under this Contract shall be deemed to be properly served if delivered in writing personally or sent by

certified mail to Buyer at _____ *R#1 Box 3110    Faros, Mo 63664*

or to Seller at _____ 200 E. Randolph Drive, Chicago, Illinois  60601

_____. Date of service of a notice served by mail shall be the postmark date.

**XXI.—Assignment:** Buyer shall not assign this Contract (voluntarily or by operation of law or otherwise) without Seller's prior written consent; provided, however, Seller shall not unreasonably withhold its consent, and further provided, that in giving any consent to any assignment (voluntary or by operation of law or otherwise), Seller may, at its election, condition the consent upon the agreement of the proposed assignee or transferee to: (1) enter into a Trial Franchise in conformity to the provisions of the Petroleum Marketing Practices Act; and (2) simultaneously therewith, enter into a Mutual Cancellation of this Contract. Refusal of the proposed assignee or transferee to enter into such Trial Franchise and Mutual Cancellation shall conclusively be adequate reason for Seller to withhold its consent to the assignment.

**XXII.—Petroleum Marketing Practices Act:** Except as herein specifically modified or restricted in writing, each party hereby expressly reserves all rights under the Petroleum Marketing Practices Act (15 U.S.C. 2801), said rights being hereby incorporated herein by reference and made a part hereof, subject to any interpretations and implementations of said rights which may be contained in this contract. No omission of any reference herein to any such specific right shall constitute a waiver thereof.

**XXIII.—Franchise Relations:** In the event of any termination or nonrenewal of this Contract, any franchise relationship created by the Petroleum Marketing Practices Act or other applicable federal, state or local law and all other agreements between the parties related to or affected by this Contract (except those relating to outstanding financial obligations of either party to the other or pertaining to commitments to buy land, vehicles, equipment, and the like), shall automatically terminate simultaneously herewith.

If Buyer for any reason whatsoever shall totally or substantially discontinue the sale of Seller's trademarked motor fuels, this Contract shall be subject to termination by either party on thirty (30) days' written notice or on such lesser length of written notice as may be reasonable in the circumstances. Buyer shall have no right to prevent the termination from being effective by resuming the sale of Seller's trademark motor fuels.

**XXIV.—Entire Agreement:** This Contract cancels and supersedes all prior written and unwritten agreements and understandings between the parties pertaining to the matters covered in this Contract, and contains the entire agreement between the parties. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this Contract. No modification or waiver of, addition to, or deletion from the terms of this Contract shall be effective unless reduced to writing and signed by Buyer and a representative of Seller authorized to execute this Contract.

**Witness Whereof,** the parties hereto have executed this agreement the day and year first above written.

Buyer: _Newcomer Serv. Corp._

By _H. B. Newcomer_

Witness _____

Title _Pres._

**Amoco Oil Company (Seller)**

By _H. A. England_

Witness _____

Title _Dist. Mgr._

# EXHIBIT D

March 20, 1990


M. A. Drobick
FC:  A-2-2
ACSC

RE:  **Account Transfer - Newcomer Service Co.**  *PoTosi, Mo*

Account # 0110000405 Drop point 000, needs to be transferred from
St. Louis District (51) Field Sales Manager #3, Territory #5, to
St. Louis District (51) Field Sales Manager #2, Territory #4.

Newcomer Service Company was bought out by Bauman Oil Company
effective May 25, 1989, but we still need to transfer this record
because of the 492 carry over amounts into the following year.

Please refer this request to the appropriate person in your
department for handling.

The attachments are back-up for this request.

Yours truly,

*Bud Stone*

Bud Stone
District Analyst
St. Louis District

cc:  J. G. Phillips
     R. L. Rubel
     M. E. Hotsenpiller
     J. M. Coker
     B. A. Van Fleet



**NEWCOMER SERVICE COMPANY**

East High & Park Drive
POTOSI, MISSOURI 63664



Phone 438-2531
Potosi

Phone 431-4788
Flat River

April 7, 1989

RECEIVED
APR 11 1989

Amoco Oil Company
St. Louis District Office
2730 North Ballas Rd.
P.O. Box 31902
St. Louis, Mo.   63131

Attn:  Gordon Hanky
        St. Louis District Manager

Dear Mr. Hanky:

Subsequent to a recent letter dated April 3, 1989, it is the purpose of this letter to clarify the intent of the parties as undersigned.

Newcomer Service Company and Bauman Oil Distributors, Inc. have entered into an agreement wherein Bauman Oil intends to purchase Newcomer's business in the Washington County area.  Further it is the desire of Bauman Oil to secure a contract with Amoco Oil Company for the supply of all the various petroleum products currently being purchased by Newcomer.

Due to an excellent acceptance of Amoco products by Newcomer's customers, it is imperative that Bauman Oil secure a contract with Amoco in order for them to operate profitably.  In fact the sales agreement is contingent on Bauman Oil securing a supply contract with Amoco.

Bauman Oil will cooperate fully with Amoco's requirements so that a contract can be consummated as soon as possible.

It is the intent of Newcomer and Bauman Oil to close on this transaction during the first week of May 1989.

Please advise either of the undersigned of any further information that may be needed.

Respectfully Yours,

Homer Newcomer
President
Newcomer Service Company

Respectfully Yours,

**BAUMAN OIL**

**Paul F. Bauman**
Vice-President
(314) 937-3412

cc:  J.M. Coker

Mailing Address:
Post Office Box 3
Crystal City, MO 63019

Location:
1503 Commercial (Hwy 61-67)
Herculaneum, MO 63048

# EXHIBIT E



Date of Contract: **July 17, 2017**

## Branded Jobber Contract (Retail)
## Documents Checklist
(7-2016)

☐ Contract New

☒ Contract Renewal

☐ Trial Franchise

Jobber Name : **Bauman Oil Distr. Inc.**

Jobber Number : **90026419**

Jobber Sales Manager : **Dale Kluba**

| Document Name | Document Number |
|---|---|
| ☒ Branded Jobber Contract (Retail) | BJC (5-2016) |
| ☒ Attachment A to Branded Jobber Contract (Retail) – Approved Retail Sites and Jobber's Designated Terminals | BJC-A (4-2012) |
| ☒ Attachment A-1 to Branded Jobber Contract (Retail) Total Minimum Annual Volume Requirement | BJC-A1 (4-2012) |
| ☒ Guaranty | BJC(R)-GUAR (4-2012) |
| ☒ Revised Summary of Title I of the Petroleum Marketing Practices Act | BJC-PMPA (10-2001) |
| ☒ 2007 PMPA Amendment | BJC-PMPA AM (10-2008) |
| ☒ Minutes of a Joint Special Meeting of the Stockholders and Board of Directors of Corporation (Jobber) | BJC(R)-CORP (4-2012) |
| ☐ Certification of Unanimous Action of Partnership (Jobber) | BJC(R)-PART (10-2001) |
| ☐ Certification of Unanimous Action of Limited Liability Company (Jobber) | BJC(R)-LLC (10-2001) |

**If Trial Franchise is checked above, the following are to be included:**

| | |
|---|---|
| ☐ Trial Franchise Rider to Branded Jobber Contract Retail | BJC(R)-TF (4-2012) |

*List ALL MISCELLANEOUS documents /attachments, to the Branded Jobber Contract, below:*

☐ _____

☐ _____

☐ _____

☐ _____

BP Signature

Branded Jobber Contract - Checklist
Page 1 of 24

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To _____
Street, Apt. No.; or PO Box No. _____
City, State, ZIP+4 _____

7004 0150 0000 2159 7622

PS Form 3800, August 2006                    See Reverse for Instructions

Jobber Number    **90026419**

(State "Trial Franchise," if applicable)



# bp

## Branded Jobber Contract (Retail)

BJC (4-2013)

This branded jobber contract ("**Contract**") is by and between **BP Products North America Inc.** and hereinafter referred to "**Company**," and with a principal office located a 30 S. Wacker Drive, Suite 900, Chicago, IL 60606,

and _____ **Bauman Oil Distr. Inc.** _____ ("**Jobber**"), a **Corporation**,

(State exact legal name of Jobber)    (State legal entity)

with its principal offices located at **1503 Commercial Blvd., Herculaneum, MO 63048**

(complete address of principal office  A post office box is _not_ sufficient)

**Now, Therefore,** Company and Jobber, intending to be legally bound, agree to the following:

**1. Term.** The term ("**Term**") covered by this Contract will be for a period of **three (3)** year(s) beginning **July 1, 2017** and ending on **June 30, 2020** _____ , unless terminated earlier by law or by the terms of this Contract or unless extended by Company for a period of time designated by Company in a written notice delivered to Jobber. If the franchise relationship underlying this Contract continues for any reason beyond the expiration date indicated above, as the same may have been extended by Company, this Contract will be automatically extended through the expiration or termination of such franchise relationship, unless otherwise terminated, or until Jobber receives written notice that Company is not renewing the Contract, or until the parties enter into a new branded jobber contract, if offered by Company.

**2. Products, Approved Retail Sites, and Annual Volume Requirement.**

   **(a) Products to be purchased.** Company agrees to sell and, to the extent permitted by law, Jobber agrees to purchase and receive Company's currently offered and available branded motor fuel products as determined and designated by Company ("**Products**"). The Products may include branded diesel ("**Branded Diesel**") and/or branded Renewable Fuel (defined below); provided, however, that Company makes no representations or warranties that Branded Diesel or branded Renewable Fuel will be offered or available during any part of the Term of this Contract.

   **(b) Renewable Fuel.**
     (i) Jobber may sell Renewable Fuel where required or mandated by law; provided any such Renewable Fuel must meet all federal, state and local standards. "**Renewable Fuel**" is (i) fuel where no less than 10 percent and no more than 85 percent of the volume consists of ethanol; and (ii) any mixture of biodiesel and diesel or renewable diesel (as defined in regulations adopted pursuant to Section 211(o) of the Clean Air Act (40 CFR part 80), determined without regard to any use of kerosene and containing at least 20 percent biodiesel or renewable diesel. To the extent the definition of Renewable Fuel is inconsistent with the definition of renewable fuel as set forth in 15 U.S.C. §2807(a)(1), as the same may be amended from time to time ("**Renewable Fuel Statute**"), then the definition of "Renewable Fuel" herein will be the same as the definition of renewable fuel contained in the Renewable Fuel Statute.

     (ii) If Company is offering Renewable Fuel for resale at the Approved Retail Sites, then all of Jobber's Renewable Fuel must be purchased from Company, subject to all applicable laws. If Jobber is required or mandated to sell Renewable Fuel at a time when Company is not offering Renewable Fuel for resale at the Approved Retail Sites, then Jobber may purchase such Renewable Fuel from another source, provided that Jobber begins purchasing such Renewable Fuel from Company immediately after Jobber receives notice from Company that it is offering Renewable Fuel to Jobber for resale at the Approved Retail Sites.

   **(c) Diesel.**
     (i) If Company is offering diesel for resale at the Approved Retail Sites, then all of Jobber's diesel must be purchased from Company. If Company is not offering diesel for resale at the Approved Retail Sites, then Jobber may purchase diesel from another source, provided that (A) the diesel is sold as unbranded diesel, and (B) Jobber begins purchasing diesel from Company immediately after Jobber receives notice from Company that it is offering diesel to Jobber for resale at the Approved Retail Sites.

     (ii) Jobber acknowledges that it has received a copy of Company's current on-site winterization guidelines for diesel and Jobber covenants that it will at all times comply with such guidelines and complete all documentation required by Company to confirm such compliance. Jobber further acknowledges and agrees that on and after the date Company installs its own terminal winterization, that Jobber has the option to purchase such blended diesel product from Company in lieu of on-site winterization.

**(d) Approved Retail Sites.** Attachment A will set forth, among other things, the retail sites approved under **Paragraph 6(a)** below from which the Products purchased from Company may be resold ("**Approved Retail Sites**"). Jobber will provide Company with, among other things, the complete address for each Approved Retail Site. All retail locations at which Company's approval has been revoked will be deemed automatically removed from Attachment A on the date approval is revoked.

**(e) Resale of Products.** Products purchased under this Contract will not be resold, under Company's Trade Identities (as defined in **Paragraph 5(a)** below), from any location unless and until said location is set forth on Attachment A and/or unless and until said location has been approved pursuant to **Paragraph 6(a)** below. Jobber will not sell, supply or deliver any Products purchased under this Contract to any retail location that is directly-supplied by Company or that is designated by Company as a directly supplied location.

**(f) Total - Minimum Annual Volume Requirement.** Jobber will be required to purchase a minimum number of gallons of Products during every continuous 12-month period during the Term as set forth in Attachment A-1 ("**Annual Volume Requirement**"), with the first period commencing on the beginning date of the Term. In the event that Jobber fails for any reason to acquire from Company the minimum amount of Total Annual Volume Requirement required for each applicable 12-month period, Jobber will be in breach of this Contract, and Company may terminate this Contract and/or non-renew any franchise relationship as described in **Paragraph 16** of this Contract. Jobber also acknowledges and agrees that Company's rights and remedies pursuant to the Contract will be without prejudice to all other rights and remedies available to Company pursuant to the Contract, at law, or in equity, including, but not limited to, the right to seek actual and any consequential damages caused by or related to Jobber's breach of the Contract.

**(g) Per Site - Minimum Annual Volume Requirement.** Jobber will be required to purchase a minimum of 300,000 gallons of Products during every continuous 12-month period during the terms for each and every Approved Retail Site ("**Per Site Annual Volume Requirement**"), with the first period commencing on the beginning of the Term. In the event that Jobber fails for any reason to acquire from Company the minimum amount of Per Site Annual Site Volume Requirement required for each applicable 12-month period for any one Approved Retail Site, Company may revoke its approval of such Approved Retail Site, at which time it will automatically be removed from the list of Approved Retail Sites set forth on Attachment A of this Contract. Jobber also acknowledges and agrees that Company's rights and remedies pursuant to the Contract will be without prejudice to all other rights and remedies available to Company pursuant to the Contract, at law, or in equity, including, but not limited to, the right to seek actual and any consequential damages caused by or related to Jobber's breach of the Contract.

**(h) Trial Franchise.** If this Contract states that this is a "**Trial Franchise**", then Jobber will provide to Company, prior to the beginning of the Term, Jobber's estimate of the quantities of all Products that it expects to purchase and supply during the first year for each and every Approved Retail Site.

**(i) Updates to Attachment A.** Company may provide to Jobber an updated, amended and/or revised Attachment A from time to time during the Term ("**Updated Attachment A**"), which will immediately supersede the previous Attachment A received by Jobber. Jobber will immediately notify Company in writing if it notices an error in such Attachment A, or if it is no longer able to supply an Approved Retail Site listed in Attachment A. If such written notice isn't received by Company within five (5) days of the date Company delivered the Updated Attachment A, the information contained in the Updated Attachment A shall be deemed by Jobber to be true, complete and accurate.

**3. Jobber's Designated Terminals, Price of Products, Title and Risk of Loss.**
   **(a) Prices.** All terminals where Jobber will take delivery of the Products sold under this Contract will be determined and designated by Company ("**Jobber's Designated Terminals**") and set forth in Attachment A, as amended from time to time. The price which Jobber will pay for each Product sold under this Contract will be Company's jobber buying price, as recorded at the applicable Company business unit office, principal business office or such other office as Company may designate from time to time, in effect on the date and at the time of sale for each of Jobber's Designated Terminals ("**Jobber Buying Price**"). In addition to the applicable Jobber Buying Price, Jobber will also pay all other applicable charges, including, but not limited to, those charges categorized in **Paragraph 25** below.

   **(b) Title and risk of loss.** Title and risk of loss to all Products sold to Jobber under this Contract will pass to Jobber f.o.b. Jobber's Designated Terminals at the time of loading into Jobber's transport equipment, including any contract carrier equipment engaged by Jobber.

**4. Payment Terms.**
   **(a) Credit.** Nothing in this Contract will be construed as obligating Company to extend credit to Jobber. If Company, in its sole discretion, determines to extend credit to Jobber, it will do so: (i) in accordance with Company's then current credit policies, as amended from time to time; (ii) subject to Jobber timely providing annual financial statements; and (iii) subject to the execution of a guaranty by Jobber's principal or by a third party provided such guaranty is deemed satisfactory by Company. Upon Company's request, in accordance with Company's then current credit policies, Jobber will also provide Company with interim financial statements and a letter of credit, cash deposit and/or other form of security acceptable to Company. Company reserves the right to change its credit terms and policies at any time either for the class of trade generally or for Jobber individually and, among other things, to revoke Jobber's credit (if previously extended), and require that Jobber pay for all Products and services under this Contract via the advance payment methods set forth in **Paragraph 4(b)** below. Payment discounts are not applicable to taxes, inspection fees and the like.

   **(b) Jobber payments method.** Jobber will pay for all Products, open account items and all other items and services under this Contract via the payment method designated for Jobber by Company, which may include electronic funds transfer ("**EFT**"),

advance payment via bank wire transfer, or such other comparable payment methods then required by Company. Company reserves the right to change Jobber's payment method at any time either for the class of trade generally or for Jobber individually. Jobber will establish an account with a financial institution, on terms acceptable to Company, that provides EFT services and will authorize Company to initiate transfers of funds between Jobber's account and Company's accounts for payment of any and all amounts due to Company under this or any other agreement. Jobber will provide Company with all information and authorization necessary to debit and credit Jobber's account via EFT. These drafting authorities will remain in full force and effect during the entire Term of this Contract giving Company the right, at all times, to withdraw funds for sums owed to Company from Jobber's account, via EFT.

**(c) Rights of Company.** Company is entitled to restrict deliveries, as determined by Company, require additional security and/or terminate or non-renew this Contract, in addition to exercising any other rights Company may have under this Contract at law or in equity in the event of: (i) one or more incidents of a failure by Jobber to timely or fully pay, including the inability for Company to withdraw sums via EFT because of nonsufficient or uncollected funds, a bank wire transfer that was not authorized or had a stop payment, or any other stop payment or nonpayment reason; or (ii) Jobber's failure to supply required or requested financial information or security acceptable to Company; or (iii) Jobber's financial distress; or (iv) a determination by Company that Jobber may be unable to timely or fully pay in the future.

**(d) Finance and service charges.** Company will, at its election, assess finance charges on all amounts not paid by Jobber on the net due date. Finance charges will be assessed monthly at an annualized rate equal to the greater of (i) 8%, or (ii) 2% over the highest Prime Rate published in the Wall Street Journal (**"Money Rates"** section) on the last business day of the month preceding the assessed charge (or if such rate exceeds the highest rate allowable by law, then the highest rate allowable by law), or in the event such rate ceases to be determined and reported in such publication, any comparable rate determined in good faith by Company. Company reserves the right to change this finance charge rate at any time without prior notice to Jobber. Company will also impose a service charge for each attempted withdrawal via EFT which is dishonored for nonsufficient or uncollected funds, whether or not subsequently paid by Jobber. All charges assessed by Company will be collected by withdrawing funds from Jobber's account via EFT.

**(e) Company invoices.** Other than those disputes governed by **Paragraph 20** below, Jobber must notify Company in writing of disputes regarding any charges or other items on any Company invoice or statement within 60 days after Jobber's receipt of same. If Jobber fails to dispute a charge or other item within this 60 day period, the invoice or statement in question will be presumed to be accurate.

## 5. Company's Trade Identities and Image.

**(a) Use of Trade Identities generally.** Jobber will be permitted to use, and will be permitted to allow the dealers and others it supplies with Products purchased under this Contract (**"Jobber Marketer"**) to use -- on a non-exclusive, limited, site-specific basis at Approved Retail Sites -- certain and specifically designated Company trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards and the like (individually and collectively, **"Trade Identities"**) in connection with the advertising, distribution and/or resale of the Products authorized by, supplied by and/or purchased from Company under this Contract. Company's Trade Identities may include those in use at the time this Contract is executed and may also include, in the Company's sole discretion, those Trade Identities that the Company may subsequently develop, adopt or otherwise obtain through licenses or other means. Company will retain, at all times, the right to determine which Trade Identities will be used or displayed, and the manner of their use or display, at an Approved Retail Site and the right to restrict the use or display of certain Trade Identities to certain Approved Retail Sites (or to certain locations at an Approved Retail Site). Company will also have the right, at any time and for any reason, to revoke its approval to use certain or all of its Trade Identities at certain or all Approved Retail Sites (or at certain locations at an Approved Retail Site) -- as further provided in **Paragraphs 5(e) and 6(b)** below -- and, where applicable and in its sole discretion, to substitute any other Trade Identities in their place. Jobber will not directly or indirectly cause any Trade Identity to become fixtures or part of the real property.

**(b) Use of Trade Identities governed by this Contract, related agreements and related guidelines, etc.** The permission to use Company's Trade Identities will be governed by the terms and conditions of this Contract and related agreements, including all attachments, schedules, appendices and amendments attached to and incorporated in those agreements. In addition, Company's Trade Identities will only be used in accordance with -- and only if Jobber complies with -- the guidelines, policies, procedures, programs, requirements, specifications, standards (both operational and visual) and strategies issued by Company, as amended from time to time.

**(c) Use of Trade Identities on signage.** Jobber will be permitted to acquire and display approved signage bearing Company's Trade Identities (**"Trade Identity Signage"**), in connection with the advertising, distribution and/or resale of Products under this Contract, on an Approved Retail Site-specific basis. Under no circumstances will Jobber be allowed to relocate signage bearing Company's Trade Identities to another Approved Retail Site or other retail location without Company's consent. Jobber will provide Company with a list of all signage bearing Company's Trade Identities in Jobber's possession and/or control and the exact location of said signage at the Approved Retail Site, upon Company's request.

**(d) Use of Trade Identities in conjunction with the sale of Representative Amounts of certain Products.** At all times at each Approved Retail Site, including each Jobber Marketer Approved Retail Site, Jobber will offer for sale, or cause to be offered for sale, representative amounts of each grade of Company-branded Products that are necessary, in Company's discretion, to satisfy public demand (**"Representative Amounts"**). If Jobber ceases to offer or make available one or more of these designated Products in the required Representative Amounts at an Approved Retail Site, Company may revoke its prior approval to use certain or all of its Trade Identities at the Approved Retail Site, in which case Jobber will cease using or displaying, or cause its Jobber Marketers to cease using or displaying, certain or all of Company's Trade Identities at that site.

**(e)  Use of Trade Identities in conjunction with Company's retail marketing strategies and development plans, image programs and standards.** At each Approved Retail Site, including each Jobber Marketer Approved Retail Site, Jobber will comply with, and ensure that all of its Jobber Marketers comply with, Company's then current image programs and standards (both operational and visual), as amended from time to time, which may include programs and standards for the design, construction, maintenance, appearance and cleanliness of the Approved Retail Sites at which the Trade Identities is installed and displayed. As part of this image compliance requirement, Jobber will ensure that no items of a pornographic or sexually explicit nature are displayed, used, stored, offered, rented or sold at any Approved Retail Site, items of this nature will include, but will not be limited to, magazines, videotapes, compact disks, digital video disks, or like materials which are pornographic, sexually explicit or so-called "adult" in nature. Additionally, as part of this image compliance requirement, Jobber will ensure that no illegal drugs, synthetic drugs produced to mimic illegal drugs, (including, but not limited to cannabinoids), or items that are intended or designed for use in ingesting, inhaling or otherwise consuming an illegal drug are displayed, used, stored, offered, rented or sold at any Approved Retail Site, items of this nature will include, but not be limited to, pipes, tubes, roach clips, instructions or descriptive materials, or containers for concealing illegal drugs or paraphernalia. Jobber further agrees, as part of this image compliance requirement, that no gambling devices, machine or equipment are displayed, used, stored, offered, rented or sold at any Approved Retail Site, items of this nature will include, but not be limited to, slot machines, pinball machines (except those that do not return to the player anything but free additional games), cane racks, knife racks, artful dodgers, punch boards, roll downs, merchandise wheels, roulette wheels, video poker, video pull-tabs or similar devices. Items of this nature shall specifically exclude equipment used for sale of lottery tickets endorsed by the State in which the Approved Retail Site is located. Jobber also agrees that its right to use Company's Trade Identities under this Contract will be subject to Company's then current retail marketing strategies and development plans, as amended from time to time. If an Approved Retail Site no longer conforms or fails to conform to Company's then current retail marketing strategies and development plans, as amended from time to time, or to Company's then current image programs or standards (both operational and visual), as amended from time to time, or to the foregoing image compliance requirements, Company may revoke its prior approval to use certain or all of its Trade Identities at the Approved Retail Site, in which case Jobber will cease using or displaying, or cause the offending Jobber Marketer to cease using or displaying, certain or all of Company's Trade Identities at that site.

**(f)  Use of Trade Identities on Jobber's property including websites.** Jobber will be permitted to display Company's Trade Identities in conjunction with Jobber's websites, business forms, advertising materials, structures, vehicles, and other Jobber property directly related to the advertising, distribution and/or resale of Products under this Contract. Jobber may only do so, however, if the words "**Products Distributor**" or "**Products Jobber**" appear immediately adjacent to the displayed location of said Trade Identities. Company will have the right to approve such use of its Trade Identities in advance and to revoke its approval at any time and for any reason. If Company exercises its right to revoke, terminate or nonrenew, or if the property in question is sold or otherwise transferred, Jobber will immediately (i) cease using or displaying, remove, cover or obliterate, or (ii) cause any third party to immediately cease using or displaying, remove, cover or obliterate the Trade Identities on the property in question.

**(g)  Misuse of Trade Identities with Jobber's company name or Jobber's own trade identities.** Jobber will not use any of Company's Trade Identities as part of Jobber's company name. If Jobber has formed a company or has acquired a company that uses any of Company's Trade Identities as part of Jobber's company name, it will be required to amend its articles of incorporation or organization so as to delete Company's Trade Identities from its company name. Likewise, Jobber will not use any of Company's Trade Identities as part of Jobber's own trade identities. If Jobber has developed trade identities or has acquired trade identities that incorporate any of Company's Trade Identities as part of Jobber's trade identities, it will be required to delete Company's Trade Identities from its own trade identities.

**(h)  Misuse of Trade Identities in connection with certain sales.** Jobber will not use any of Company's Trade Identities in connection with the advertising, distribution and/or resale of: (i) any dilution or adulteration of a Product authorized by, supplied by and/or purchased from Company; (ii) any mixture or blend of Products authorized by, supplied by and/or purchased from Company, without Company's prior written consent (which consent may be revoked at any time and for any reason); (iii) any Product authorized by, supplied by and/or purchased from Company but sold under an incorrect or inappropriate Company Trade Identities or sold through unapproved or disapproved packages, containers or equipment; or (iv) any product not authorized by, supplied by and/or purchased from Company. In furtherance thereof, Jobber shall not introduce any Products into any storage tank(s), transportation vehicle(s), or pump(s) that has supplied or been used for storage, transportation or dispensing of any motor fuels other than the Products until such tank, vehicle or pump has been purged of all such motor fuels. Company must be provided with fourteen (14) days advance written notice if Jobber intends to introduce any of the Products into a storage tank or pump that has been supplied or been used for storage or dispensing of motor fuels other than the Product. In addition, Jobber will not use or display at any Approved Retail Site, any trademarks, service marks, or brand names of any company or entity that is affiliated with the sale of motor fuel products other than Company's Trade Identities or Jobber's trade identities. In the event Company believes Jobber or any Approved Retail Site is in violation of this paragraph, Company may, but shall not be obligated to, perform tests at such Approved Retail Sites, the costs of which shall be paid in full by Jobber.

**(i)  Company's right to audit.** To verify Jobber's performance under this Contract and related agreements or as part of a Company compliance program, as issued and amended from time to time, Company will have the right to: audit records in the possession or control of Jobber or its Jobber Marketers; inspect all Approved Retail Sites; and sample all Products in the possession or control of Jobber and/or its Jobber Marketers. Jobber will cooperate fully and completely throughout the audit and inspection processes, and ensure that its Jobber Marketers cooperate fully and completely. If Jobber designates its records as confidential, Company will not voluntarily disclose said information to anyone without Jobber's written consent, except to those directors, officers, shareholders, employees, agents, principals or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors) ("**Agents**") of Company with a need to know.

**(j) Discontinued use of Trade Identities.**

(i) Upon expiration or termination of this Contract, for any reason, Jobber will immediately cease using or displaying, and cause all of its Jobber Marketers to cease using or displaying, Company's Trade Identities and will dispose of all signage in accordance with this Contract. All remaining evidence of Company's Trade Identities will be immediately obliterated by Jobber.

(ii) Company will have the right to cause any and all signage bearing Company's Trade Identities to be removed, or to cause Company's Trade Identities on said signage to be removed, covered or obliterated, from any disapproved retail location or from any retail location at which Company's approval has been revoked, including those Trade Identities on any personal property sold or transferred by Jobber or a Jobber Marketer.

(iii) If Jobber does not immediately cease using or displaying, and cause its Jobber Marketers to cease using or displaying, Company's Trade Identities when required in this Contract, Company will have the irrevocable right to use any means necessary to remove, cover or obliterate the Trade Identities, including entering upon the relevant premises or filing a legal action, with Jobber's full and complete cooperation, and at Jobber's expense. Jobber will reimburse Company for all expenditures incurred in removing, covering and obliterating Company's Trade Identities hereunder, including, but not limited to, attorneys' fees and court costs.

**(k) Company's right to purchase Trade Identity Signage via purchase option.** Company will have the option, but not the obligation, at any time and for any reason to purchase any and all Trade Identity Signage owned by Jobber, on the basis of a depreciated cost determined by the period of Jobber's ownership and beginning with the date of Jobber's purchase. The date upon which the Trade Identity Signage is placed in Company's possession will also be used to compute the period of Jobber's ownership. Company will initiate its option by providing Jobber with a list of the Trade Identity Signage it desires to purchase, along with a request for proof of purchase. Within 10 days of receiving Company's list, Jobber will provide Company with the requisite proof of purchase in a form or forms satisfactory to Company. Within 10 days of receiving satisfactory proof of purchase, Company may exercise its option to purchase the Trade Identity Signage by providing Jobber with written notice. In the event Company exercises its option under this paragraph, Jobber agrees to do all things necessary to place Company in full ownership and possession of the Trade Identity Signage, within 30 days of Company's notice. Pursuant to this paragraph, Company agrees to pay Jobber for the Trade Identity Signage as follows:

| | | |
|---|---|---|
| During the first year of ownership | 100% | of Jobber's purchase price |
| During the second year of ownership | 90% | of Jobber's purchase price |
| During the third year of ownership | 80% | of Jobber's purchase price |
| During the fourth year of ownership | 70% | of Jobber's purchase price |
| During the fifth year of ownership | 60% | of Jobber's purchase price |
| During the sixth year of ownership | 50% | of Jobber's purchase price |
| During the seventh year of ownership | 40% | of Jobber's purchase price |
| During the eighth year of ownership | 30% | of Jobber's purchase price |
| After the eighth year of ownership | 25% | of Jobber's purchase price |

**(l) Canopies for Branded Diesel.** All Branded Diesel will be sold by Jobber only under Company-branded canopies or from a Branded Diesel dispenser at a location not under canopy at the Approved Retail Sites approved by Company and as provided in the PMPA (defined in **Paragraph 16(b)** of this Contract), and all pumps dispensing diesel under BP-branded canopies, even if not Branded Diesel, will conform in all respect to Company's then current image programs and standards for Branded Diesel, as amended from time to time, except as otherwise agreed to and in writing by Company. Notwithstanding the foregoing, if Company is offering diesel for resale at the Approved Retail Sites, then all of Jobber's diesel must be purchased from Company, as provided in **Paragraph 2(c)(i)** of this Contract.

**6. Site Approval.**

**(a) Use of Company's Trade Identities at each Approved Retail Site.** It is and will be an on-going condition of the right to use Company's Trade Identities under this Contract, which Jobber must first obtain Company's prior written consent for each and every location that Jobber desires to identify with Company's Trade Identities, including all Jobber Marketer retail locations. The approval and designation as an Approved Retail Site will be within Company's sole discretion and will be based on certain factors and upon certain criteria relative to the site, including, but not limited to: current or proposed appearance; current or proposed Trade Identities to be used; location of underlying real estate; ownership status of underlying real estate; current or proposed mode of operation; current or proposed offer; current or projected volume; current or proposed hours of operation; current or proposed training capabilities; current or proposed improvements, facilities or equipment; enrollment or participation in the Company's brand assurance program; Company's then current image programs and standards (both operational and visual), as amended; or Company's then current or amended retail marketing strategies and development plans in the vicinity of the proposed location, or elsewhere. For purposes of emphasis and elaboration, but without limitation, Company will have the right to require motor fuel dispensers to be covered by approved canopies and to be equipped with approved card readers. Company will also have the right to determine the appropriate geographic density and channel-of-trade mix for all retail locations identified and/or to be identified with Company's Trade Identities. It will be a further requirement that Jobber has used and/or is using its best efforts to develop, operate and/or supply its then currently Approved Retail Sites. Company's right of approval hereunder will also apply to those situations where Jobber desires to supply a retail location that is then currently identified with Company's Trade Identities but supplied by another branded jobber or other supplier of Company's Products. Company will retain, at all times, the right to determine or the right to approve which Trade Identities will be used or displayed, and the manner

of their use or display, at an Approved Retail Site and the right to restrict the use or display of certain Trade Identities to certain Approved Retail Sites (or to certain locations at an Approved Retail Site).

**(b)  Site approval revoked.** Company will have the right to revoke its prior approval identifying an Approved Retail Site if the site no longer conforms to or fails to conform to: the terms or conditions of this Contract and related agreements; any other agreements with Company or an affiliate of ·Company; the Company's then current image programs or standards (both operational and visual), as amended from time to time; the Company's then current retail marketing strategies and development plans, as amended from time to time; or to any law or regulation. Company will also have the right to revoke its prior approval identifying an Approved Retail Site based upon, but not limited to, the factors and criteria set forth in **Paragraph 6(a)** above. For purposes of emphasis and elaboration, but without limitation, Company will have the right to revoke its prior approval identifying an Approved Retail Site if -- after 6 months from Company's request – the site is not identified with approved Trade Identities, the motor fuel dispensers at the sites are not covered by approved canopies or said dispensers are not equipped with approved card readers.  In addition to the foregoing, if Company approves a site which is operating as a competitor site at the time of such approval, Company's approval is automatically revoked if such site is not identified with approved Trade Identities within six (6) months of the date of the original site approval.  If Company revokes its approval, Jobber will immediately cease using or displaying, or cause its Jobber Marketers to cease using or displaying, Company's Trade Identities at that retail location as described in **Paragraph 5(j)(ii)**. Company will also have the right, at any time and for any reason, to revoke its prior approval to use certain or all of its Trade Identities at certain or all Approved Retail Sites (or at certain locations at an Approved Retail Site) and, where applicable and in its sole discretion, to substitute any other Trade Identities in their place.

**(c)  Jobber's right to supply disapproved or revoked sites.**  Nothing in this Contract will prevent Jobber from supplying a disapproved retail location or a retail location at which Company's approval has been revoked provided that Jobber does not permit Company's Trade Identities to be displayed at that location.

**7.  Marketing Responsibility at Approved Retail Sites.**
**(a)  Jobber to use best efforts to market at each Approved Retail Site.**  Jobber will use its best efforts to market, or cause to market, the Products covered by this Contract at each and every Approved Retail Site and within the trade area of each and every Approved Retail Site.

**(b)  Marketing within the trade area of an Approved Retail Site not exclusive.**  This Contract does not confer upon Jobber exclusive marketing rights and/or trademark rights within any trade areas. Company will, at all times and for any reason, maintain its sole and unlimited right to make other provisions for the marketing of its Products and services under any of its Trade Identities within the trade areas of Jobber's Approved Retail Sites, or elsewhere, including, but not limited to: establishing its own directly-operated, contractor-operated, or commission marketer retail locations; establishing its own directly-supplied reseller/dealer retail locations; and/or approving retail locations to be operated or supplied by other jobbers.

**8.  Payment Methods including Credit Cards.**
**(a)  Company's Payment Methods Program.** Company may from time to time endorse and sponsor specific proprietary and third party payment methods including certain credit cards, charge cards, fleet cards, debit cards, pre-paid cards and the like (individually or collectively, **"Payment Methods"**) for use at specified Approved Retail Sites  selling Company's Products. Company will not be obligated to sponsor or participate in any specific Payment Methods program, or may withdraw its sponsorship of, or participation in, any such program at any time, or may condition any sponsorship or participation upon payment of service, equipment or other fees by Jobber. If Company does sponsor a Payment Methods program (**"Payment Methods Program"**), Jobber agrees that Company's proprietary Payment Methods and all third party Payment Methods specified by Company will be accepted at each payment point (including card-readers-in-dispensers, if present) at each Approved Retail Site including, but not limited to, cents off per gallon loyalty cards and other Company proprietary reward program cards (except where prohibited by law). Jobber will strictly comply with the operating rules, terms and conditions of any Payment Methods Program that Company may sponsor, by and through any manuals, bulletins, or other forms of written or electronic communications, as issued and as amended from time to time.

Company will have the right to charge back sales transaction amounts made by Jobber's customers or by customers of its Jobber Marketers for a period of 6 months from the date of a transaction. Jobber must maintain, or cause to maintain a paper record of each transaction (including the actual draft generated at the time of sale) for a period of 6 months.  This obligation to maintain a paper record of each transaction does not impose any obligation on Jobber to retain a similar electronic record.

For purposes of this Contract, the **"BP Systems"** means the equipment and software referred to as the Electronic Payment ' Server (**"EPS"**) box required by Company and which is located at the Approved Retail Sites combined with the wide area network infrastructure outsourced by Company, both of which act as the interface between the Approved Retail Site and the processor selected by Company (**"Settlement Processor"**), to ultimately transfer Cardholder Data (defined below) collected by Approved Retail Sites for authorization and  settlement.  Company makes no representations or warranties that it will perform the duties of the Settlement Processor or contract with any affiliate or unrelated party to perform the duties of the Settlement Processor. Jobber acknowledges and agrees that (i) if Company designates a Settlement Processor for any Approved Retail Site(s), that Jobber will use such Settlement Processor; (ii) if no Settlement Processor is designated for an Approved Retail Site, or if a Settlement Processor ceases to perform such services, Jobber will be responsible for contracting with an approved party to perform the duties of the Settlement Processor, and (iii) Jobber fully releases Company from any acts or omissions of the Settlement Processor.

Company transfers Jobber's payment card transactions to the Settlement Processor on behalf of Jobber for purposes of processing settlement.  Jobber acknowledges and agrees that Company is only liable to Jobber for any non-received payment

card transaction settlement funds to the extent that Company actually received such payment card transaction settlement funds from the Settlement Processor.

**(b)  Electronic point-of-sale equipment, software and firmware.**  (i) Jobber will comply with Company's point-of-sale policies and guidelines, as amended from time to time.  Prior to selling any Products at any Approved Retail Site(s) and using BP Systems, Jobber will purchase and install, or cause to be installed with a Company-approved provider, at each Approved Retail Site electronic point-of-sale equipment approved by Company ("**Pre-Approved Equipment**") for processing transactions using BP Systems.  The purchase and installation of the Pre-Approved Equipment will be at the sole cost and expense of Jobber.  If at any time there are new requirements for point-of-sale equipment, within six (6) months of Company's request, Jobber will upgrade, or cause to be upgraded such Pre-Approved Equipment as specified by Company at Jobber's sole cost.  Subject to this Section, all such Pre-Approved Equipment will, at all times, use BP Systems and will be operated using Company's required most current Payment Methods software and firmware.    Jobber shall address any defects in the Pre-Approved Equipment directly with its vendor.  Notwithstanding the foregoing, Jobber acknowledges that the software and firmware and the specifications are proprietary products of Company or its vendors. Unless otherwise specified, no right, title or ownership interest in any software or firmware will be transferred to Jobber from Company. Under no circumstances will Jobber reverse engineer, decompile, disassemble or otherwise attempt to derive the source code for the software or firmware or alter its intended functionality.  Any updates or patches to Payment Methods software and firmware that is part of the Pre-Approved Equipment will be provided through the annual software maintenance (ASM) contract that Jobber is required to enter into with the third party approved by Company.  Jobber will install such updates and patched within the time period specified by the third party providing the ASM services.

(ii)  Jobber shall pay Company within thirty (30) days of receiving an invoice for all fees and charges invoiced by a third party in connection with Approved POS or any software or firmware, or any imprinter plate costs.  Any third party fees may be invoiced directly to Jobber, in which event Jobber may pay such third party directly; provided Jobber simultaneously sends Company a copy of Jobber's evidence of payment.  Where applicable, Jobber will pay Company for the Pre-Approved Equipment and the ASM payments as specified in the Payment System Technology Contract and ASM Contract, respectively. In addition, Jobber shall pay Company a monthly fee for use of the BP Systems and any software or firmware used at an Approved Retail Site equal to the then current charge assessed by Company, as notified in writing to Jobber.  Such monthly fee is subject to increase by Company at any time by giving ten (10) days advance notice.

(iii) Company shall have no obligation or liability to Jobber with respect to the Jobber for the Pre-Approved Equipment, and Jobber shall be solely responsible for any failures of the Pre-Approved Equipment, and shall be responsible for enforcing any warranties by the third party vendor.  Company will have no obligation or liability with respect to expenses, changes or damages incurred by Jobber with respect to the Pre-Approved Equipment using the BP Systems.

(iv) FOR NETWORK SECURITY BREACH OF JOBBER'S NETWORK, INCLUDING SUSPECTED BREACH, NON-CERTIFIED USE (INCLUDING WITHOUT LIMITATION THE USE OF PRE-APPROVED EQUIPMENT OR USE OF THE BP SYSTEMS TO ACCESS PORNOGRAPHIC OR ITEMS OF A SEXUALLY EXPLICIT NATURE) AND SIMILAR ISSUES, COMPANY RESERVES THE RIGHT TO SUSPEND OR DISCONTINUE USE OF THE BP SYSTEMS AND CONNECTIVITY AT ANY TIME, FOR ANY REASON, WITH OR WITHOUT NOTICES TO ANY OR ALL APPROVED RETAIL SITES UNTIL ANY SUCH ISSUE HAS BEEN CURED TO COMPANY'S SOLE SATISFACTION.

(v)  To the maximum extent permitted by applicable law, Company, its affiliates, employees and agents shall not be liable to Jobber or any other person for any direct, indirect, incidental, consequential, special, exemplary, or punitive damages, any anticipated or lost business, revenues or profits, any loss of data, business interruption, or equipment downtime, or any other loss, harm, casualty, injury or damage of any kind, arising from or related to the Pre-Approved Equipment, due to Jobber installation, possession, use, maintenance, or removal thereof, for any acts or omissions of a third party, or for the performance or non-performance of any obligations undertaken in this Contract, from all causes of action of any kind, whether in contract, tort or otherwise, and even if advised of the possibility of such damages.  To the maximum extent permitted by applicable law, in no event shall Company's total cumulative liability arising under this Section, from all causes of action of any kind, whether in contract, tort, or otherwise, exceed the recurring monthly fees and charges paid by Jobber to Company under **Paragraph 8(b)(ii)** in the three (3) months preceding the accrual of the first such claim.

(vi)  Jobber accepts the EPS and the BP Systems "as is" without any representations or warranties of any kind, express or implied, and all use of the same is at Jobber's sole risk.  COMPANY SPECIFICALLY DISCLAIMS ANY IMPLIED OR STATUTORY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS, RESULTS, EFFORTS, AND ACCURACY.  Company shall not be liable for delays or any failure to provide or install or operate the BP Systems due to causes beyond its reasonable control, including without limitation fires, floods, earthquakes, hurricanes, epidemics, and other natural disasters and acts of god; strikes, embargoes, war, or acts of terrorism; riots, civil unrest, sabotage, or theft or other criminal acts of third parties; failure of electronic or mechanical equipment; denial of services attacks or other third party interference with the availability of the BP Systems; or fluctuations in or failures of electronic power, telecommunications, or the internet.

**(c)  PCI Compliance.**  Jobber acknowledges and agrees that for purposes of compliance with PCI Requirements and Cardholder Applicable Law (both terms hereinafter defined), the Pre-Approved Equipment and any software or firmware therein used to process card payments, any devices and connectivity used through the selection of "bring your own broadband" and any Third Party WAN or Jobber WAN (hereinafter defined) shall be within the scope of Jobber's PCI Requirements compliance obligations and not Company.  Jobber agrees that it and its Agents will at all times fully comply with the most current version of the following: i) the requirements of the Payment Card Industry Data Security Standard, as modified from time to time by the PCI Security Standards Council ("**PCI SSC**"), or similar standards required by payment card associations or the PCI SSC; ii) any payment application software not provided by Company, must be a payment application that is certified as compliant with the Payment Application Data Security Standard, as modified from time to time by the PCI SSC; iii)  the requirements of the Visa

Cardholder Information Security Program that are set forth in the Visa Operating Regulations or that are otherwise issued by Visa U.S.A., Inc., or its successors; iv) the requirements of the MasterCard Site Data Protection Program that are set forth in the MasterCard Security Rules and Procedures or that are otherwise issued by MasterCard or its successors; and v) all other applicable payment card industry standards having to do with the protection or security of Cardholder Data, as such standards may be modified from time to time (requirements specified in (i) through (v) jointly referred to as "**PCI Requirements**") and with all applicable laws and regulations having to do with the protection or security of Cardholder Data or any parts of Cardholder Data ("**Cardholder Applicable Law**"). For purposes of this Section, "**Cardholder Data**" means the numbers and other data assigned by card issuers to identify cardholders' accounts (including all data within the magnetic stripe), data about card transactions and other personal information of cardholders.

Jobber agrees that it and its agents will use the Cardholder Data that they store, process, handle, or transmit under this Contract only as necessary to process card transactions, provide fraud-control services, perform their obligations under this Contract, and comply with Cardholder Applicable Law. Jobber agrees that it will only store electronically that portion of the Cardholder Data that is essential to its business, but in no event anything more than the name, account number (which must be encrypted pursuant to PCI Requirements), and expiration date. Further, Jobber agrees that paper copies of reports that contain Cardholder Data shall be retained for the time specified in the BP Payment Guide and then such paper copies will be destroyed in a manner to make the document unreadable (i.e. cross-cut shred). Other than for the creation of secure and encrypted system back-ups, Cardholder Data will not be copied, stored or transmitted to portable storage devices, including without limitation, laptops, floppy disks, CD-ROMs, PDAs, digital images and flash drives. In the event Jobber provides Cardholder Data to third parties, other than those specified by Company, where the Cardholder Data will be retained by the third party or transmitted through such third party's systems/networks ("Third Parties" or "Third Party"), Jobber will insure that such Third Party is certified as compliant with the most recent version of the PCI Requirements. Jobber further agrees that it, its agents, and its Third Parties, through their acts or omissions, will not cause Company, or Company's affiliates to be in violation of the PCI Requirements and will be liable for all costs incurred by Company resulting from violations caused by these acts or omissions.

If Jobber discovers that unauthorized access has been, or may have been, gained to Cardholder Data stored, processed, handled, or transmitted by Jobber or its agents or Third Parties, Jobber will immediately notify Company and provide the applicable card company, the acquiring financial institution, and their respective designees access to Jobber's and its agents' or Third Parties' facilities and all pertinent records to conduct a forensic review and a review of the compliance by Jobber and its agents or Third Parties with the PCI Requirements. Jobber shall: i) keep Company regularly advised of the progress of the forensic and compliance review and ii) upon the request of Company, provide Company with a copy of all drafts of the forensic/compliance report and the final version of the forensic/compliance report resulting from such review. Jobber agrees that it and its agents will fully cooperate and it will require its Third Parties to cooperate with any reviews of their facilities and records provided for in this subsection. Jobber agrees that it and its agents will maintain and it will require its Third Parties to maintain appropriate business continuity procedures and systems to ensure security of Cardholder Data in the event of a disruption, disaster, or failure of Company's or Jobber's primary data systems.

Jobber will provide Company and Company's Affiliates with all certifications and other information reasonably requested by Company or Company's Affiliates to enable Company and Company's Affiliates to show to card companies that Jobber and, if applicable, any Third Party is complying with the PCI Requirements. Company and Company's Affiliates will not be responsible for any expense Jobber (or, if applicable, any Third Party) incurs in obtaining and maintaining required certificates or required information for which Jobber does not already possess. If in the process of obtaining certification or validating compliance with the PCI Requirements Jobber determines there are areas of non-compliance, Jobber will take appropriate action, prompt under the circumstances, to remedy such non-compliance, including non-compliance of any Third Party.

Jobber's obligations under this Section will continue in effect after the termination of this Contract for so long as it has access to Cardholder Data. In addition, Jobber will remain in full compliance with the then current BP Payment Guide and as amended from time to time and as posted on BP's official website http://bpconnection.com.

COMPANY RESERVES THE RIGHT TO TERMINATE AND/OR TEMPORARILY DISABLE JOBBER'S ABILITY TO PROCESS PAYMENTS ON THE EPS AND/OR THROUGH BP SYSTEMS WITHOUT PENALTY IF COMPANY REASONABLY BELIEVES AN APPROVED RETAIL SITE(S) IS NOT IN COMPLIANCE WITH THIS SECTION. IN ADDITION, JOBBER WILL BE SOLELY RESPONSIBLE AND FULLY LIABLE FOR ANY NON-COMPLIANCE WITH THIS SECTION. JOBBER WILL INDEMNIFY AND HOLD COMPANY HARMLESS FROM ANY AND ALL FINES, DAMAGES, PENALTIES, ASSESSMENTS AND ACTIONS, INCLUDING ATTORNEY FEES AND COSTS, RELATED TO ALLEGATIONS, CLAIMS OR INVESTIGATIONS IN ANY WAY RELATED TO JOBBER'S NON-COMPLIANCE WITH THIS SECTION INCLUDING, BUT NOT LIMITED, TO THOSE RELATED TO ALLEGATIONS OF BREACH AND/OR COMPROMISE.

In the event Jobber uses a Wide Area Network ("WAN") that is provided through a third party service provider ("**Third Party WAN**") or through a WAN using Jobber's own equipment ("**Jobber WAN**"), then Jobber using a Third Party WAN must use a Level 1 network service provider listed on Visa's Global List of PCI DSS Validated Service Providers (http://www.visa.com/splisting/searchGrsp.do) as PCI DSS compliant with the most recent version of the PCI DSS at the time of the validation and that is listed as validated within the past 12 months. In the event the Level 1 network service provider does not meet these PCI DSS validation listing requirements, Jobber must be able to provide Company with a Report on Compliance ("ROC") for the Third Party WAN showing compliance with the most recent version of the PCI DSS at the time of the ROC and that has been validated by an approved QSA within the past 12 months. Jobbers that use a Jobber WAN must provide proof of their PCI compliance with either (i) a ROC showing compliance with the most recent version of the PCI DSS and that has been validated by an approved QSA within the past 12 months, or (ii) a Self Assessment Questionnaire ("SAQ") validation type designated by BP, or if not designated by BP, then the SAQ validation type for which Jobber qualifies pursuant to PCI SSC

standards demonstrating compliance with every requirement. All Jobber Third Party WANs and Jobber WANs must also have an Approved Scan Vendor (ASV) (as approved by the PCI Security Standards Council) complete quarterly network scans and provide those results to Company.

(d) **Use of Information.** Company reserves the right to use any information obtained by Company through the Pre-Approved Equipment, EPS, BP Systems, and/or any other equipment, software or firmware performing a similar or related service for product integrity, tracking performance of offers and promotions, understanding product slate ratios, calculating average throughputs per site, validating customer volume submissions, summarizing information for marketing purposes, and similar uses. All such information obtained from Jobber's Approved Retail Sites will be shared by Company with Jobber, and all such information obtained from all Approved Retail Sites in a DMA (as defined in **Paragraph 12(a)**) may be shared by Company to persons or entities other than Jobber, but only on a consolidated basis for such DMA.

**9.   Additional Jobber Responsibilities.**

(a) **Transport and tank trucks.**   Jobber will operate or contract with third party carriers to operate, where necessary, a sufficient number of transport and/or tank trucks so as to efficiently perform its delivery functions under this Contract. Jobber will comply and/or cause its third party carriers to comply with all rules and instructions issued by the terminal at which Jobber receives Products, as such rules and instructions may be amended from time to time, and all applicable Federal State and local laws and regulations.

(b) **Emergency notification procedures.**   From time to time Company may provide Jobber with notification procedures to be utilized if and when emergency situations or other situations occur at any Approved Retail Site and/or if and when such situations directly or indirectly involve the Trade Identities being utilized by Jobber. For purposes of this Contract, reportable situations may include, but may not be limited to: death or serious injury; transport or tank truck accidents; Product spills or other incidents of significant environmental impact and other significant events as defined from time to time. Jobber agrees that it will comply with said procedures, if and when provided, and if and when a defined, reportable situation occurs.

(c) **Communication with Company via the Internet.**   Jobber must be equipped with e-mail capability and access to the Internet so that Company may communicate and exchange information with Jobber via the Internet and via the Company's intranet, extranet and/or web pages.

(d) **Customer inquiries and complaints.**   Jobber will develop a program designed to respond to and resolve customer inquiries or complaints within 10 business days of receipt. This program will apply to inquiries and complaints regarding an Approved Retail Site, including its Jobber Marketers Approved Retail Sites, that are either received directly by Jobber or those referred to Jobber by Company. Where customer inquiries received by Jobber relate to a fuel quality concern, Jobber will provide customer with Company's Consumer Relations phone number, as may be amended from time to time. In addition, Jobber must contact Company to notify of potential fuel quality incidents per the emergency notification procedures in this paragraph. Company, at its discretion, may choose to compensate customers directly for poor fuel quality related vehicle repair expenses ("**Customer Guaranty Payment**"). If Company makes any Customer Guaranty Payment related to any Product resold by Jobber, and Company determines in its sole discretion that the quality of the Product was satisfactory when delivered to Jobber, Jobber shall reimburse Company for the entire Customer Guaranty Payment within thirty (30) days after receiving an invoice of such amount.

(e) **Brand assurance program.**   If Company sponsors or conducts a brand assurance program, Jobber will participate in such a program at each Approved Retail Site selected by Company. Jobber shall pay to Company the then current costs for visiting the Approved Retail Site, as published by Company in its brand assurance materials. Jobber will promptly take corrective measures at each and every Approved Retail Site that scores below the target score established by Company for the marketing area that includes said Approved Retail Site, and in addition, pay to Company a fee for each Approved Retail Site that fails the site visit, equal to the amount set forth in Company's then current brand assurance materials, not to exceed $1,500.00 per visit per Approved Retail Site. If any Approved Retail Site receives notification of repeated failures, Company will have the right to remove such offending site from the list of Approved Retail Sites, in which event Jobber will immediately cease using or displaying, or cause its Jobber Marketers to cease using or displaying, Company's Trade Identities at that Approved Retail Site.

(f) **Branded lubricants and motor oils.**   Jobber will use its best efforts to offer for sale Representative Amounts of certain and specifically designated lubricants and motor oils (including certain and specifically designated Castrol®-branded and BP Visco Select®-branded lubricants and motor oils) at each of its Approved Retail Sites, including its Jobber Marketers Approved Retail Sites.

(g) **Right of Setoff.**   Immediately upon the occurrence of an event giving rise to Company's right to terminate or not renew this Contract under **Paragraph 16** of this Contract, or in the event Jobber: (i) makes an assignment or any general arrangement for the benefit of creditors, (ii) files a petition or otherwise commences, authorizes, or acquiesces in the commencement of a proceeding or case under any bankruptcy or similar law for the protection of creditors or has such petition filed or proceeding commenced against it, (iii) otherwise becomes bankrupt or insolvent (however evidenced), (iv) has a receiver, provisional liquidator, conservator, custodian, trustee or other similar official appointed with respect to it or substantially all of its assets, (v) is subject to the issuance of any writ, warrant, or other execution against its property, or (vi) has not paid any amount due Company under the terms of this Contract or otherwise,  Company may, at its sole option and without prior notice or demand, setoff (including by setoff, offset, combination of accounts, deduction, right of retention or withholding, or similar action) and apply (A) any indebtedness or obligation of Company to Jobber, whether matured or unmatured, including but not limited to all funds, amounts, accounts, credit card settlements or deposits at any time held by Company under this Contract or any other agreements, instruments, undertakings, or otherwise, including Payment Methods, against (B) any indebtedness or obligation of

Jobber to Company, whether matured or unmatured, now or hereafter existing under this Contract or any other agreements, instruments, undertakings, or otherwise, including Payment Methods. Such rights will be without prejudice and in addition to any right of setoff (including by setoff, offset, combination of accounts, deduction, right of retention or withholding, or similar action) to which Company is at any time otherwise entitled whether by operation of law, contract, or otherwise. Company's failure to exercise its rights under this paragraph will not be construed as a waiver of such rights.

**10. Jobber as Independent Business.** Company and Jobber are and will remain separate and independent businesses. None of the provisions of this Contract are intended to provide a party hereto with any management direction or control over the other party's business, business operations or employees. Jobber has no authority to act, or employ any person to act, as an agent for or on behalf of Company. Jobber will not place or allow the placement of any signage upon or near any premises owned, leased, operated or supplied by Jobber which might indicate that Company is the owner or operator of the business conducted upon said premises.

**11. Jobber Marketer.**
  (a)  **Acts and omissions of Jobber Marketer imputed to Jobber.**  Subject to **Paragraph 26** below, Jobber will inform those Jobber Marketers permitted to use Company's Trade Identities of the specific terms and conditions of this Contract and all related agreements, including all attachments, schedules, appendices and amendments attached to and incorporated in those agreements which pertain to the use of Company's Trade Identities and related matters. In addition, Jobber will inform those Jobber Marketer of the specific guidelines, policies, procedures, programs, promotions, requirements, specifications, standards (both operational and visual) and strategies periodically issued by Company, as amended from time to time, which pertain to the use of Company's Trade Identities and related matters. Notwithstanding the Jobber's best efforts to ensure its Jobber Marketers' compliance, and regardless of any contractual relationship between Jobber and its Jobber Marketers, any act or omission by a Jobber Marketer that, if committed or omitted by Jobber would place Jobber in violation of this Contract or related agreements, will be imputed to Jobber and will give Company the right, in its sole discretion, to take appropriate action against Jobber up to and including site approval revocation or termination of this Contract.

  (b)  **Actions against Jobber Marketer.**  Nothing in this Contract will prevent or preclude Company from exercising any legal or equitable rights against a Jobber Marketer directly, separate and apart from any actions taken against Jobber.

**12. Jobber's Sale of Assets; Jobber's Change in Control.**
  (a)  **Right of First Refusal on Jobber's Sale of Assets.**  Jobber will not sell, lease or otherwise transfer – or allow the sale, lease or transfer – of (i) substantially all of Jobber's Company Branded Assets located in any one State, (ii) substantially all of Jobber's Company Branded Assets (defined below) located in any one Designated Market Area – as determined by Nielsen Media Research, Inc., or its successors or assigns ("**DMA**"), (iii) more than fifty (50%) percent of its highest volume Approved Retail Sites based on each Approved Retail Sites annual volumes for the most recently completed calendar year, or (iv) more than twenty-five percent (25%) of Jobber's Company-Branded Assets without first giving Company a right of first refusal to purchase or otherwise acquire all of such assets that Jobber is intending to sell in the manner described in **Paragraph 12(b)** below ("**Right of First Refusal**"). "**Jobber's Company-Branded Assets**" are all assets in Jobber's possession or control, or in the possession or control of its subsidiaries, affiliates or principals as the case may be, which are related to this Contract and which, at any time during the franchise relationship, have been identified with or by Company's Trade Identities including, but not limited to Jobber-owned or leased: Approved Retail Sites; other retail locations; terminal facilities; transport and tank trucks; and all related real and personal property, contract rights, or good will.

  (b)  **Right of First Refusal Procedure.**  To satisfy its Right of First Refusal obligations under **Paragraph 12(a)** above, Jobber agrees, promptly after entering into an agreement with a third party ("**Sale Offer**"), to submit to Company complete and fully executed copies of all contract documents (including all exhibits and schedules) which comprise the proposed agreement, a certification by Jobber listing the assets and intangibles being sold, along with an itemized list of the value of each such asset and/or intangible, and any additional information, facts and data required by Company to evaluate the bona fide nature of the agreement; and, should the proposed agreement include Jobber's request to assign the Contract, to evaluate the third-party purchaser's qualifications to be a Company jobber. Company will thereafter have 60 days after receiving all of the foregoing information ("**ROFR Period**") within which to exercise its Right of First Refusal, by written notice to Jobber. If the provisions of the Sale Offer change as to reduce the amount of cash or cash equivalent, or if the Sale Offer is not comprised entirely of cash or cash equivalent and there is any change in the provisions of the Sale Offer, the ROFR Period shall start again commencing on the date all materials related to such changes are received by Company. Closing will be held at a time and place agreeable to Company and Jobber, but no later than 60 days after Company elects to exercise its Right of First Refusal. Jobber will convey all real property with good and marketable title and all other property in contractual forms acceptable to Company, subject only to such liens, encumbrances and commercially reasonable provisions that were acceptable to the third-party purchaser. If Company waives its Right of First Refusal, and if (i) such sale or transfer is not completed within one hundred eighty (180) days after the date waived by Company, (ii) there is any change in the provisions of the Sale Offer which reduces the amount of cash or cash equivalent, or (iii) the Sale Offer is not comprised entirely of cash or cash equivalent and there is any change in the provisions of the Sale Offer, then before making any such sale or transfer Jobber shall again follow the requirements of this provision as if a new Sale Offer had been made.

  (c)  **Exception to Company's Right of First Refusal.**  Notwithstanding **Paragraph 12(a)** above, Jobber will be permitted to sell, lease or otherwise transfer, or cause to sell, lease or transfer, Jobber's Company-Branded Assets to: (i) a spouse, child, son-in-law, daughter-in-law, parent, brother or sister ("**Immediate Family Member**"), if Jobber is a sole proprietorship; (ii) an Immediate Family Member of a partner's immediate family or of a member's immediate family, if Jobber is a partnership or Limited liability company ("**LLC**"), respectively; (iii) an Immediate Family Member of a stockholder's immediate family, if Jobber is a corporation; or (iv) a fellow partner, fellow member or fellow shareholder("**Fellow Stakeholder**"), if Jobber is a partnership, LLC or corporation, respectively, without providing Company with a Right of First Refusal; provided, however, that each

Immediate Family Member or Fellow Stakeholder who receives assets hereunder has reached the applicable age of majority in the State in which the individual resides with at least one year of active management experience in Jobber's business and, provided further, that no agreement executed in accordance with this **Paragraph 12(c)** will operate as a mere means or device to transfer control or ownership of Jobber's Company-Branded Assets to someone other than an Immediate Family Member or Fellow Stakeholder without providing Company with its Right of First Refusal. Regardless of the exception allowed in this **Paragraph 12(c)**, Jobber will promptly provide Company with written notice as required under **Paragraph 12(b)** above.

**(d) Sale of Jobbership/Change of Control.**

(i) **Right to Purchase.** Any intended sale, conveyance, alienation, transfer, merger or other intended change of legal or beneficial interest that will result in a change in control of Jobber's corporation, partnership, LLC, sole proprietorship or other entity, whichever the case may be, at any time during the franchise relationship, either voluntarily or involuntarily, by operation of law, by merger or by or through any other type of proceedings, will trigger Company's right to purchase the entirety of Jobber's Company-Branded Assets for a cash price equal to the fair market value of those assets ("**Right to Purchase**"), as determined by the average of three independent appraisals made pursuant to **Paragraph 12(d)(ii)** below, and will be considered a request to assign or transfer the Contract; provided, however, that where Jobber intends to sell, convey or transfer all or substantially all of its motor fuel business, Jobber will have the right to elect either of the following to Company in lieu of Right to Purchase: (A) a Right of First Refusal on its motor fuel business, or (B) a Right of First Refusal on Jobber's Company-Branded Assets. If Jobber elects either Right of First Refusal, Jobber will follow the procedure described in **Paragraph 12(b)** above.

(ii) **Information Jobber must provide/Company's election to appraise.** Pursuant to **Paragraph 12(d)(i)** above, Jobber will promptly provide Company with written notice of an intended change in control. Jobber will also promptly submit to Company complete and fully executed copies of all contract documents that evidence the intended transaction and corresponding change in control, and any information, facts and data requested by Company to evaluate the bona fide nature of said transaction and to evaluate Jobber's request to assign or transfer the Contract. After receiving all requested information, Company will thereafter have 90 days within which to appraise Jobber's Company-Branded Assets and exercise its Right to Purchase (the "**90-Day Exercise Period**"), by written notice to Jobber. If Company elects to appraise, the process must be initiated in writing within the first 30 days of the 90-Day Exercise Period. The process will consist of three independent Appraisal Institute MAI-certified ("**MAI**") appraisers -- one chosen by Company within the first 30 days of the 90-Day Exercise period, one chosen by Jobber within the first 40 days of the 90-Day Exercise Period and one chosen by the other two MAI appraisers within the first 50 days of the 90 Day-Exercise Period. Each appraiser will appraise the entirety of Jobber's Company-Branded Assets and provide their respective appraisals within the first 70 days of the 90-Day Exercise Period. Each appraiser will provide Company with a written appraisal and the average of these appraisals will be the price Company would pay, should Company decide to exercise its Right to Purchase. Jobber will cooperate fully and completely with Company by promptly naming an appraiser and by providing any information, facts and data required by Company and/or the appraisers to evaluate and appraise Jobber's Company-Branded Assets. Company and Jobber will each pay for their own appraiser and will each pay one-half of the third appraiser's fee. Closing will be in accordance with **Paragraph 12(b)** above.

(iii) **Exception to Company's Right to Purchase.** Notwithstanding **Paragraph 12(d)(i)** above, Jobber will be permitted to effect a sale, conveyance, alienation, transfer, merger or other change of legal or beneficial interest resulting in a change in control of Jobber's corporation, partnership, LLC, sole proprietorship or other entity, whichever the case may be, to an Immediate Family Member or Fellow Stakeholder, without triggering Company's Right to Purchase or Right of First Refusal; provided, however, that the Immediate Family Member or Fellow Stakeholder has reached the applicable age of majority in the State in which the individual resides with at least one year of active management experience in Jobber's business and, provided further, that no transaction executed in accordance with this **Paragraph 12(d)(iii)** will operate as a mere means or device to transfer control or ownership of Jobber's Company-Branded Assets to someone other than an Immediate Family Member or Fellow Stakeholder without providing Company with its Right to Purchase and/or Right of First Refusal. Regardless of the exception allowed in this **Paragraph 12(d)(iii)**, Jobber will promptly provide Company with written notice as required under **Paragraph 12(d)(ii)** above.

**(e) Company's right to verify ownership interest.** From time to time, Company may request and Jobber will provide a confirmation of all shareholder interest (legal and beneficial), partnership interest, membership interest, or other type of ownership interest, whichever the case may be, on a form acceptable to and/or provided by Company. Such confirmation will include the names of all shareholders, partners, members, or owners, whichever the case may be.

**(f) Status of Contract after sale of Jobber's Company-Branded Assets or after change of company control.** In the event of any sale, lease or transfer of Jobber's Company-Branded Assets hereunder, this Contract will continue in full force and effect unless terminated by Company, upon written notice, or unless assigned or transferred by Jobber, upon Company's written consent. Subject to **Paragraph 13** below, Company's decision not to exercise its Right of First Offer or Right of First Refusal in accordance with this **Paragraph 12** will not prevent Company from withholding its consent to assign this Contract to any third-party acquirer including any Immediate Family Member or Fellow Stakeholder. In addition, and also subject to **Paragraph 13** below, Company's decision not to exercise its Right to Purchase in accordance with this **Paragraph 12** will not prevent Company from withholding its consent to assign or transfer this Contract to any third-party acquirer and/or newly formed entity, including any acquirer or entity that is managed by or on behalf of any Immediate Family Member or Fellow Stakeholder.

**(g) Company may assign its Right of First Refusal and/or its Right to Purchase.** Company will have the right to assign its Right to Purchase, and/or its Right of First Refusal to one or more third-party purchasers of its choosing, and upon such

assignment, Company shall be fully released from any acts or omissions of Company's assignee or successor assignee, including, but not limited to, such assignee's failure to fulfill its duties or obligations to purchase any assets of Jobber.

**13.  Assignment.**

(a)  **Jobber's prior written request and Company's written consent required.**  Jobber acknowledges and understands that the current ownership and control of Jobber is a material element in Company's willingness to enter into this Contract. Jobber, therefore, agrees that it will not assign or transfer its interest in this Contract, or any franchise relationship attendant thereto, without a prior written request and without Company's corresponding written consent; provided, however, that Company will not unreasonably withhold its consent, and provided further, that Company will consent to Jobber's request to assign or transfer this Contract to an Immediate Family Member or Fellow Stakeholder designated by Jobber if said Immediate Family Member or Fellow Stakeholder meets all of Company's then current qualifications for new jobbers, including, but not limited to, those qualifications related to financial responsibility, creditworthiness, physical and mental fitness, moral character and business experience.  Jobber may only assign its interest in this Contract using Company's then current assignment form.

(b)  **Company may withhold consent.**  In giving its consent to any assignment, whether voluntarily or by operation of law, Company may, at its election, condition its consent upon: (i) the agreement of the proposed assignee or transferee to enter into a trial franchise; (ii) the agreement of Jobber to simultaneously enter into a mutual cancellation of this Contract and related agreements; and (iii) the satisfaction of all indebtedness owed by Jobber to Company.  In addition, nothing stated in this **Paragraph 13** or elsewhere will limit Company's right to impose other or additional conditions on its consent or limit Company's right to withhold its consent for any reason, including, but not limited to, a decision by Company to limit or reduce the number of jobbers in a geographic area.

(c)  **Effect of assignment without Company's consent.**  Jobber agrees and acknowledges that any attempted or purported assignment or transfer of this Contract without Company's knowledge and/or Company's prior written consent may result in the termination of this Contract and the non-renewal of any franchise relationship.

(d)  **Company may assign.**  Company may assign this Contract to a subsidiary, affiliate or successor of Company or to a third party without the consent of Jobber.  In the event of such assignment, Company shall be relieved of any further duties or obligations under this Contract with respect to the supply of fuel.  Jobber acknowledges and agrees that in the event of such assignment, the price of fuels sold to Jobber shall be set by the assignee and Company shall have no liability for the pricing practices of such assignee.

**14. Indemnity.**

Jobber agrees to indemnify, defend and hold Company, including, but not limited to, Company's parents, subsidiaries, affiliates and all Agents of Company, its parents, subsidiaries and affiliates, harmless from and against all losses, suits, claims, damages (consequential or otherwise), demands, causes of action, liabilities, fines, penalties, costs or expenses (including reasonable attorney's fees and other costs of defense) of whatever kind and nature, directly or indirectly arising in whole or in part out of: (a) any default or breach by Jobber of any obligation contained in this Contract or any other agreement with Company; (b) the receipt, shipment, delivery, storage, handling, use, sale, dispensing, labeling, invoicing, advertising or promoting of the Products by Jobber or its Jobber Marketers; (c) any act of commission or omission at an Approved Retail Site; (d) the use of any Company property (real or personal) by Jobber or its Jobber Marketers; (e) any allegation of agency or other alleged legal relationship by which Company is being held or might be held responsible for the acts or omissions of Jobber or its Jobber Marketers; (f) the use of Company's Trade Identities by Jobber or its Jobber Marketers, including the use of said Trade Identities on signage and in the advertising or promoting of Products sold or services rendered by Jobber or its Jobber Marketers; (g) the violation of any federal, state or local law, rule, regulation, court order or government directive by Jobber, its Jobber Marketers, or any other customers of Jobber or customers of its Jobber Marketers; (h) all taxes incurred and owed by Jobber or its Jobber Marketers of whatever kind and nature; (i) the revocation of any prior approval to use or display, or the loss of any right to use or display, any or all of Company's Trade Identities; (j) Jobber's termination of any franchise or non-renewal of any franchise relationship with its Jobber Marketers; (k) the Product being defective or damaged in any way whatsoever if due to any act or omission of Jobber or its Jobber Marketers, including, but not limited to improper blending or other act or omission that reduces the quality of the Product (in which event the indemnity shall include reimbursing Company for the Consumer Guaranty Payment as described in **Paragraph 9(d)**); (l) or any other act or omission of Jobber, its Jobber Marketers, any other customers of Jobber, or any of Jobber's -- or a Jobber Marketer' -- Agents, contractors, invitees, licensees, or business associates, except such as may be due to the negligence of Company. Notwithstanding the above, Jobber agrees that the defense obligation included in this **Paragraph 14** will be immediate and ongoing, regardless of any ultimate allocation of negligence or other form of liability.  This paragraph shall survive the termination of this Contract.

**15. Insurance.**

(a)  **Types of coverage required.**  Jobber will purchase and maintain at all times insurance covering all business operations related to this Contract.  Specifically, Jobber will obtain and maintain, at its sole cost and expense, insurance coverage through an insurer, and in a form acceptable to Company, as follows: (i) Commercial general liability insurance of not less than $2,000,000 per occurrence, including coverage for premises, operations liability, independent contractor's, products-completed operations, personal injury and advertising injury, and contractual liability coverage; (ii) Worker's compensation, as required by law, and employer's liability insurance of not less than $1,000,000 for each accident and disease; (iii) Business automobile liability insurance, including coverage on all vehicles owned, hired or used in the performance of this Contract, of not less than $2,000,000 per occurrence.  In addition to the foregoing, (A) for all Approved Retail Sites where alcoholic beverages are sold, the Jobber or Jobber Marketer will obtain and maintain liquor liability insurance of not less than $2,000,000 per occurrence, and (B) for all Approved Retail Sites where no alcoholic beverages are sold, Jobber will deliver to Company a Liquor Liability Waiver Form on Company's standard form, signed by Jobber or its Jobber Marketers, whichever is applicable.  Jobber may comply with the stated coverage amounts using alternative methods, excluding self-insurance, but including the use of umbrella coverage; provided such excess liability coverage must state what coverage it may be applied if not otherwise specified on the form.

**(b)  Requirements for each type of coverage.**  All insurance policies required under this Contract will: (i) name the Company, its parents, subsidiaries, and affiliated companies as an additional insured, except Worker's compensation insurance; (ii) include an endorsement containing an express waiver of any right of subrogation or other recovery, by Jobber or any insurance company, against Company; (iii) include an endorsement stipulating that Jobber's insurance policies are primary to, not contributory with and not excess to any other policies or self-insurance, except business automobile liability insurance; (iv) provide that no policy will be materially changed, amended or canceled except after 30 days' written notice to Company; and (v) provide that Jobber will be solely responsible for the payment of any premium or assessment, with no recourse against Company.

**(c)  Proof of coverage required.**  Each time Jobber renews the insurance coverage required under this Contract, but no less than annually, and at any time requested by Company, Jobber will provide such proof of coverage as Company determines is necessary for verification purposes including, but not limited to certificates of insurance or copies of the policies themselves. If Jobber fails to provide acceptable proof of insurance, as determined by Company, then Company may, at its option and in addition to all other remedies available to it under this Contract or at law, after 10 days notice to Jobber, obtain coverage to protect Company's interests only and charge the cost of such coverage to Jobber.

**(d)  Environmental coverage.**  If required by any applicable law, Jobber must obtain environmental impairment coverage in the amount and of the type required by such law.

**(e)  Indemnity not limited by insurance.**  The existence or non-existence of any insurance as required by this Contract will not limit the Jobber's indemnity or other obligations under this Contract.

**16.  Termination and Non-Renewal.**
  **(a)  Company's breach.**  Jobber may terminate this Contract if Company fails to comply with any material provision of this Contract, upon 90 days prior written notice of such a failure; provided, however, that Jobber will provide Company with a reasonable opportunity to exert good faith efforts to carry out such provision.

**(b)  Jobber's breach/PMPA.**  Company may terminate this Contract and non-renew any franchise relationship in accordance with Title I of the Petroleum Marketing Practices Act, 15 U.S.C. 2801 et seq., as amended ("**PMPA**"), and/or other applicable federal, state and/or local laws of the same nature and effect. Company expressly reserves all of its rights under the PMPA and Jobber acknowledges and agrees that no omission by Company of any specific reference to any specific PMPA right will constitute a waiver of that right. In addition, Jobber agrees and acknowledges that Company's rights and remedies under the PMPA will be without prejudice to all other rights and remedies available to Company at law or in equity.

**(c)  Procedures for termination and non-renewal by Company.**  If Jobber fails to comply with any of the terms and conditions of this Contract and/or related agreements, including all attachments, schedules, appendices, and amendments attached to and incorporated in those agreements, or if any other ground for termination and/or non-renewal arises, Company may, at its election, terminate this Contract and/or non-renew any franchise relationship upon 90 days written notice (or upon less than 90 days notice as may be reasonable under a particular circumstance). In the case of a market withdrawal, as defined in the PMPA, Company may terminate this Contract and/or non-renew any franchise relationship upon 180 days written notice.

**(d)  Physical or mental incapacity and death.**  For purposes of emphasis and elaboration, but without limitation, it is acknowledged and agreed by and between Company and Jobber that the following will constitute grounds for termination of this Contract and non-renewal of any franchise relationship: death or continuous, severe physical or mental disability of at least 3 months duration of: (i) the owner of the business, if Jobber is a sole proprietorship; or (ii) one of the partners, if Jobber is a partnership; or (iii) one of the members, if Jobber is an LLC; or (iv) the beneficial owner(s) of a majority of Jobber's voting stock, if Jobber is a corporation, unless the death or other incapacity of said beneficial owner(s) results in the contemporaneous transfer of a majority of said voting stock to an Immediate Family Member or Members, or to a Fellow Stakeholder or Stakeholders who has reached the applicable age of majority in the State in which the individual resides with at least 1 year of active management experience in the Jobber's business.

**(e)  Early termination.**  Jobber may terminate this Contract prior to the Term by paying Company an early termination sum ("**Early Termination Sum**") that is calculated by adding the following 3 elements: (i) all financial obligations under Jobber's accounts, aggregated and accrued up to and including the termination date; (ii) the aggregated and unamortized portion of any and all loans and advances made, and incentive and re-image funds provided to, Jobber; and (iii) an amount established by Company ("**Annual Purchase Commitment Calculation**"), in its sole discretion, determined by multiplying (A) the greater of (I) the Monthly Future Volume Requirement (as defined below), or (II) the Monthly Historic Volume (as defined below), by (B) the number of months remaining in the Term, by (C) 2 cents per gallon. "**Monthly Future Volume Requirement**" is calculated by adding the Total Annual Volume Requirement required of Jobber under this Contract from the date of termination through and including the end of the Term (prorated for any partial year) and dividing such sum by the number of months remaining in the Term. "**Monthly Historic Volume**" is calculated by adding the actual volume purchased by Jobber for the twelve (12) month period prior to the termination date and dividing by twelve (provided, however, that if there are less than twelve (12) months from the commencement of the Term through the termination date, then the actual volume purchased by Jobber during the Term divided by such number of months). Jobber agrees that Company's losses arising out of Jobber's early termination of the Contract would not be readily ascertainable and that the Early Termination Sum, as developed above, would represent a reasonable approximation of Company's losses in the event of such early termination. Jobber also agrees that Company's rights and remedies under the various provisions of this **Paragraph 16** will be without prejudice to all other rights and remedies available to Company in this Contract or at law or in equity, including, but not limited to the right to actual, consequential damages caused by and/or related to Jobber's breach of this Contract or any provision therein.

**(f) Company's equitable remedies.** Jobber agrees that money damages may not be a sufficient remedy for its breach of this Contract and that, therefore, in addition to all remedies available at law, Company will be entitled to seek specific performance, injunctive relief, declaratory judgment and/or other equitable remedies, as appropriate. Jobber agrees to waive any requirement for the posting of a bond in connection with Company's effort to seek an equitable remedy.

**(g) Claims and disputes.** Except as to claims relating to indebtedness, Company's equipment, protection of Company's Trade Identities, indemnification or as otherwise specified in this agreement, the parties will not be liable to each other for any other claim arising out of this agreement unless the claimant provides the other party with written notice of the claim (setting forth fully the facts on which the claims is based) within 180 days after the date on which the claim arose; and neither party may institute court proceedings against the other more than one year after the claim arose.

**17. Purchases.**
**(a) Company's right to limit purchase quantities.** Unless otherwise specified in the attachments, schedules, appendices or amendments to this Contract, purchases of each Product hereunder will be in equal and ratable quantities, subject to weekly or daily pro rating or any seasonal adjustments. Company will not be obligated to have available for purchase by Jobber in any given month more than an amount equal to 1/12 of the respective 12-month quantity for each such Product. Should Jobber at any time or for any month order in quantities less than its pro rated monthly amount, Company will not be obligated to have the deficiency available for purchase at any time. Should Jobber at any time or for any month require more than said pro rated amount, Company will have the right, at its option, to supply such excess requirement, but if Company supplies same it will not be obligated to do so again in the future.

**(b) Changes in and at Jobber's Designated Terminals.** Company will have the right, at any time, to change Jobber's Designated Terminals and/or to limit the quantity of Products that Company will make available to Jobber at any of said terminals by pro rating the annual quantities on a monthly, weekly or daily basis. Company will also have the right to determine and designate the percentage of Jobber's quantities that Company will make available to Jobber at Jobber's Designated Terminals.

**(c) Returned vapors.** Any petroleum product vapors that are redelivered to Company's terminals or other delivery points from Jobber's transport equipment in connection with the operation of any vapor recovery equipment or system, will become the property of Company without any accounting therefore by Company to Jobber.

**18. Determination of Quantities.** The quantities of Products sold hereunder will be determined on the basis of the temperature thereof at 60°F in accordance with "Table No. 6B of API Standard 2540, Manual of Petroleum Measurement Standards, Chapter 11.1 – Temperature and Pressure Volume Correction Factors for Generalized Crude Oils, Refined Products, and Lubricating Oils – March 2003" (or any API/ASTM reissue or replacement thereof in effect at the time of measurement), or at Company's option, on the basis of gross volume, as established by Company for Jobber's class of trade in the applicable geographic area, or as otherwise required by law.

**19. Clean Air Act Compliance.** Jobber will cooperate fully in all Clean Air Act compliance or survey programs by allowing an independent surveyor and/or the US Environmental Protection Agency ("**EPA**") to collect samples of fuel and by providing to the independent surveyor and/or EPA copies of product transfer documents and other records or information regarding the source of any gasoline received, the destination of any gasoline distributed, the oxygenate blending instructions for the reformulated blend stock for oxygenate blending (RBOB), and the rate (volume%) that oxygenate was blended into the gasoline.

**20. Rejection of Products and Notice of Breach.**
**(a) Rejection must occur within 48 hours of receipt.** Jobber will have 48 hours after its receipt of the Products sold under the Contract to inspect and either accepts or reject said Products.

**(b) Required procedures if Products rejected.** If Jobber intends to reject, it must do so in writing within the 48 hour inspection period and Company must receive said notice within 5 business days of Jobber's receipt of the Products in question. If Jobber fails to timely reject or fails to specify a claimed shortage, defect or nonconformity, said failure will constitute an irrevocable acceptance of the Products in question and/or a waiver of the alleged shortage, defect or nonconformity.

**(c) Required procedures if breach discovered after acceptance.** In the event that the Products are accepted pursuant to the terms of this **Paragraph 20**, Jobber agrees to notify Company in writing of any subsequently discovered breach of warranty which could not have reasonably been discovered by careful inspection at the time of Jobber's purchase. Such notice will be given within 7 days after discovery of the breach and must specify the facts constituting the alleged breach. Failure to give such notice will be deemed conclusive evidence that Jobber has no valid claim for breach of warranty.

**21. Express Warranties, Disclaimers and Damage Limits.**
**(a) Company warranties.** Company warrants that the Products sold to Jobber under this Contract will meet Company's then current specifications for the respective Product and that said Product will be in merchantable condition.

**(b) NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, ARE MADE.**

**(c) Right to damages limited.** Under no circumstances will Company be liable for incidental, special, punitive or consequential damages whether under warranty, tort, contract, strict liability or otherwise.

**22. Force Majeure and Allocation.**

(a) **Force majeure.** (1) Company will be excused from delay or nonperformance in the event of a refinery turnaround, whether partial or complete, or if it is otherwise unable to meet the demand for its Products at Company's normal and usual distribution points for supplying Jobber (regardless of whether or not Company may have diverted certain supplies from such distribution points in order to alleviate shortages at other distribution points), or in the event of failure or delay due to exhaustion, reduction or unavailability of Product, or an element, item or component necessary in the manufacture, production, or delivery of such Product. (2) Either party will be excused from delay or nonperformance in the event of any condition whatsoever beyond said party's reasonable control or reasonable foreseeability, and which is in no way the fault, in whole or in part, of the party seeking to be excused, that actually or proximately causes performance to be impossible, including without limitation: unavailability, failure, or delay of transportation; "Acts of God"; labor difficulties; explosions; storms; breakdown of machinery or equipment; fire; riots; war conditions in this or any other country; and compliance with any law or governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary) precluding, directly or indirectly, said party's ability to perform hereunder provided that the party seeking to be excused has taken every action reasonably within its powers to perform its duties under this Contract. Notwithstanding anything in **Paragraph 22(a)(2)** seemingly to the contrary, performance by either party cannot be avoided or excused merely because performance has become more economically burdensome or more costly than the party anticipated, or has become less profitable or unprofitable because of events or conditions outside the party's reasonable control, such as a change in market forces or reduction in demand for the Products. In the event that an event or condition described in this **Paragraph 22(a)(2)** is temporary, performance will be excused only for the period during which such event or condition makes performance impossible.

(b) **Allocation.** In the event of any of the contingencies or conditions referred to in **Paragraph 22(a)** above, Company will have the right to curtail purchases or allocate its supply of Product for sale among its customers in any manner that it deems to be fair and reasonable under the circumstances, and will not be obligated to obtain or purchase other supplies of Product or in any way make up for any Product not available for purchase. Jobber will not hold Company responsible in any manner for any losses or damages which Jobber may claim as a result of any such curtailment or allocation by Company.

**23. Discontinuance of Products or services.** Company may at any time and for any reason: (a) discontinue the production or sale of any Product covered hereby; (b) change the specifications or grade of any such Product; (c) replace any such Product with another Product; (d) change or withdraw the Trade Identities applicable to any such Product; (e) change or withdraw services, equipment or facilities offered in connection with any such Product, including, but not limited to, Payment Methods services or privileges; and/or (f) withdraw from marketing any such Product in the trade area encompassing any Approved Retail Site and/or in which any of Jobber's Designated Terminals are located. Company will not be liable to Jobber by reason of any such discontinuance, replacement, change or withdrawal.

**24. Compliance with Laws.**

(a) **Compliance with laws generally.** Jobber will comply, and require its Jobber Marketers and other customers to comply, with any and all applicable laws and regulations of any and all governmental authorities regarding (i) the receipt, shipment, delivery, storage, handling, use, sale, dispensing, measuring, calibrating, labeling, invoicing, advertising and/or promoting of the Products purchased under this Contract; and (ii) payment card compliance.

(b) **Compliance with environmental laws.** Without limiting the foregoing, Jobber will comply, and require its Jobber Marketers and other customers to comply, with any and all applicable laws and regulations promulgated by any and all governmental occupational, health and safety agencies and/or environmental protection agencies, including but not limited to: (i) the following federal Clean Air Act regulations and any corresponding state counterparts, as amended from time to time: (A) 40 CFR. Part 80, Subpart D, regarding reformulated gasoline; (B) 40 CFR. Part 80, Subpart C, regarding oxygenated gasoline; (C) 40 CFR. Part 80, Subpart B (specifically 40 C.F.R. sections 80.27 and 80.28), regarding gasoline volatility; (D) 40 CFR. Part 80, Subpart B (specifically 40 C.F.R. sections 80.29 and 80.30), regarding diesel fuel; and (E) 40 C.F.R. Part 80, Subpart G, regarding detergent-additize gasoline; (ii) the Resource Conservation and Recovery Act, as amended, 42 USC Section 6901 et seq.; (iii) the Clean Water Act, as amended, 33 USC Section 1251 et seq. ; and (iv) the Safe Drinking Water Act, as amended, 42 USC Section 300f et seq.

(c) **Compliance with laws regarding youth access to tobacco.** Jobber will comply, and require its Jobber Marketers to comply, with all laws regarding youth access to tobacco. Violation(s) of such laws can constitute grounds for termination or non-renewal of this Agreement.

(d) **Company's right to monitor compliance.** As part of Company's compliance programs, Jobber acknowledges and agrees that Company will have the right to enter upon any premises, including any Approved Retail Site, in or upon which any records necessary to demonstrate Jobber's compliance with the obligations referred to in **Paragraphs 19, 24(a), 24(b) and 24(c)** above are kept. Jobber also grants to Company the right to obtain and/or copy any records, inspect any equipment and sample any Products covered by this Contract.

(e) **Anti-Money Laundering and Bribery.** Company expressly prohibits payment of bribes and also payment of any so-called **"facilitation"** or **"grease"** payments in connection with Company's business operations by any party engaged to provide goods or services to Company. Therefore, Jobber represents and warrants that it has complied and shall comply with all anti-corruption laws applicable to either party and that it will comply with the principles of Company's Code of Conduct in connection with this Contract. Jobber represents and warrants that it has not made, offered, promised or authorized and will not make, offer, promise or authorize any improper or illegal payment, gift or other advantage, whether directly or through any other person or entity, to any third party, including any **"government official"** (i.e., any person holding a legislative, administrative, or judicial office, including any person employed by or acting on behalf of a public agency, a government-controlled enterprise, or a public

international organization) or any political party or political party official or candidate for office, for purposes of influencing official actions or decisions or securing any improper advantage in order to obtain or retain business or where it would otherwise be improper for such advantage to be accepted. Except as otherwise disclosed in writing to Company, as of the date of execution of this Contract and during the term of this Contract, no **"government official"** is or will become associated with, or will own or presently owns any interest in Jobber. At the request of Company, Jobber shall allow Company to review or audit Jobber's books, records and files relating to this Contract and Jobber will provide information and answer any reasonable questions that Company may have relating to Jobber's performance of this Contract in order to assess compliance with this **Paragraph 24(e)**. Company shall have the right to terminate this Contract and/or suspend performance hereunder with immediate effect if Company reasonably believes in good faith that any of the agreements, undertakings, representations or requirements set forth in this **Paragraph 24(e)** have not been complied with or fulfilled by Jobber.

**25. Taxes.** Jobber will pay, or will reimburse Company for Company's payment of, any tax, inspection or environmental fee, duty, tariff or other like charge (including penalty and interest, if any) imposed, levied, or assessed by federal, state, local, Native American, or foreign authority upon the Products or transactions covered by this Contract, or upon the import, manufacture, storage, sale, use, transportation, delivery, or export of the Products covered by this Contract, or upon the privilege of doing any of these activities, whether imposed on or measured by the volume, price, or proceeds of sale of the Products covered by this Contract.

**26. Confidentiality.** Jobber acknowledges and agrees that the guidelines, manuals, methods, policies, procedures, programs, software, specifications, standards (both operational and visual), strategies and all related information provided by, or on behalf of, Company are proprietary and confidential (individually and collectively, **"Confidential Information"**). Accordingly, Jobber will not disclose any Confidential Information to third parties or use it for any purpose not authorized by Company, unless otherwise required by law. In addition, Jobber may only disclose Confidential Information to its employees and its Jobber Marketers on a 'need to know' basis and only then if Jobber, its employees and its Jobber Marketers undertake to keep said disclosures confidential.

**27. Notices.** All notices given under this Contract will be deemed properly served if delivered in writing personally or sent by certified mail (return receipt requested) to Company or Jobber at the addresses indicated in the introduction to this Contract. The date of notice will be the date deposited in the U.S. mail or, if delivered personally, the date of delivery. Any change of address of a party will be communicated to the other party by written notice in accordance with the terms of this **Paragraph 27**.

**28. Entire Agreement.** This Contract cancels and supersedes all prior written and unwritten agreements, attachments, schedules, appendices, amendments and understandings between the parties pertaining to the matters covered in this Contract, except any indebtedness owed to Company, and contains the entire agreement between the parties. No representations or statements, other than those expressly set forth in this Contract were relied upon by the parties in entering into this Contract. No amendment, modification or waiver of, addition to, or deletion from the terms of this Contract will be effective unless reduced to writing and signed by Jobber and a properly authorized Company representative with actual authority to bind the Company.

BY SIGNATURE BELOW, JOBBER AFFIRMS AND REPRESENTS THAT NO PROMISES OTHER THAN _____ **[IF BLANK, "NONE"]** WERE MADE IN ORDER TO INDUCE JOBBER TO EXECUTE THIS CONTRACT.

*(Jobber's signature)*

**29. Severability.** In the event one or more paragraphs of this Contract, or portions of any paragraph, are declared or adjudged invalid or void by a court of competent jurisdiction, or in the event there is a change in any law that would invalidate any clause in this Contract, the remaining paragraphs of this Contract, or remaining portions of any paragraph, will remain in full force and affect. Company may, in the alternative and at its sole discretion, cancel this Contract with due notice to Jobber.

**30. No Waiver.** No course of dealing and no failure to act on any incident of breach under this Contract will be construed against Company as a waiver of its right to act in the future. The waiver of any breach of any term or condition in this Contract will not be construed as a waiver of any subsequent breach of the same or any other term or condition. Any failure by Company to enforce its rights or to seek remedies for any breach of this Contract will not prejudice its rights or available remedies for any subsequent breach by Jobber.

**31. Paragraph Titles.** The titles and subtitles of paragraphs in this Contract are for reference and identification purposes only. They are not intended to modify, restrict or expand upon the content of the paragraphs themselves.

**32. Capitalized Terms/Definitions.** Capitalized terms in the Contract will be defined and have the meanings as set forth herein.

**33. Execution.** This Contract will not be binding upon Company unless and until it is signed by Jobber and a Company representative with actual authority to bind the Company and a fully executed copy is returned to Jobber.

**34. Date of Contract.** The date of this Contract is the date of the last party to sign, as indicated in the signature block.

**SIGNATURE PAGE**
**FOR**
**BRANDED JOBBER CONTRACT**

**In Witness Whereof,** the parties hereto have executed this Contract on the date stated.

| Jobber: | Bauman Oil Distr. Inc. | | BP Products North America Inc. |
|---|---|---|---|

Signature: _____        Signature: _____

Print Name: Paul F. Bauman              Print Name: **Dale Kluba**

Title: President                        Title: **Business Development Manager**

Date: 6-19-17                           Date: 7-17-2017

bp

**Guaranty**

BJC(R)-GUAR (4-2012)

THIS GUARANTY AGREEMENT (this "**Guaranty**") is made and entered into as of this date of June 19, 2017 by Paul F. Bauman , (the "**Guarantor**"), in consideration for value received and to induce BP Products North America Inc., a Maryland corporation (hereinafter referred to as the "**Company**"), to lend money to or otherwise extend financial accommodation to or for the account of Bauman Oil Distr. Inc. , (the "**Debtor**"), in connection with any and all Branded Jobber Contract(s) and other fuel supply agreements, Jobber Outlet Incentive Program contract(s), Jobber Reimage Program contract(s) and any other agreements made in connection with any of the foregoing, including, without limitation, any purchases of motor fuel by Debtor from Company on credit, and any other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

1.    Guaranty of Obligations.  The Guarantor hereby absolutely, unconditionally and irrevocably guarantee(s) payment when due, and agrees to be liable for the full and indefeasible payment and performance when due, whether by declaration or otherwise, of any and all indebtedness, including interest thereon, of Debtor to Company, howsoever such indebtedness may arise, whether as principal, guarantor, endorser or otherwise, now existing or hereafter arising (including obligations which, but for any automatic stay under Section 362(a) of the United States Bankruptcy Code, would become due) which arises from the following agreements (as the same may be supplemented, amended, extended, renewed or replaced from time to time) between Debtor and Company: any and all Branded Jobber Contract(s) and other fuel supply agreements, Jobber Outlet Incentive Program contract(s), Jobber Reimage Program contract(s) and any other agreements made in connection with any of the foregoing, including, without limitation, any purchases of motor fuel by Debtor from Company on credit, any liquidated damages and fees owing from Debtor under any of the foregoing agreements and any payments or indebtedness received by Company from Debtor which Company may subsequently be required to relinquish under applicable law because of Debtor insolvency (all such indebtedness being herein called "Debt"), whether arising before, during or after the term of the Branded Jobber Contract(s) or after the commencement of any case with respect to Debtor under the United States Bankruptcy Code or any similar statute (including, without limitation, the payment of interest and other amounts, which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in any such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured and however acquired by the Company.  The Guarantor further unconditionally agree(s) to pay all expenses (including attorneys' fees, legal expenses and costs) incurred by Company to collect Debt and in enforcing this Guaranty, whether such expenses are incurred before, during or after the term of the Branded Jobber Contract(s) or after the commencement of any case with respect to the Debtor under the United States Bankruptcy Code or any similar statute.   Nothing contained herein shall be construed as obligating Company to extend any credit or to make any other financial accommodation to Debtor any other person or entity.

2.    Nature of Guaranty.  **This Guaranty Shall Be a Continuing and Irrevocable Guaranty**, and is a guaranty of payment, and not merely of collection.  The Company shall not be required, as a condition of the Guarantor's liability, to make any demand upon or to pursue any of its rights against the Debtor or to pursue any rights which may be available to it with respect to any collateral or any other person who may be liable for the payment of the Debt.

The Guarantor hereby waive(s) presentment, demand and protest; notice of acceptance of this Guaranty; notice of extensions of credit to Debtor from time to time; notice of the creation of the Debt, of any default, diligence, presentment and of protest, dishonor, or other action taken in reliance hereon; all demands and notices of any kind in connection with this Guaranty or the Debt and any defense based upon Company's failure to comply with the notice requirements of the applicable version of the Uniform Commercial Code §9-613(5); and all diligence in collection or protection of or realization upon the Debt.   The Guarantor agrees that the Company need not attempt to collect any Debt from Debtor but may require the Guarantor to make immediate payment of all Debt when due, whether by maturity, acceleration or otherwise, or at any time thereafter.

Company may, from time to time, without notice to or consent of any of the Guarantor, and without in any way affecting any of the Guarantor's liability or Company's rights hereunder: alter, accelerate, extend, renew, or change the time, place, manner or terms of payment of, or grant indulgences with respect to, Debt; increase or decrease the amount of Debt or the rate of interest on Debt; obtain the primary or secondary liability of any party or parties, in addition to the Guarantor, with respect to Debt; release or compromise any liability of any of the Undersigned hereunder or any other party or parties primarily or secondarily liable on Debt; release, foreclose on or otherwise exercise Company's secured interests in any real, tangible or intangible collateral securing any obligation of Debtor to Company, whether or not covered hereby; apply to Debt in such manner as Company shall determine, any sums received by it from Debtor or from any other source to be applied to Debtor's obligations; or resort to any or all of the Guarantor for payment of any or all Debt, whether or not Company shall have resorted to any property securing Debt or shall have proceeded against any other of the Guarantor or any other party primarily or secondarily liable on Debt.

3.    Account Stated.  The books and records of Company showing the account and dealings and transactions between Company and Debtor shall be admissible in evidence in any action or proceeding, including photocopies thereof, shall be binding upon the Undersigned for the purpose of establishing the items and amounts set forth therein, and shall constitute prima facie evidence thereof.

4.    Waiver.  No invalidity, irregularity or unenforceability of all or any part of the Debt shall affect, impair or be a defense to this Guaranty, nor shall any other circumstance which might otherwise constitute a defense be available to, or legal or equitable discharge of the Debtor in respect of any of the Debt, or the Undersigned in respect of this Guaranty, affect, impair or be a defense to the Guaranty.

5.    Additional Indebtedness.  The Undersigned acknowledges that the Debt may arise from time to time, without further authorization from, the consent of or notice to, the Undersigned, notwithstanding any adverse change in the condition of the business, assets or prospects of the Debtor after the date hereof.  In executing and delivering this Guaranty in favor of the Company, the Undersigned is not concerned with the condition of the business, assets or prospects of the Debtor and waives the right, if any, to require the Company to disclose to the Undersigned any information that the Company may have or hereafter acquire concerning the business, assets or prospects of the Debtor.

6.    Repayments or Recovery from the Company.  If any demand is made at any time upon the Company for the repayment or recovery of any amount received by it in payment or on account of any of the Debt and if the Company repays all or any part of such amount by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, the Guarantor will be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never been received originally by the Company.  The provisions of this section will be and

remain effective notwithstanding any contrary action which may have been taken by the Undersigned in reliance upon such payment, and any such contrary action so taken will be without prejudice to the Company's rights hereunder and will be deemed to have been conditioned upon such payment having become final and irrevocable.

7.  Enforceability of Obligations; Preferences, Fraudulent Conveyances, etc.; Maximum Liability.  (a) No modification, limitation or discharge of all or any part of the Debt arising out of or by virtue of any bankruptcy, reorganization or similar proceeding with respect to the Debtor for relief of debtors under the United States Bankruptcy Code or other federal or state law will affect, modify, limit or discharge the Guarantor's liability in any manner whatsoever and this Guaranty will remain and continue in full force and effect and will be enforceable against the Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted.  The Guarantor waives all rights and benefits which might accrue to it by reason of any such proceeding and will be liable to the full extent hereunder, irrespective of any modification, limitation or discharge of the liability of the Debtor that may result from any such proceeding.  The Guarantor expressly waives the effect of any statute of limitations or other limitations of time on any action under this Guaranty.

(b)    If the Company is required to refund, or voluntarily refunds, any payment received from the Debtor because such payment is or may be avoided, invalidated, declared fraudulent, set aside or determined to be void or voidable as a preference, fraudulent conveyance, impermissible setoff or a diversion of trust funds under any bankruptcy or similar laws or for any similar reason, including without limitation any judgment, order or decree of any court or administrative body having jurisdiction over the Debtor or any of its property, or upon or as a result of the appointment of a receiver, intervenor, custodian or conservator of, or trustee or similar offer for, the Debtor or any substantial part of its property, or otherwise, or any statement or compromise of any claim effected by the Company with the Debtor (a "**Rescinded Payment**"), then Guarantor's liability to the Company shall continue in full force and effect, or the Guarantor's liability to the Company shall be reinstated and renewed, as the case may be, with the same effect and to the same extent as if the Rescinded Payment had not been received by the Company, notwithstanding the termination of any agreements between the Company and the Debtor, and regardless of whether the Company contested the order requiring the return of such payment(s).  In addition, the Guarantor shall pay, or reimburse the Company for, all expenses (including all reasonable attorneys' fees, court costs and related disbursements), incurred by the Company in the defense of any claim that a payment received by the Company in respect of all or any part of the Debt must be refunded.  The provisions of this Section 7 shall survive termination of this Guaranty and any satisfaction and discharge of the Debtor by virtue of any payment, court order or any federal or state law.

(c)  Notwithstanding anything contained in this Guaranty, Branded Jobber Contract(s) or any other documents to the contrary, if the obligations of the Guarantor hereunder exceed the limitations imposed under any Fraudulent Transfer Laws (as hereinafter defined), then such obligations of the Guarantor shall be limited to a maximum aggregate amount equal to the largest amount that would not render its obligations subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the United States Bankruptcy Code or any applicable provisions of comparable state law (collectively, the "Fraudulent Transfer Laws"), in each case after giving effect to all other liabilities of the Guarantor, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws (specifically excluding, however, any liabilities of the Guarantor in respect of indebtedness to the Debtor or any other person that is an affiliate of the Debtor to the extent that such indebtedness would be discharged in an amount equal to the amount paid by the Guarantor in respect of the Debt) and after giving effect (as assets) to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation, reimbursement, indemnification or contribution of the Guarantor pursuant to applicable law or pursuant to the terms of any agreement.

8.  Subordination.  Payment of all amounts now or hereafter owed to the Guarantor by the Debtor (other than in the ordinary course of business) is hereby subordinated in right of payment to the indefeasible payment in full to the Company of the Debt and all such amounts and any security and guarantees therefore are hereby assigned to the Company as security for the Debt.

9.  Successors and Assigns; Joint and Several Liability.  This Guaranty is binding upon the Guarantor, his, her, their or its executors, administrators, trustees, receivers, parents, holding companies, affiliates, successors and assigns, and shall inure to the benefit of Company, its successors and assigns.  This Guaranty shall survive the death of any of the Guarantor(s), and any death of any of the Guarantor(s) shall not affect this Guaranty with respect to any other person or entity liable hereunder.  The Guarantor, if more than one person or entity, shall be jointly and severally liable hereunder and the term "**Guarantor**" wherever used herein shall mean the persons and/or entities comprising the Guarantor or any one or more of them. The term "**Debtor**", if more than one is named as such, shall mean all or any one thereof.  Anyone signing this Guaranty shall be bound hereby, whether or not anyone else signs this Guaranty at any time.

10.  Governing Law.  This Guaranty shall be governed and construed in accordance with the internal laws (without giving effect to choice of laws principles) of the State of Illinois.

11.  Waiver of Jury Trial.  **THE GUARANTOR HEREBY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, LAWSUIT OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO: (i) THIS GUARANTY OR ANY SUPPLEMENT OR AMENDMENT THERETO; OR (ii) ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN COMPANY AND THE GUARANTOR; OR (iii) ANY BREACH, CONDUCT, ACTS OR OMISSIONS OF COMPANY OR THE GUARANTOR OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSON AFFILIATED WITH OR REPRESENTING COMPANY OR THE UNDERSIGNED; IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.**

12.  Preservation of Rights.  No delay or omission on the Company's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Company's action or inaction impair any such right or power.  The Company's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Company may have under other agreements, at law or in equity.

13.  Illegality.  If any provision or portion of this Guaranty or any supplement or amendment thereto is held to be illegal, invalid or unenforceable by a court or adjudicatory body of competent jurisdiction, said provision or portion shall be deemed to be severed and deleted and the remainder shall continue to be valid and enforceable.

14.  Entire Agreement; Amendment.  This instrument contains the entire agreement between the parties as to the subject matter hereof and may not be modified, waived or otherwise changed except by a written instrument signed by Company and the Guarantor.  In no event shall the Guarantor use or otherwise claim as relevant any course of dealing between the parties, any usage of the trade or any parole or extrinsic evidence of any nature to supplement, explain or modify any term or provision of this Guaranty or any supplement or amendment thereto.  The Guarantor acknowledges receipt of a copy of this Guaranty, and certifies that the Guarantor has read all of said document, and fully understand and agrees to the same, before having signed it.

15.  Counterparts.  This Guaranty may be executed in multiple counterparts.  Signatures hereon sent by e-mail, fax or other electronic means may be treated as original signatures.

## SIGNATURE PAGE FOR GUARANTY

**IN WITNESS WHEREOF,** Guarantor has executed and delivered this Guaranty as of the day and year first written above.

_____          6-19-17
Guarantor Signature                                        Date

_____          _____
Guarantor Signature                                        Date

_____          _____
Guarantor Signature                                        Date

**\*\*\* *NOTARIZED SIGNATURE REQUIRED***

Subscribed and sworn to before me a Notary Public on this 19 day of June ,2017 in the county of Jefferson
State of Missouri by Paul F. Bauman (Guarantor) who:

✓ is personally known to me; or

_____ produced his/her Driver's License

_____
Notary Public

5/17/2021
My Commission Expires

_____
Notary Public Stamp

**Minutes of a Joint Special Meeting
of the Stockholders and Board of
Directors of Corporation (Jobber)**

BJC(R)-CORP (4-2012)

A Joint Special Meeting of the Stockholders and Board of Directors of

**Bauman Oil Distr. Inc.**

("Corporation") was

_____
(State exact legal name of Corporation)

held on _____ , at _____ o'clock _____ a. m. or p.m. The following

individuals, being all of the Stockholders and all of the Directors of said Corporation, were present:

_____

_____
(State names of all Stockholders and Directors)

The meeting was called to order by the president ("**President**") of the Corporation,

_____ who stated that the purpose of the meeting was to consider
(State name of President)

a resolution authorizing the Corporation to enter into a Branded Jobber Contract and any and all other legal documents with BP
Products North America Inc., or its successor ("**BP**").

The President of the Corporation moved that the following resolution be adopted by the Corporation:

     RESOLVED, that each of the President and the Secretary of the Corporation individually be, and
     each hereby is, empowered to execute a Branded Jobber Contract and any other legal documents
     with BP, including, but not limited to, any guaranty or security agreements required by Company.

     RESOLVED, that the following officers of the Corporation individually be, and each hereby is,
     empowered to execute a Branded Jobber Contract and any other legal documents with BP:

     **Name**                            **Title**

     _____      _____

     _____      _____

There being no further discussion on the question, the aforementioned resolution was unanimously passed by the Board of
Directors and Stockholders of the Corporation.

I, the undersigned, Secretary of _____
                                        (State name of Corporation)

a _____ corporation, do hereby certify that the foregoing resolution was
    (Insert state of incorporation)

(i) adopted by an affirmative vote of the Stockholders and Directors of said Corporation at a Joint Special Meeting of the
Stockholders and Board of Directors duly called and held on the above-stated date, at which a quorum was present; and (ii) that
all officers being authorized to sign documents is in strict accordance with the Corporation's by-laws.

_____
                                   Corporate Secretary

Jobber SAP Number:    __90026419__



**Attachment A -**
**Approved Retail Sites and Jobber's**
**Designated Terminals**

BJC-A (4-2012)

**[See Attached]**



Jobber SAP Number:    **90026419**

**Attachment A-1**
**Minimum Annual Volume**
**Requirement Schedule**
BJC-A1 (4-2012)

## Minimum Annual Volume Requirement Schedule

| Years | Dates (MM/DD/YY to MM/DD/YY) | Minimum Annual Volume Requirement (gallons) |
|-------|------------------------------|---------------------------------------------|
| 1 | 07-01-2017 to 06-30-2018 | 5,000,000 |
| 2 | 07-01-2018 to 06-30-2019 | 5,000,000 |
| 3 | 07-01-2019 to 06-30-2020 | 5,000,000 |
| 4 | to | |
| 5 | to | |
| 6 | to | |
| 7 | to | |
| 8 | to | |
| 9 | to | |
| 10 | to | |

**Jobber:**    **Bauman Oil Distr. Inc.**

Signature:

Print Name:    Paul F. Bauman

Title:    President

Date:    7-17-17

**BP Products North America Inc.**

Signature:

Print Name:    **Dale Kluba**

Title:    **Business Development Manager**

Date:    7-17-2017

# Revised Summary of Title I of the Petroleum Marketing Practices Act

**AGENCY: Department of Energy**

ACTION: Notice

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or non renewal of a franchise is given.

**SUPPLEMENTARY INFORMATION:**
Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under the title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

## Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C §§2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination, or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark, which is owned or controlled by a refiner and it includes secondary agreements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. §§2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

## I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

### A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State, or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance within the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

### B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the time period which began not more than 180 days before you receive the notice of termination.

### C. Mutual Agreement to Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

### D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. § 2802(b)(E).

### E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate you franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisor acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered by the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A. Failure to Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

### III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

### A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier my repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

### B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain: (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action; (2) The date the termination or nonrenewal takes effect; and (3) A copy of this summary.

### IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

### A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2806.

### VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I - Definitions and Legal Remedies

### I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

### A. Franchise

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

**B. Franchise Relationship**

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

**C. Franchisee**

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**D. Franchisor**

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**E. Marketing Premises**

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

**F. Leased Marketing Premises**

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

**G. Fail to Renew and Nonrenewal**

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

**II. Legal Remedies Available to Franchisee**

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

**A. Franchisee's Right to Sue**

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

**B. Equitable Relief**

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

**C. Burden of Proof**

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

**D. Damages**

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

**E. Franchisor's Defense to Permanent Injunctive Relief**

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
(2) To materially alter, add to, or replace such premises;
(3) To sell such premises;
(4) To withdraw from marketing activities in the geographic area in which such premises are located; or
(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Form BJC-PMPA (10-2001)

# 2007 PMPA AMENDMENT

### 15 U.S.C. § 2807.    Prohibition on restriction of installation of renewable fuel pumps.

**(a) Definition**
In this section:

(1) Renewable fuel
The term "renewable fuel" means any fuel—

(A) at least 85 percent of the volume of which consists   of ethanol; **or**

(B) any mixture of biodiesel and diesel or renewable diesel (as defined in regulations adopted pursuant to section 7545(o) of Title 42 (40 CFR, part 80)), determined without regard to any use of kerosene and containing at least 20 percent biodiesel or renewable diesel.

(2) Franchise-related document
The term "franchise-related document" means—

(A) a franchise under this Chapter; **and**

(B) any other contract or directive of a franchisor relating to terms or conditions of the sale of fuel by a franchisee.

**(b) Prohibitions**

(1) In general

No franchise-related document entered into or renewed on or after December 19, 2007, shall contain any provision allowing a franchisor to restrict the franchisee or any affiliate of the franchisee from—

(A) installing on the marketing premises of the franchisee a renewable fuel pump or tank, except that the franchisee's franchisor may restrict the installation of a tank on leased marketing premises of such franchisor;

(B) converting an existing tank or pump on the marketing premises of the franchisee for renewable fuel use, so long as such tank or pump and the piping connecting them are either warranted by the manufacturer or certified by a recognized standards setting organization to be suitable for use with such renewable fuel;

(C) advertising (including through the use of signage) the sale of any renewable fuel;

(D) selling renewable fuel in any specified area on the marketing premises of the franchisee (including any area in which a name or logo of a franchisor or any other entity appears);

(E) purchasing renewable fuel from sources other than the franchisor if the franchisor does not offer its own renewable fuel for sale by the franchisee;

(F) listing renewable fuel availability or prices, including on service station signs, fuel dispensers, or light poles; **or**

(G) allowing for payment of renewable fuel with a credit card,

so long as such activities described in subparagraphs (A) through (G) do not constitute mislabeling, misbranding, willful adulteration, or other trademark violations by the franchisee.

(2) Effect of provision

Nothing in this section shall be construed to preclude a franchisor from requiring the franchisee to obtain reasonable indemnification and insurance policies.

**(c) Exception to 3-grade requirement**

No franchise-related document that requires that 3 grades of gasoline be sold by the applicable franchisee will prevent the franchisee from selling a renewable fuel in lieu of 1, and only 1, grade of gasoline.

*Form BJC-PMPA AM (10-2008)

**bp**



**Chris Elliott**
Business Relations and Midwest Fuels Director

BP Products North America Inc.
30 South Wacker Drive, Suite 900
Chicago, IL  60606

VIA CERTIFIED MAIL -- RETURN RECEIPT REQUESTED

January 20, 2017

Paul Bauman
Bauman Oil Distr. Inc.
1503 Commercial Blvd.
Herculaneum, MO 63048

<u>Branded Jobber Contract – Renewal</u>

Dear Paul Bauman:

Please refer to your Branded Jobber Contract (BJC) and other related agreements (collectively, "Franchise") dated March 24, 2014, between you and BP Products North America Inc. ("BP"). The Franchise expires by its own terms on June 30, 2017.

In order to renew your Franchise relationship, please sign the enclosed Branded Jobber Contract package and return it to your Business Development Manager, **Dale Kluba** at **PO Box 370, St. Charles, MO  63302** by May 30, 2017. The renewal term will be effective **July 01, 2017** and will end **June 30, 2020**.

As a reminder, pursuant to your Branded Jobber Contract you are required to purchase annually 5,000,000 gallons of BP Products ("Annual Minimum Volume") and if you fail to meet your Annual Minimum Volume requirement during any year of your term of your Franchise, BP will have grounds to non-renew and/or terminate your franchise relationship with BP.

The Branded Jobber Contract has been revised and the following items are the major updates made to the contract:

- Renewable Fuels definition added
- Per Site - Minimum Volume Requirement with a Side Letter added
- The Trade Signage Agreement eliminated and terms are incorporated into the Branded Jobber Contract
- Payment Card Industry (PCI) Compliance added
- Minimum insurance requirement increased
- Right of First Refusal revised
- Compliance with Law revised – added Anti-Money Laundering and Bribery
- Early termination fee revised
- Guaranty replaces the Unlimited Guaranty and requires a Notary Public seal
- Attachment A-1: Annual Minimum Volume Requirement Schedule added

In addition, as of January 1, 2014, pursuant to Section 2(g) of the Branded Jobber Contract and Side Letter, each of your Approved Retail Sites will be required to purchase a minimum of 300,000 gallons of Product during every continuous 12-month period of the Term of the Branded Jobber Contract. In the event that you fail for any reason to meet the minimum amount of the Per Site Annual Volume Requirement for each Approved Retail Site, BP will revoke its approval of and require you to debrand such Approved Retail Site pursuant to Section 6(b) of the Branded Jobber Contract.

If you do not timely execute and return the Branded Jobber Contract, BP must assume that you wish to non-renew your Franchise. If BP does not receive the fully executed Branded Jobber Contract on or before **May 30, 2017**, BP does hereby non-renew your Franchise and any related franchise relationship effective on **June 30, 2017** ("Nonrenewal Effective Date"). In addition, your Jobber Sales Manager and/or Sales Analyst may contact you to collect any unamortized balances owed to BP.

As part of the BP Branded Diesel Program and to update the Branded Jobber Contract, please review the preliminary Attachment A. You must visit bpconnection.com to make any corrections and add more specific detail to retail sites offering branded diesel (see enclosed brochure for further instruction).

In compliance with your Franchise, you are hereby notified that pursuant to Section 16(c) of your Franchise, if a ground for non-renewal has arisen, BP may nonrenew your Franchise upon 90 days written notice.

In compliance with Petroleum Marketing Practices Act ("PMPA"), you are hereby notified that pursuant to Section 2802(b)(3)(A) of the PMPA, your failure to agree to changes or additions to the provisions of the franchise made in good faith and in the normal course of business and not for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor, is grounds for non-renewal.

If you have any questions regarding this matter, please contact your Business Development Manager. I am enclosing a copy of the Revised Summary of Title I of the PMPA.

Very truly yours,

Chris Elliott
Business Relations and Midwest Fuels Director

Enclosure:      Revised PMPA Summary and Amendment
                Diesel Program Updates Instructions

cc:      Dale Kluba
         Alex Cerda
         Steven Fetzer

# EXHIBIT F

**IN THE CIRCUIT COURT**
**THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

MATTHEW EATON,                          )                     EXHIBIT A
                                        )
                    Plaintiff,          )
                                        )
vs.                                     )
                                        )
TURTLE WAX, INC.,                       )     Case No.:  17-L-644
                                        )
BP PRODUCTS NORTH AMERICA, INC.,        )
                                        )
PHILLIPS 66 COMPANY,                    )
                                        )
BAUMAN OIL DISTRIBUTORS INC.,           )     **JURY TRIAL DEMANDED**
As Respondent in Discovery only         )
                                        )
SERVE:                                  )
National Registered Agents, Inc.        )
208 S. LaSalle Street, Suite 814        )
Chicago, IL 60604                       )
                                        )
3M COMPANY, a/k/a MINNESOTA             )
MINING AND MANUFACTURING,               )
                                        )
BERRYMAN PRODUCTS,                      )
                                        )
THE B'LASTER CORPORATION,               )
                                        )
CRC INDUSTRIES, INC.,                   )

and

SAFETY-KLEEN SYSTEMS INC.,

                    Defendants.

**<u>FOURTH AMENDED COMPLAINT</u>**

COMES NOW Plaintiff Matthew Eaton (hereinafter, "Plaintiff"), by and through

undersigned counsel, and for his Fourth Amended Complaint and cause of action against

Defendants, states as follows:

## PARTIES

1. Plaintiff is a resident of Potosi, located in the County of Washington, State of Missouri, and is a citizen of the State of Missouri.

2. Defendant TURTLE WAX, INC. (hereinafter, "Turtle Wax") is an Illinois corporation, doing business within the State of Illinois.

3. Defendant BP PRODUCTS NORTH AMERICA, INC. (hereinafter "BP") is a foreign corporation, incorporated in the State of Delaware, with its principal place of business located in the State of Illinois.

4. Defendant PHILLIPS 66 COMPANY (hereinafter, "Phillips 66") is a foreign corporation, incorporated in the State of Delaware and doing business within the State of Illinois.

5. Defendant 3M COMPANY, also known as MINNESOTA MINING AND MANUFACTURING (hereinafter, "3M"), is a foreign corporation, incorporated in the State of Delaware, and doing business within the State of Illinois.

6. Defendant BERRYMAN PRODUCTS (hereinafter, "Berryman"), is a foreign corporation, incorporated in the State of Texas, and doing business within the State of Illinois.

7. Defendant THE B'LASTER CORPORATION (hereinafter, "B'Laster"), is a foreign corporation, incorporated in the State of Ohio, and doing business within the State of Illinois.

8. Defendant CRC INDUSTRIES, INC. (hereinafter, "CRC Industries"), is a foreign corporation, incorporated in the State of Indiana, and doing business within the State of Illinois.

9. Defendant SAFETY-KLEEN SYSTEMS INC. (hereinafter, "Safety-Kleen"), is a foreign corporation, incorporated in the State of Wisconsin, and doing business within the State of Illinois.

10. BAUMAN OIL DISTRIBUTORS INC. (hereinafter, "Bauman") is a foreign corporation, incorporated in the State of Illinois with a registered agent, National Registered Agents, Inc., located at 208 S. LaSalle Street, Suite 814, Chicago, IL 60604.  At this time, Bauman is named as a Respondent in Discovery only under 735ILCS 5/2-402, because on information and belief, Plaintiffs are informed that Bauman transported gasoline and other petroleum products from various facilities in Madison County, Illinois to the location of Plaintiff, Matthew Eaton's benzene exposure.

11. The forgoing individual defendants, set forth in Paragraphs 2 through 10, will be collectively referred to as "Defendants" throughout Plaintiff's Complaint.

### JURISDICTION AND VENUE

12. Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution, this Court has *in personam* jurisdiction over Defendants, because Defendants are present or domiciled in the State of Illinois, such that requiring an appearance does not offend traditional notions of fair play and substantial justice.  Moreover, Plaintiff was exposed to benzene or benzene-containing products within the State of Illinois and that originated within the State of Illinois.

13. This Court has both general and specific personal jurisdiction over Defendants, pursuant to and consistent with, 735 ILCS 5/2-209, and the United States and Illinois constitutional requirements of Due Process, in that the Defendants, individually or acting through their apparent agents, committed one or more of the following acts:

    a. Defendants transacted business in the State of Illinois, 735 ILCS 5/2-209(a)(1);

    b. Defendants committed, and/or conspired to commit, a tortious act within the State of Illinois, 735 ILCS 5/2-209(a)(2); and/or

    c.  Defendants owned, used, or possessed real estate situated in the State of Illinois, 735 ILCS 5/2-209(a)(3);

    d.  At all relevant time, it was foreseeable to Defendants that their tortious acts and/or their transaction of business in the State of Illinois would have consequences such that Defendant could reasonably foresee being hauled into Court in the State of Illinois; and

    e.  Requiring Defendants to litigate this claim in the State of Illinois does not offend traditional notions of fair play and substantial justice and is permitted by the United States Constitution.

14. There is no federal subject matter jurisdiction because there is no federal question raised.

15. On or about June 22, 2015, Plaintiff was diagnosed with Acute Myeloid Leukemia (hereinafter, "AML").

16. Plaintiff was first exposed to and inhaled, ingested, or otherwise absorbed benzene fumes emanating from benzene and certain benzene-containing materials and products, including, but not limited to, gasoline, that was purchased from Standard Oil, Amoco, Defendant Phillips 66, and Defendant BP oil refineries and terminals, located in the City of Wood River Illinois, in the County of Madison, State of Illinois.

17. All Defendants are entities that may have caused, or contributed to cause, Plaintiff's AML from benzene and contaminants exposure through their products, facilities, or operations within the State of Illinois and elsewhere or are parent companies, affiliates, subsidiaries, successors in interest, employees, contractors, sub-contractors or other agents of the named Defendants, or their respective predecessors in interest.

18. The aforementioned Defendants are jointly and severally liable in that they caused or contributed to Plaintiff's injuries.

19. Venue is proper in this Court under 735 ILCS §5/2-101(2) because Madison County is the county in which the actions or omissions, or some parts thereof, occurred and out of which Plaintiff's cause of action arose.

### ALLEGATIONS COMMON TO ALL COUNTS

20. In the course of his life and in the course of his duties and responsibilities as an employee of various businesses, Plaintiff was caused to be exposed to and thereby inhaled, ingested, breathed, and/or otherwise absorbed the benzene and certain benzene-containing products, materials, gases and fumes, including, but not limited to, gasoline, that was purchased from Standard Oil, Amoco, Defendant Phillips 66, and Defendant BP oil refineries and terminals, located in the City of Wood River Illinois, in the County of Madison, State of Illinois.

21. During the course of Plaintiff's life and work, Plaintiff was present at and worked at service stations where he conducted and/or was in the vicinity of vehicle repairs, gasoline pumping, and gasoline pump/tank maintenance, and in the process thereof was exposed to and inhaled, ingested or otherwise absorbed benzene and/or benzene fumes emanating from benzene and certain benzene-containing and/or benzene-related materials and products he was working with and around, which were processed, produced, manufactured, sold, distributed, marketed, and/or otherwise used by Defendants.

22. From 1979 through 1985, Plaintiff's father, Walter "Bud" Eaton (hereinafter, "Bud Eaton") owned and operated a Defendant Phillips 66 gas station, with two (2) service bays and four (4) pumps, named "Eaton 66."

23. Eaton 66 was located at 602 High Street, Potosi, Missouri 63664.

24. From 1985 through 2003, Plaintiff's father, Bud Eaton, owned and operated a Standard/Amoco/Defendant BP gas station, with an office, showroom, four (4) service bays, and nine (9) pumps, named "Eaton's Service Center."

25. Eaton's Service Station was located on Park Drive in Potosi, Missouri.

26. As an infant, Plaintiff was transported by his Mother to and fro Eaton 66, whereat he was caused to spend a significant amount of time at Eaton 66, including in and around the service bay and pumps, vehicle repairs, gasoline pumping, and gasoline pump/tank maintenance.

27. As a child, Plaintiff was transported to and fro Eaton 66 and Eaton's Service Center, via the local school bus, whereat he was caused to spend a significant amount of time at Eaton 66 and Eaton's Service Center, including in and around the service bay and pumps, vehicle repairs, gasoline pumping, and gasoline pump/tank maintenance.

28. Beginning in and around 1992, at the age of approximately fifteen, and continuing until 2003 Plaintiff was employed by and worked at Eaton's Service Center, whereat he was caused to spend a significant amount of time at Eaton's Service Center, including in and around the service bay and pumps, vehicle repairs, gasoline pumping, and gasoline pump/tank maintenance.

29. From 1979 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Plaintiff during his employment at Eaton's Service Center, used and worked around wax that was produced, manufactured, distributed, and/or sold by Defendant Turtle Wax.

30. From 1979 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Plaintiff during his employment at Eaton's Service Center, used and worked

around petrochemical products, including various forms of gasoline and diesel fuel and 3-in-1 oil, that were produced, manufactured, distributed, and/or sold by Defendant BP.

31. From 1979 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Plaintiff during his employment at Eaton's Service Center, used and worked around petrochemical products that were produced, manufactured, distributed, and/or sold by Defendant Phillips 66.

32. From 1979 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Plaintiff during his employment at Eaton's Service Center, used and worked around petrochemical products that was produced, manufactured, distributed, and/or sold by Defendant Bauman.

33. From 1979 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Plaintiff during his employment at Eaton's Service Center, used and worked around, the following products produced, manufactured, distributed, and/or sold by Defendant 3M:

    a.  Weatherstrip & Gasket Adhesive, which was a paste product, used daily;

    b.  Super 77 Spray Adhesive, which was a liquid product, used almost every day; and

    c.  General Purpose Adhesive Remover, which was a spray product, used once in a while.

34. From 1979 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Plaintiff during his employment at Eaton's Service Center, used and worked around cleaners, degreasers, lubricants, and penetrants that were produced, manufactured, distributed, and/or sold by Defendant Berryman.

35. From 1979 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Plaintiff during his employment at Eaton's Service Center, used and worked

around cleaners, degreasers, lubricants, and penetrants that were produced, manufactured, distributed, and/or sold by Defendant B'Laster.

36. From 1979 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Plaintiff during his employment at Eaton's Service Center, used and worked around CRC Brakeleen and CRC Contact Cleaner that were produced, manufactured, distributed, and/or sold by Defendant CRC Industries.

37. From 1979 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Plaintiff during his employment at Eaton's Service Center, used and worked around Safety-Kleen parts cleaner that were produced, manufactured, distributed, and/or sold by Defendant Safety-Kleen.

38. Plaintiff was further exposed to and inhaled, ingested, or otherwise absorbed benzene fumes emanating from benzene and certain benzene-containing materials and products, while employed by numerous entities and/or employers, including, but not limited to:

    a. In 1995, as a laborer at various jobsites located throughout Missouri for Eagle Cabinet Company, located at 18935 MO 21, Cadet, Missouri 63630; and

    b. In and around 1999 through 2000, as an employee at various locations throughout Missouri and Illinois, including the County of Madison and County of St. Clair, for Michel Build Products, a Division of McBride and Sons.

39. During his employment at the entities and/or employers set forth in Paragraph 38, including all subparts thereof and including, but not limited to, his duties of construction on residential windows, Plaintiff was exposed to cleaners, solvents and solvent-based fluids, which were processed, produced, manufactured, sold, distributed, marketed, and/or otherwise used by Defendants.

### COUNT I—NEGLIGENCE
#### (AGAINST ALL DEFENDANTS)

COMES NOW Plaintiff, by his attorneys, The Dysart Law Firm, P.C., and for his cause of action against Defendants, and states:

40. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

41. At all times relevant herein, these Defendants had a duty to exercise reasonable care and caution for the safety of Plaintiff and others working with and around their benzene - containing materials and/or products.

42. At all times relevant herein, Defendants manufactured, used, and/or distributed the benzene and/or benzene-containing, materials, and/or products at issue herein.

43. At all times relevant herein, benzene-containing products contain a specific hazard in that they are have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting, or otherwise absorbing them.

44. At all times herein, these Defendants failed to exercise ordinary care and caution for the safety of Plaintiff in one or more of the following respects:

    a. Included benzene in its materials and/or products, even though it was completely foreseeable and could or should have been anticipated that persons such as Plaintiff working with or around them would inhale, ingest or otherwise absorb benzene;

    b. Included benzene in its materials and/or products when Defendants knew or should have known that said benzene would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing it;

    c. Included benzene in its materials and/or products when adequate substitutes were available;

    d. Failed to provide any or adequate instructions concerning the safe methods of working with and around the benzene, materials and/or products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing benzene;

      e.  Failed to conduct tests on said benzene, materials and/or products in order to determine the hazards to which persons such as Plaintiff might be exposed while working with and around the same;

      f.  Failed to provide any or adequate warnings to persons working with and around their benzene, materials, and/or products of the dangers of inhaling, ingesting, or otherwise absorbing benzene; and

      g.  Failed to provide Plaintiff with its acquired knowledge concerning the hazards of benzene or actively suppressed knowledge and information concerning the hazards of benzene.

45. At all times herein, Plaintiff employed the products provided by these Defendants in the manner and for the purposes for which they were reasonably expected and in the way that Defendants should expect.

46. The benzene and/or benzene containing products had a particular defect or hazard when put to the reasonably expected use and/or disposal thereof, in that Defendants had no reason to believe that the user would realize the danger posed by the product's defect or hazard and in fact failed to adequately warn users, including Plaintiff, of the danger.

47. Defendants knew or should have known that the benzene contained in its materials, and/or products had a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting, or otherwise absorbing it.

48. That as a direct and proximate result of the unreasonably dangerous condition of Defendants' benzene, materials, and/or products, Plaintiff was exposed to and inhaled, ingested, or otherwise absorbed benzene in sufficient amounts to cause, or contribute to cause, disease and/or other injury.

49. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff was caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff to develop AML.

50. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff was caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff to incur medical bills, pain and suffering, a shortened life expectancy, and mental anguish.

51. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff was caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff to miss work, and his career and ability to make a living has been severely and permanently damaged.

52. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff was caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby ensuring Plaintiff will incur future medical bills, life-long medication and medical treatment, pain and suffering, a shortened life expectancy, and mental anguish.

WHEREFORE, Plaintiff prays this Court to enter judgment in his favor and against Defendants, to award compensatory damages, costs incurred prosecuting this matter, plus interest in a fair and reasonable amount in excess of FIFTY THOUSAND DOLLARS ($50,000) and to grant such other and further relief as this Court deems appropriate.

### COUNT II—WILLFUL AND WANTON MISCONDUCT
(AGAINST ALL DEFENDANTS)

COMES NOW Plaintiff, by his attorneys, The Dysart Law Firm, P.C., and for his cause of action against Defendants, and states:

53. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

54. Defendants had a duty to Plaintiff to refrain from willful and wanton acts or omissions that would harm the Plaintiff.

55. Defendants' conduct described in this Complaint show complete indifference to or conscious disregard for the safety of others amounting to willful and wanton misconduct in that Defendants failed to exercise ordinary care when a known and extraordinary danger, namely benzene, was imminent or, Defendants through recklessness, regardless to the danger of another, carelessly failed to discover the extraordinary and impending danger of benzene and would have discovered it through the exercise of ordinary care.

56. Defendants breached their respective duties to Plaintiff and engaged in one or more of the following acts or omissions amounting to willful and wanton misconduct:

    a. Intentionally or with reckless disregard for the safety of Plaintiff, included benzene in their materials and/or products, even though they knew that persons such as Plaintiff living and working with or around the same would inhale, ingest or otherwise absorb benzene;

    b. Intentionally or with reckless disregard for the safety of Plaintiff, included benzene in their materials and/or products when they knew that the benzene would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

    c. Intentionally or with reckless disregard for the safety of Plaintiff, included benzene in their materials and/or products when they knew adequate substitutes were available;

    d. Intentionally or with reckless disregard for the safety of Plaintiff, failed to provide any or adequate warnings to persons working with and around the benzene, materials and/or products of the dangers of inhaling, ingesting or otherwise absorbing benzene;

    e. Intentionally or with reckless disregard for the safety of Plaintiff, failed to provide any or adequate instructions concerning the safe methods of working with and around benzene and benzene-containing materials and/or products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the benzene in them;

    f. Intentionally or with reckless disregard for the safety of the Plaintiff, failed to conduct tests on their benzene and benzene containing materials and/or products in order to

determine the hazards to which persons such as the Plaintiff might be exposed while working with and around the same; and,

g.  Intentionally or with reckless disregard for the safety of Plaintiff, suppressed knowledge and information of the hazards of benzene.

64. Defendants knew that their acts and omissions created a substantial risk that persons such as Plaintiff would suffer illness as a result and, therefore, carried out the same with complete indifference to, and/or conscious disregard for, the life, health and welfare of Plaintiff.

65.  That as a direct and proximate result of the foregoing willful and/or wanton acts or omissions on the part of the Defendants mentioned above, Plaintiff was exposed to and inhaled, ingested or otherwise absorbed benzene in sufficient amounts to cause disease and/or other harm.

66.  As a direct and proximate result of said exposure, inhalation, ingestion and/or absorption, the Plaintiff developed AML.  Plaintiff was compelled to expend and became liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his benzene related disease and conditions and to alleviate the pain, suffering, mental anguish and physical disability caused by his injury; Plaintiff experienced great physical pain and mental anguish as a result of said exposure, inhalation, ingestion and absorption; that as a further result of his benzene-induced disease and conditions, that Plaintiff had a shortened life span; Plaintiff was hindered and prevented from pursuing his normal course of employment, thereby losing large sums of money which otherwise would have accrued to him.

WHEREFORE, Plaintiff prays this Court to enter judgment in his favor and against Defendants, to award compensatory damages, costs incurred prosecuting this matter, plus interest

in a fair and reasonable amount in excess of FIFTY THOUSAND DOLLARS ($50,000) and to grant such other and further relief as this Court deems appropriate.

### COUNT III—CONSPIRACY
#### (AGAINST DEFENDANTS BP AND PHILLIPS 66)

COMES NOW Plaintiff, by his attorneys, The Dysart Law Firm, P.C., and for his cause of action against Defendants BP and Phillips 66, and states:

67. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

68. Defendants BP and Phillips 66 agreed to suppress knowledge of the hazards of benzene and benzene- containing materials and products.  Said Defendants acted together for the purpose of accomplishing by concerted action an unlawful purpose by an unlawful means, a lawful purpose by unlawful means or an unlawful purpose by lawful means. Pursuant to said agreement, Defendants BP and Phillips 66 committed overt unlawful acts in furtherance of the conspiracy, knowingly and voluntarily participated in their common scheme to commit unlawful acts in an unlawful manner.  Defendants BP and Phillips 66 understood the general objectives of the conspiratorial scheme, accepted the general objectives and agreed to do their part to further those objectives.

69. Defendants BP and Phillips 66 knowingly and voluntarily agreed to suppress or minimize knowledge of the hazards of benzene and benzene containing products, to market benzene and benzene containing products they knew to be dangerous to persons exposed thereto, to mislead downstream handlers, government officials and the public as to the hazards of benzene and benzene containing products and to refrain from warning downstream handlers, government officials and the public as to the hazards of

benzene and benzene containing products.

70. Defendants BP and Phillips 66 committed an overt act in furtherance of the conspiracy by knowingly and voluntarily engaging in uniform modes of operation, including, but not limited to, the following: marketing benzene and benzene-containing materials and products they knew to be dangerous to persons exposed thereto; failing and refusing to warn downstream handlers, government officials, and the public of the threat caused by benzene and benzene-containing materials and products; suppressing and understating information regarding the hazards of benzene and benzene-containing materials and products; systematically understating the risk of benzene exposure to individuals by excluding at-risk contract workers from cohort studies; and, ceasing chromosome analysis of potentially exposed workers,

71. Defendants BP and Phillips 66 committed an overt act in furtherance of the conspiracy by, knowingly and voluntarily engaging, individually, collectively and under the auspices of industry and trade organizations, including, but not limited to, the American Petroleum Institute ("API") and the Manufacturing Chemists Association ("MCA"), in various acts in furtherance of the Agreement, including, but not limited to, the following: forming joint task-forces and committees, including but not limited to the API's Benzene Task Force and the MCA's Benzene Panel for the purpose of misleading government decision-makers, industry laborers and the public of the hazards of benzene and benzene containing products, restricting the flow of information regarding the hazards of benzene and benzene-containing materials and products; requiring each Defendant to inform the MCA of all inter-Defendant communications regarding the hazards of benzene; directing the activities of the API and MCA for the specific purpose

of marketing benzene and benzene-containing materials and products they knew to be dangerous to persons exposed thereto; submitting false, misleading or incomplete information to the Occupational Safety and Health Administration ("OSHA") in order to suppress knowledge of the hazards of benzene; withholding from OSHA information showing the hazards of benzene; suppressing the activities of, harassing and terminating the employment of persons who provided opinions regarding the hazards of benzene contrary to the goals of their agreement.

72. Additionally, Defendants BP, Phillips 66 and others created the Shanghai Health Study designed to respond to allegations from a nationwide study of benzene exposed workers in over 50 industries conducted in Shanghai, China by researches from the United States National Cancer Institute and the Chinese Academy of Preventative Medicine that indicated, in pertinent part, that low levels of benzene exposure, less than 10 parts per million, could lead to the development of AML, Myelodysplastic Syndrome (MDS) and non-Hodgkin's Lymphoma (NHL).  It was noted by members of the conspiracy that the findings of the National Cancer Institute and the Chinese Academy of Preventative Medicine could lead to:

   a. Litigation claiming benzene produced, stored, transported and subsequently leaked, spilled or emitted, caused AML, MDS or NHL resulting in millions of dollars of expenses to the conspirators.

   b. Demands for reductions in the amount of benzene in gasoline because of the benzene's cancer causing health effects leading to "massive financial impacts on petroleum refineries."

   c. Demands for greater benzene emissions controls from stationary "sources of benzene such as a refineries and marketing facilities."

   d. Increased clean-up requirements for benzene and "petroleum contaminated media such as soil and water."

73. As a direct and proximate result of Defendants' agreement and the wrongful acts in furtherance thereof, Plaintiff was exposed to and inhaled, ingested or otherwise absorbed benzene in sufficient amounts to cause disease and/or other harm.

74. As a direct and proximate result of Defendants' agreement and the wrongful acts in furtherance thereof, Plaintiff was caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff to develop AML.

75. As a direct and proximate result of Defendants' agreement and the wrongful acts in furtherance thereof, Plaintiff was caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff to incur medical bills, pain and suffering, a shortened life expectancy, and mental anguish.

76. As a direct and proximate result of Defendants' agreement and the wrongful acts in furtherance thereof, Plaintiff was caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff to miss work, and his career and ability to make a living has been severely and permanently damaged.

77. As a direct and proximate result of Defendants' agreement and the wrongful acts in furtherance thereof, Plaintiff was caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby ensuring Plaintiff will incur future medical bills, life-long medication and medical treatment, pain and suffering, a shortened life expectancy, and mental anguish.

WHEREFORE, Plaintiff prays this Court to enter judgment in his favor and against Defendants BP and Phillips 66, to award compensatory damages, costs incurred prosecuting this matter, plus interest in a fair and reasonable amount in excess of FIFTY THOUSAND DOLLARS ($50,000) and to grant such other and further relief as this Court deems appropriate

## JURY DEMAND

COMES NOW Plaintiff, by and through his attorneys, and hereby request a trial by jury of all causes of action in this matter.


Respectfully submitted,

**SAVILLE LAW FIRM, L.L.C.**                 **THE DYSART LAW FIRM, P.C.**

/s/ Richard L. Saville, Jr.                          /s/ Christopher W. Dysart
Richard L. Saville, Jr. #6202868              Christopher W. Dysart, #06224351
801 Questover Lane                                16020 Swingley Ridge Rd., Ste. 340
St. Louis, Missouri  63141                        Chesterfield, Missouri 63017
(618) 407-7981                                        (314) 548-6298
rich@savillelawfirm.com                         cdysart@dysart-law.com

***ATTORNEYS FOR PLAINTIFF***


Dated 04/27/2020

# EXHIBIT G

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

| | | |
|---|---|---|
| MATTHEW EATON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-L-644 |
| | ) | |
| TURTLE WAX, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

### PLAINTIFF'S 1ˢᵗ SUPPLEMENTAL ANSWERS TO DEFENDANT 3M COMPANY'S FIRST INTERROGATORIES TO PLAINTIFF MATTHEW EATON

COMES NOW Plaintiff, being first duly sworn, by and through his attorneys and for his 1ˢᵗ Supplemental Answers to Defendant 3M Company's First Interrogatories to Plaintiff, states as follows, to-wit:

### INTERROGATORIES

**INTERROGATORY NO. 5** Identify each 3M product that you contend caused or contributed to any disease, illness, or injury identified in response to Interrogatory No. 3, and for each such product:

(a) State the locations, dates, frequency, and duration of your exposure to the product or any of its constituents; and

(b) Describe your use of the product and the circumstances of your exposure to it or any of its constituents.

**ANSWER:   Plaintiff was exposed to 3M Products including:   Weatherstrip & Gasket Adhesive, Super 77 Spray Adhesive and General Purpose Adhesive Remover from approximately 1978 to 1985 at his father's Phillips Station located in Potosi, Missouri.  Plaintiff would be around his father and the station's employees while**

1

using these products in repairing vehicles, specifically applying gaskets and weather-stripping.  From approximately 1985 – 2003 Plaintiff was exposed at his father's Standard/Amoco/BP station in Potosi, Missouri.  Plaintiff would be around his father and the station's employees while using these products in repairing vehicles, specifically applying gaskets and weather-stripping.  From approximately 1992-1993 Plaintiff used the products himself for the same purposes frequently.   General Purpose Adhesive Remover was used once in a while at these stations as well. Plaintiff inhaled or otherwise ingested the fumes emanating from these 3M products and absorbed the products through his skin.

Plaintiff was also exposed to 3M Products from approximately 1999-2000 while working for Michael Building Products, a Division of McBride & Sons while installing residential windows in neighborhoods in Illinois, including but not limited to, the Orchards in Belleville, Illinois and a couple of neighborhoods in Columbia, Illinois as well as various neighborhoods in Missouri.

**INTERROGATORY NO. 6:**   Identify each non-3M product that you contend caused or contributed to any disease, illness, or injury identified in response to Interrogatory No. 3, and for each such product:

   (a) State the locations, dates, frequency and duration of your exposure to the product or any of its constituents; and

   (b) Describe your use of the product and the circumstances of your exposure to it or any of its constituents.

   **ANSWER:**

   **TURTLE WAX PRODUCTS:**

   Plaintiff was exposed to Turtle Wax, Inc.'s "Turtle Wax" from 1978 – 2003 on an almost daily basis.  In 1978 Plaintiff's father owned a gas station located in Potosi, MO.  Starting from the time Plaintiff was a year old and increasing as Plaintiff grew older he spent time at his father's filling and service station, where he would be around his father and other employees of the station while they used the Turtle Wax products almost every day to wax customer vehicles.  From approximately 1992 or 1993 through 2003 Plaintiff used the Turtle Wax himself for the same purposes.

   **BP PRODUCTS:**

2

Plaintiff was exposed to BP petrochemical products, including gasoline and 3-in-1 oil from 1985 through 2003 on an almost daily basis. In 1985 Plaintiff's father owned a gas station located at East High and Park Drive, Potosi, MO which included an office, showroom, 4 service bays and 9 gas pumps. Matt stayed at the gas station daily, from open until close when not in school. During the school year, his school bus picked him up and dropped him off at the gas station. He would gauge the gas tanks that contained BP gasoline, bulk oil, diesel fuel and kerosene twice daily, where he was continuously exposed to the thousands of gallons of fuel these tanks would hold and the fumes it would emanate when opening the tanks to perform the gauging tests. Plaintiff would also pump the petrochemical products into the vehicles where again he was continuously exposed to petrochemical fumes.

From approximately 1985 through 2003 Bauman Oil would deliver BP petrochemical products in tankers from the Wood River, Illinois Refinery to Plaintiff's father's service and filling station. Plaintiff was exposed to fumes emanating from the Bauman Oil tanker trucks and by the fuel from the trucks.

## PHILLIPS 66:

Plaintiff was exposed to Phillips petrochemical products, including gasoline, from 1978 – 1985 on an almost daily basis. In 1978 Plaintiff's father owned a gas station located in Potosi, MO which contained 2 service bays and 4 gas pumps. From the time Plaintiff was a year old he spent considerable amounts of time at his father's filling and service station, where he would be around his father and other employees of the station while they used the Phillips products almost every day, including pumping gas into customer vehicles and being exposed to the gasoline fumes.

## BAUMAN OIL:

From approximately 1985 through 2003 Bauman Oil would deliver BP petrochemical products in tankers from the Wood River, Illinois Refinery to Plaintiff's father's service and filling station. Plaintiff was exposed to fumes emanating from the Bauman Oil tanker trucks and by the fuel from the trucks.

## BERRYMAN PRODUCTS:

Plaintiff was exposed to Berryman Products including: Berryman Brake Cleaner and Berryman Carburetor Cleaner from approximately 1978 to 1985 at his father's Phillips Station located in Potosi, Missouri. Plaintiff would be around his father and the station's employees while using these products in repairing vehicles. From approximately 1985 – 2003 Plaintiff was exposed at his father's Standard/Amoco/BP station in Potosi, Missouri. Plaintiff would be around his father and the station's employees while using these products in repairing vehicles, from approximately 1992-1993 Plaintiff used the products himself for the same purposes frequently. Plaintiff was exposed to fumes emanating from these Berryman Products and absorbed the products through his skin.

Plaintiff was also exposed to Berryman Products from approximately 1999-2000 while working for Michael Building Products, a Division of McBride & Sons while installing residential windows in neighborhoods in Illinois, including but not limited to, the Orchards in Belleville, Illinois and a couple of neighborhoods in Columbia, Illinois as well as various neighborhoods in Missouri.

## B'LASTER CORPORATION:

Plaintiff was exposed to B'laster Corporation Products including:  PB Blaster (penetrant), brake cleaner, fuel injector cleaner and degreaser which was manufactured and distributed by B'laster Corporation from approximately 1978 to 1985 at his father's Phillips Station located in Potosi, Missouri.  Plaintiff would be around his father and the station's employees while using these products in repairing vehicles.  From approximately 1985 – 2003 Plaintiff was exposed at his father's Standard/Amoco/BP station in Potosi, Missouri.  Plaintiff would be around his father and the station's employees while using these products in repairing vehicles, from approximately 1992-1993 Plaintiff used the products himself for the same purposes frequently.  Plaintiff was exposed to fumes emanating from these B'laster Products and absorbed the products through his skin.

Plaintiff was also exposed to B'Laster Products from approximately 1999-2000 while working for Michael Building Products, a Division of McBride & Sons while installing residential windows in neighborhoods in Illinois, including but not limited to, the Orchards in Belleville, Illinois and a couple of neighborhoods in Columbia, Illinois as well as various neighborhoods in Missouri.

## CRC INDUSTRIES:

Plaintiff was exposed to CRC Industries' Products including: "Brakleen" and other carburetor cleaner, parts cleaners and penetrating oils which were manufactured and distributed by CRC Industries from approximately 1978 to 1985 at his father's Phillips Station located in Potosi, Missouri.  Plaintiff would be around his father and the station's employees while using these products in repairing vehicles.  From approximately 1985 – 2003 Plaintiff was exposed at his father's Standard/Amoco/BP station in Potosi, Missouri.  Plaintiff would be around his father and the station's employees while using these products in repairing vehicles, from approximately 1992-1993 Plaintiff used the products himself for the same purposes frequently.  Plaintiff was exposed to fumes emanating from these CRC Industries' Products and absorbed the products through his skin.

Plaintiff was also exposed to CRC Products from approximately 1999-2000 while working for Michael Building Products, a Division of McBride & Sons while installing residential windows in neighborhoods in Illinois, including but not limited to, the Orchards in Belleville, Illinois and a couple of neighborhoods in Columbia, Illinois as well as various neighborhoods in Missouri.

**SAFETY-KLEEN:**

**Plaintiff was exposed to Safety-Kleen Products including a Safety-Kleen parts washing unit which is a stand-alone sink type united furnished by Safety-Kleen, serviced by Safety-Kleen and filled with parts washer regularly by Safety-Kleen from approximately 1978 to 1985 at his father's Phillips Station located in Potosi, Missouri.  Plaintiff would be around his father and the station's employees while using these products in repairing vehicles.  From approximately 1985 – 2003 Plaintiff was exposed at his father's Standard/Amoco/BP station in Potosi, Missouri.  Plaintiff would be around his father and the station's employees while using these products in repairing vehicles, from approximately 1992-1993 Plaintiff used the products himself for the same purposes frequently.  Plaintiff was exposed to fumes emanating from these B'laster Products and absorbed the products through his skin.**

Respectfully submitted,

THE DYSART LAW FIRM, P.C.


/s/ Christopher W. Dysart
Christopher W. Dysart, #06224351
16020 Swingley Ridge Rd., Ste. 340
Chesterfield, Missouri 63017
Office: (314) 548-6298
Fax:    (314) 548-6230
cdysart@dysart-law.com


SAVILLE LAW FIRM, L.L.C.


/s/ Richard L. Saville, Jr.
Richard L. Saville, Jr., #6202868
801 Questover Lane
St. Louis, Missouri  63141
(618) 407-7981
rich@savillelawfirm.com


*ATTORNEYS FOR PLAINTIFF*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing document was sent this 18th day of December, 2017, via electronic mail, to:

M. Ann Hatch
Gary L. Smith
Herzog Crebs LLP
100 N. Broadway, 14th Floor
St. Louis, MO 63102
(314) 231-6700
(314) 231-4656 (fax)
mah@herzogcrebs.com
gls@herzogcrebs.com
*Attorneys for Turtle Wax*

BP PRODUCTS NORTH AMERICA INC.

    C T Corporation System
    208 So LaSalle St, Suite 814
    Chicago, IL 60604

*Attorneys for BP Products North America, Inc. have not entered their appearance*

Gregg A. Kinney
HeplerBroom LLC
130 North Main St.
Edwardsville, IL 62025-0510
(314) 480-4196
(618) 656-1364 (fax)
gak@heplerbroom.com
*Attorney for Phillips 66 Company*

David Ahlheim
Childress Ahlheim Cary LLC
1010 Market Street, Suite 500
St. Louis, MO 63101
(314) 621-9800
(314) 621-9802 (fax)
dahlheim@jchildresslaw.com
*Attorneys for Bauman Oil Distributors, Inc.*

E. Ben Thames, Jr.
Richard W. Wiese
Jason Kennedy
Segal McCambridge Singer & Mahoney, Ltd.
10 S. Broadway, Ste. 1560
St. Louis, MO 63012
(314) 300-5778
(314) 300-5788 (fax)
bthames@smsm.com
MOAssociates@smsm.com
jkennedy@smsm.com
*Attorneys for 3M Company a/k/a Minnesota Mining and Manufacturing*

A. Jay Koehler
Erica S. Longfield
Swanson, Martin & Bell, LLP
330 N. Wabash, Ste. #3300
Chicago, IL 60611
jkoehler@smbtrials.com
elongfield@smbtrials.com
*Attorneys for Berryman Products, Inc.*

Robert Kum
Sedgwick LLP
801 S. Figueroa Street, 19th Floor

Christian D. Ambler
Stone & Johnson, Chtd.
111 West Washington St., #1800

Los Angeles, CA 90017-5556
(213) 426-6900
Robert.kum@sedgwicklaw.com
***Attorneys for Berryman Products, Inc.***

Chicago, IL 60602
(312) 332-5656
(312) 269-2804 Direct
CAmbler@stonejohnsonlaw.com
***Attorneys for Blaster Corporation***

Ted Harvey
Freeark, Harvey & Mendillo, P.C.
115 W. Washington St.
P.O. Box 546
Belleville, IL 62220
(618) 233-2686
(618) 233-5677 (fax)
tharvey@freeark.com
***Attorneys for Safety-Kleen Systems, Inc.***

James J. McGoldrick
Amanda M. Koch
Steven W. Hopkins
Jones Carr McGoldrick, LLP
5910 N. Central Expressway, Suite 1700
Dallas, TX 75206
(214) 828-9200
(214) 828-9229 (fax)
james.mcgoldrick@jcmfirm.com
amanda.koch@jcmfirm.com
***Attorneys for Safety-Kleen Systems, Inc.***

Joseph R. Vallort
Chilton, Yambert, Porter LLP
303 West Madison, Suite 2300
Chicago, IL 60606
(312) 460-8000
jvallort@cyp-law.com
***Attorneys for CRC Industries, Inc.***

/s/ Kelly Keiser

STATE OF Missouri )
                    ) SS.
COUNTY OF St. Louis )

      Comes now, MATTHEW EATON, being duly sworn upon his oath and states that the foregoing answers are true and correct to the best of his information, knowledge and belief.

MATTHEW C. EATON

Subscribed and sworn to before me this _18th_ day of _Dec._ , 20_1_ _7_.

KELLY KEISER
Notary Public - Notary Seal
State of Missouri
Commissioned for Lincoln County
My Commission Expires: July 27, 2019
Commission Number: 15421822

Notary Public

My Commission Expires: 7-27-19

# EXHIBIT H

***EFILED***
Case Number 2020L 001081
Date: 7/31/2020 4:36 PM
Mark Von Nida
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

# IN THE CIRCUIT COURT
# THIRD JUDICIAL CIRCUIT
# MADISON COUNTY, ILLINOIS

AIMEE EATON,                                              )
JOYCE EATON, individually and as Special                 )
Representative of the Estate of WALTER "BUD"             )
EATON, DOUGLAS DICKEY and his wife                      )
DAWN DICKEY                                               )
                                                         )
                          Plaintiffs,                    )    Case No.:    2020L 001081
                                                         )
vs.                                                      )
                                                         )
TURTLE WAX, INC.,                                        )
      *Serve:*                                            )
      *National Registered Agents, Inc.*                 )
      *208 S. LaSalle Street, Suite 814*                 )
      *Chicago, IL 60604*                                 )
                                                         )
BP PRODUCTS NORTH AMERICA, INC.,                         )
      *Serve:*                                            )
      *CT Corporation System*                            )
      *208 S. LaSalle Street, Suite 814*                 )
      *Chicago, IL 60604*                                 )
                                                         )
PHILLIPS 66 COMPANY,                                     )
      *Serve:*                                            )
      *Illinois Corporation Service*                      )
      *801 Adlai Stevenson Drive*                         )
      *Springfield, IL 62703*                             )
                                                         )
3M COMPANY, a/k/a MINNESOTA MINING                       )
AND MANUFACTURING,                                       )
      *Serve:*                                            )
      *Illinois Corporation Service*                      )
      *801 Adlai Stevenson Drive*                         )
      *Springfield, IL 62703*                             )
                                                         )
BERRYMAN PRODUCTS, INC.                                  )
      *Serve:*                                            )
      *3800 E. Randol Mill Road*                          )
      *Arlington, TX 76011*                               )
                                                         )
                                                         )

Page 1 of 28

THE B'LASTER CORPORATION,                    )
    *Serve:*                                 )
    *ACFB Incorporated*                      )
    *200 Public Square, Suite 2300*          )
    *Cleveland OH 44114*                     )
                                             )
CRC INDUSTRIES, INC.,                        )
    *Serve:*                                 )
    *Dennis Conlon*                          )
    *885 Louis Dr*                           )
    *Warminster PA 18974-2820*               )
                                             )
SAFETY-KLEEN SYSTEMS INC.,                   )
    *Serve:*                                 )
    *CT Corporation*                         )
    *1999 Bryan Street #900*                 )
    *Dallas, TX 75201*                       )
                                             )
RADIATOR SPECIALTY COMPANY                   )
    *Serve:*                                 )
    *Ronald Weiner, Registered Agent*        )
    *600 Radiator Road*                      )
    *Indian Trail, NC  28079*                )
                                             )
UNITED STATES STEEL CORPORATION              )
    *Serve:*                                 )
    *Illinois Corporate Services Co.*        )
    *801 Adlai Stevenson Dr.*                )
    *Springfield, IL  62703*                 )
                                             )
BAUMAN OIL DISTRIBUTORS, INC.                )
As Respondent in Discovery, Only             )
*Serve:  National Registered Agents Inc.*    )
    *208 S. LaSalle St., Ste 814*            )
    *Chicago, IL  60604*                     )
                                             )
               Defendants.          )
                                             )

## COMPLAINT

COME NOW Plaintiffs Aimee Eaton, Joyce Eaton, Individually and as Special Representative of the Estate of Walter "Bud" Eaton, Douglas Dickey and Dawn Dickey (hereinafter, "Plaintiffs"), by and through undersigned counsel, and for their Complaint and cause of action against Defendants, state as follows:

### PARTIES

1. Plaintiff Joyce Eaton is the surviving spouse of Walter "Bud" Eaton, and is a resident of Potosi, located in the County of Washington, State of Missouri and is a citizen of the State of Missouri.

2. Plaintiff Douglas Dickey is a resident of Bonne Terre, located in St. Francois County, State of Missouri and is a citizen of the State of Missouri,

3. Plaintiff Dawn Dickey is the lawful spouse of Plaintiff Douglas Dickey.

4. Defendant TURTLE WAX, INC. (hereinafter, "Turtle Wax") is an Illinois corporation, doing business within the State of Illinois.

5. Defendant BP PRODUCTS NORTH AMERICA, INC. (hereinafter "BP") is a foreign corporation, incorporated in the State of Delaware, with its principal place of business located in the State of Illinois.

6. Defendant PHILLIPS 66 COMPANY (hereinafter, "Phillips 66") is a foreign corporation, incorporated in the State of Delaware and doing business within the State of Illinois.

7. Defendant 3M COMPANY, also known as MINNESOTA MINING AND MANUFACTURING (hereinafter, "3M"), is a foreign corporation, incorporated in the State of Delaware, and doing business within the State of Illinois.

8. Defendant BERRYMAN PRODUCTS (hereinafter, "Berryman"), is a foreign corporation, incorporated in the State of Texas, and doing business within the State of Illinois.

9. Defendant THE B'LASTER CORPORATION (hereinafter, "B'Laster"), is a foreign corporation, incorporated in the State of Ohio, and doing business within the State of Illinois.

10. Defendant CRC INDUSTRIES, INC. (hereinafter, "CRC Industries"), is a foreign corporation, incorporated in the State of Pennsylvania, and doing business within the State of Illinois.

11. Defendant SAFETY-KLEEN SYSTEMS INC. (hereinafter, "Safety-Kleen"), is a foreign corporation, incorporated in the State of Texas, and doing business within the State of Illinois.

12. Defendant RADIATOR SPECIALTY COMPANY (hereinafter, "Radiator Specialty"), is a foreign corporation doing business in the State of Illinois.

13. Defendant UNITED STATES STEEL CORPORATION (hereinafter "United States Steel"), is a foreign corporation doing business in the State of Illinois.

14. BAUMAN OIL DISTRIBUTORS, INC. (hereafter "Bauman Oil") -as respondent in discovery only.

15. The forgoing individual defendants, set forth in Paragraphs 4 through 14, will be collectively referred to as "Defendants" throughout Plaintiff's Complaint.

### JURISDICTION AND VENUE

16. Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution, this Court has *in personam* jurisdiction over Defendants, because Defendants are present or domiciled in the State of Illinois, such that requiring an appearance does not offend traditional notions of fair play and substantial justice. Moreover, Plaintiff

Walter "Bud" Eaton ("Decedent") and Plaintiff Douglas Dickey were exposed to

Defendant's benzene or benzene-containing products within the State of Illinois and/or that

were produced, manufactured, distributed from  the State of Illinois.

17. This Court has both general and/or specific personal jurisdiction over Defendants, pursuant

to and consistent with, 735 ILCS 5/2-209, and the United States and Illinois constitutional

requirements of Due Process, in that the Defendants, individually or acting through their

apparent agents, committed one or more of the following acts:

    a. Defendants transacted business in the State of Illinois, 735 ILCS 5/2-209(a)(1);

    b. Defendants committed, and/or conspired to commit, a tortious act within the State of
       Illinois, 735 ILCS 5/2-209(a)(2); and/or

    c. Defendants owned, used, or possessed real estate situated in the State of Illinois, 735
       ILCS 5/2-209(a)(3);

    d. At all relevant time, it was foreseeable to Defendants that their tortious acts and/or
       their transaction of business in the State of Illinois would have consequences such
       that Defendant could reasonably foresee being hauled into Court in the State of
       Illinois; and

    e. Requiring Defendants to litigate this claim in the State of Illinois does not offend
       traditional notions of fair play and substantial justice and is permitted by the United
       States Constitution.

18. There is no federal subject matter jurisdiction because there is no federal question raised.

19. On or about August 5, 2018 Decedent Walter Eaton was diagnosed with Lymphoma which

caused his death on or about February 28, 2019.

20. On or about June 11, 2019 Plaintiff Douglas Dickey was diagnosed with Acute Myelogenous

Leukemia (AML).

21. Plaintiff, Douglas Dickey and Decedent were first exposed to and inhaled, ingested, or

otherwise absorbed benzene fumes emanating from benzene and certain benzene-containing

materials and products, including, but not limited to, gasoline, that was purchased from

facilities, including Standard Oil, Amoco, Defendant Phillips 66, and Defendant BP oil refineries and terminals, located in the City of Wood River Illinois, in the County of Madison, State of Illinois.

22. Decedent Bud Eaton and Plaintiff Douglas Dickey were also exposed to benzene containing materials and products including, but not limited to Liquid Wrench that was purchased from Radiator Specialty and/or United States Steel.

23. Decedent Bud Eaton and Plaintiff Douglas Dickey were exposed to benzene containing products, namely Safety-Kleen Recycled 105 Solvent, that was manufactured, tested for benzene content, and benzene was allowed to remain in the product, in the State of Illinois, with Defendant Safety-Kleen's knowledge that benzene caused, or contributed to cause cancer, including the diseases contracted by Plaintiffs and Decedent, and benzene was allowed to remain in Safety-Kleen Recycled 105 Solvent even though Defendant Safety-Kleen knew that persons such as Plaintiffs and Decedent working with and around Safety Kleen Recycled 105 Solvent would inhale, ingest, or otherwise absorb benzene;

24. All Defendants are entities that may have caused, or contributed to cause, Plaintiffs' and Decedent cancers from benzene and contaminants exposure through their products, facilities, or operations within the State of Illinois and elsewhere or are parent companies, affiliates, subsidiaries, successors in interest, employees, contractors, sub-contractors or other agents of the named Defendants, or their respective predecessors in interest.

25. The aforementioned Defendants are jointly and severally liable in that they caused or contributed to Plaintiffs' injuries and Decedent's injuries and death.

26. Venue is proper in this Court under 735 ILCS §5/2-101(2) because Madison County is the county in which the actions or omissions, or some parts thereof, occurred and out of which Plaintiffs' and Decedent's cause of action arose.

**ALLEGATIONS COMMON TO ALL COUNTS**

27. In the course of his life and in the course of his duties and responsibilities working in various businesses, Decedent Walter "Bud" Eaton was caused to be exposed to and thereby inhaled, ingested, breathed, and/or otherwise absorbed benzene and certain benzene-containing products, materials, gases and fumes, including, but not limited to, gasoline, that was manufactured, refined, stored and distributed from the State of Illinois by Defendant BP, and its predecessors Standard Oil and Amoco, Defendant Phillips 66, Defendant Radiator Specialty, and Defendant United States Steel. Moreover, Decedent Walter "Bud" Eaton was exposed to benzene containing products, namely Safety-Kleen Recycled 105 Solvent, that was manufactured, distributed from, tested for benzene content, and benzene was allowed to remain in the product without adequate warning, in the State of Illinois, with Defendant Safety-Kleen's knowledge that benzene caused, or contributed to cause cancer, including the disease contracted by Decedent with knowledge that persons such as Decedent working with and around Safety Kleen Recycled 105 Solvent would inhale, ingest, or otherwise absorb benzene;

28. In the course of his life Plaintiff Douglas Dickey was caused to be exposed to and thereby inhaled, ingested, breathed, and/or otherwise absorbed the benzene and certain benzene-containing products, materials, gases and fumes, including, but not limited to, gasoline, that was manufactured, refined, stored and shipped from the State of Illinois, by Defendant Phillips 66, Defendant Radiator Specialty, and Defendant United States Steel. Moreover,

Plaintiff Douglas Dickey was exposed to benzene containing products, namely Safety-Kleen Recycled 105 Solvent, that was manufactured, tested for benzene content, and benzene was allowed to remain in the product without adequate warning, in the State of Illinois, with Defendant Safety-Kleen's knowledge that benzene caused, or contributed to cause cancer, including the disease contracted by Decedent, and with knowledge that persons such as Decedent working with and around Safety Kleen Recycled 105 Solvent would inhale, ingest, or otherwise absorb benzene;

29. During the course of Decedent Walter "Bud" Eaton's life and work, Decedent was present at, owned and/or worked at service stations where he conducted and/or were in the vicinity of vehicle repairs, gasoline pumping, and gasoline pump/tank maintenance, and in the process thereof were exposed to and inhaled, ingested or otherwise absorbed benzene and/or benzene fumes emanating from benzene and certain benzene-containing and/or benzene-related materials and products they were working with and around, which were processed, produced, manufactured, sold, distributed, marketed, and/or otherwise used by Defendants.

30. From 1975 through 1978 Plaintiff Doug Dickey's parents owned and operated a Defendant Phillips 66 gas station known as Dickey's Phillips 66 Service Station located at 602 High Street, Potosi, Missouri. Dickey's Phillips 66 was a full-service gas station with repair facilities. Decedent Walter "Bud" Eaton worked as a mechanic at Dickey's Phillips 66.

31. From 1975 through 1982 Plaintiff Doug Dickey was at the Dickey's Phillips 66 on a daily basis, where he pumped gas and assisted with auto repair, including cleaning vehicle parts, where he was in and around the service bay and pumps, vehicle repairs, gasoline pumping, and gasoline pump/tank maintenance and where he conducted and/or was in the vicinity of vehicle repairs, gasoline pumping, and gasoline pump/tank maintenance, and in the process

thereof was  exposed to and inhaled, ingested or otherwise absorbed benzene and/or benzene

fumes emanating from benzene and certain benzene-containing and/or benzene-related

materials and products they were working with and around, which were processed, produced,

manufactured, sold, distributed, marketed, and/or otherwise used by Defendants.

32. From 1975 through 1982, employees and the owner of Dickey's Phillips 66 including but not

limited to Plaintiff Doug Dickey, used and worked around petrochemical products that were

produced, manufactured, distributed, and/or sold by Defendant Phillips 66.

33. From 1975 through 1982, employees of Dickey's Phillips 66, including but not limited to

Plaintiff Doug Dickey, used and worked around Liquid Wrench that was produced,

manufactured, distributed, and/or sold by Defendants Radiator Specialty and United States

Steel.

34. From 1975 through 1982, employees of Dickey's Phillips 66, including but not limited to

Plaintiff Douglas Dickey, used and worked around Safety-Kleen parts cleaner that were

produced, manufactured, distributed, and/or sold by Defendant Safety-Kleen.

35. From 1982 through 1988 Plaintiff Doug Dickey's parents owned and operated a car

dealership known as Dickey's Dodge Chrysler Plymouth, located in Potosi, Missouri.  The

dealership was a full service car dealership which performed vehicle service, vehicle

detailing and body work.

36. From 1982 through 1988 Plaintiff Doug Dickey worked at his parents' car dealership

performing mechanical work and detailing services using benzene and benzene containing

products manufactured and supplied by Defendants Safety-Kleen, Radiator Specialty and/or

United States Steel.

37. From 1978 through 1985, Decedent, Walter "Bud" Eaton (hereinafter, "Decedent Bud Eaton") owned and operated a Defendant Phillips 66 gas station, with two (2) service bays and four (4) pumps, named "Eaton 66."

38. Eaton 66 was located at 602 High Street, Potosi, Missouri 63664.

39. From 1985 through 2003, Decedent, Bud Eaton, owned and operated a Standard/Amoco/Defendant BP gas station, with an office, showroom, four (4) service bays, and nine (9) pumps, named "Eaton's Service Center."

40. Eaton's Service Station was located on Park Drive in Potosi, Missouri.

41. From 1978 through 2003, employees and the owner of Eaton 66 and Eaton's Service Center, including but not limited to Decedent Bud Eaton, used and worked around wax that was produced, manufactured, distributed, and/or sold by Defendant Turtle Wax.

42. From 1978 through 2003, employees and the owner of Eaton 66 and Eaton's Service Center, including but not limited to Decedent Bud Eaton, used and worked around petrochemical products, including various forms of gasoline and diesel fuel and 3-in-1 oil, that were produced, manufactured, distributed, and/or sold by Defendant BP.

43. From 1978 through 2003, employees and the owner of Eaton 66 and Eaton's Service Center, including but not limited to Decedent Bud Eaton, used and worked around petrochemical products that were produced, manufactured, distributed, and/or sold by Defendant Phillips 66.

44. From 1978 through 2003, employees and the owner of Eaton 66 and Eaton's Service Center, including but not limited to Decedent Bud Eaton, used and worked around, the following products produced, manufactured, distributed, and/or sold by Defendant 3M:

    a. Weatherstrip & Gasket Adhesive, which was a paste product, used daily;

    b. Super 77 Spray Adhesive, which was a liquid product, used almost every day; and

    c. General Purpose Adhesive Remover, which was a spray product, used once in a while.

45. From 1978 through 2003, employees and the owner of Eaton 66 and Eaton's Service Center, including but not limited to Decedent Bud Eaton during his employment at Eaton's Service Center, used and worked around cleaners, degreasers, lubricants, and penetrants that were produced, manufactured, distributed, and/or sold by Defendant Berryman.

46. From 1978 through 2003, employees and the owner of Eaton 66 and Eaton's Service Center, including but not limited to Decedent Bud Eaton, used and worked around cleaners, degreasers, lubricants, and penetrants that were produced, manufactured, distributed, and/or sold by Defendant B'Laster.

47. From 1978 through 2003, employees and the owner of Eaton 66 and Eaton's Service Center, including but not limited to Decedent Bud Eaton, used and worked around CRC Brakeleen and CRC Contact Cleaner that were produced, manufactured, distributed, and/or sold by Defendant CRC Industries.

48. From 1978 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Decedent Bud Eaton, used and worked around Liquid Wrench that was produced, manufactured, distributed, and/or sold by Defendants Radiator Specialty and which was produced and/or manufactured with benzene containing raffinate supplied by United States Steel.

49. From 1978 through 2003, employees of Eaton 66 and Eaton's Service Center, including but not limited to Decedent Bud Eaton, used and worked around Safety-Kleen parts cleaner that were produced, manufactured, distributed, and/or sold by Defendant Safety-Kleen.

50. Bauman Oil, as a Respondent in Discovery only, was, upon information and belief, a supplier of petroleum products to Eaton 66 and Eaton's Service Center at times materials to the allegations against Defendants herein and is likely in possession of information relevant to the determination of the proper parties to this action.

### COUNT I—NEGLIGENCE
### (AGAINST DEFENDANTS TURTLE WAX, BP PRODUCTS, PHILLIPS 66, 3M COMPANY, BERRYMAN CORP., THE B'LASTER CORP, CRC INDUSTRIES, AND SAFETY-KLEEN SYSTEMS)

COMES NOW Plaintiffs Aimee Eaton, Joyce Eaton, individually and as Special Representative of the Estate of Walter "Bud" Eaton ("Decedent") and Plaintiff Douglas Dickey and his wife Dawn Dickey, by their attorneys, Saville Law Firm, LLC., and The Dysart Law Firm, P.C., and for their cause of action against Defendants, and states:

51. Plaintiff Douglas Dickey and Decedent incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

52. At all times relevant herein, these Defendants had a duty to exercise reasonable care and caution for the safety of Plaintiff Douglas Dickey and Decedent and others working with and around their benzene -containing materials and/or products.

53. At all times relevant herein, Defendants manufactured, used, and/or distributed the benzene and/or benzene-containing, materials, and/or products at issue herein.

54. At all times relevant herein, benzene-containing products contain a specific hazard in that they are have a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting, or otherwise absorbing them.

55. At all times herein, these Defendants failed to exercise ordinary care and caution for the safety of Plaintiff Douglas Dickey and Decedent in one or more of the following respects:

a. Included benzene in its materials and/or products, even though it was completely foreseeable and could or should have been anticipated that persons such as Plaintiff Douglas Dickey and Decedent working with or around them would inhale, ingest, or otherwise absorb benzene;

b. Included benzene in its materials and/or products when Defendants knew or should have known that said benzene would have a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing it;

c. Included benzene in its materials and/or products when adequate substitutes were available;

d. Failed to provide any or adequate instructions concerning the safe methods of working with and around the benzene, materials and/or products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing benzene;

e. Failed to conduct tests on said benzene, materials and/or products in order to determine the hazards to which persons such as Plaintiff and Decedent might be exposed while working with and around the same;

f. Failed to provide any or adequate warnings to persons working with and around their benzene, materials, and/or products of the dangers of inhaling, ingesting, or otherwise absorbing benzene; and

g. Failed to provide Plaintiff Douglas Dickey and Decedent with its acquired knowledge concerning the hazards of benzene or actively suppressed knowledge and information concerning the hazards of benzene.

56. At all times herein, Plaintiff Douglas Dickey and Decedent employed the products provided by these Defendants in the manner and for the purposes for which they were reasonably expected and in the way that Defendants should expect.

57. The benzene and/or benzene containing products had a particular defect or hazard when put to the reasonably expected use and/or disposal thereof, in that Defendants had no reason to believe that the user would realize the danger posed by the product's defect or hazard and in fact failed to adequately warn users, including Plaintiff Douglas Dickey and Decedent, of the danger.

58. Defendants knew or should have known that the benzene contained in its materials, and/or products had a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting, or otherwise absorbing it.

59. That as a direct and proximate result of the unreasonably dangerous condition of Defendants' benzene, materials, and/or products, Plaintiff Douglas Dickey and Decedent were exposed to and inhaled, ingested, or otherwise absorbed benzene in sufficient amounts to cause, or contribute to cause, disease and/or other injury.

60. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff Douglas Dickey and Decedent were caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff Doug Dickey to develop AML and Decedent to develop Lymphoma.

61. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff Douglas Dickey and Decedent were caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff Douglas Dickey and Decedent  to incur medical bills, pain and suffering, a shortened life expectancy, and mental anguish and death.

62. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff Douglas Dickey and Decedent were caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff Douglas Dickey and Decedent to miss work, and his career and ability to make a living has been severely and permanently damaged.

63. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff Douglas Dickey and Decedent was caused to be

exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby ensuring Plaintiff

Douglas Dickey and Decedent will incur future medical bills, life-long medication and

medical treatment, pain and suffering, a shortened life expectancy, and mental anguish and

death.

WHEREFORE, Plaintiffs prays this Court to enter judgment in their favor and against

Defendants, to award compensatory damages, costs incurred prosecuting this matter, plus interest

in a fair and reasonable amount in excess of FIFTY THOUSAND DOLLARS ($50,000) and to

grant such other and further relief as this Court deems appropriate.

### COUNT II—WILLFUL AND WANTON MISCONDUCT
### (AGAINST DEFENDANTS TURTLE WAX, BP PRODUCTS, PHILLIPS 66, 3M COMPANY, BERRYMAN CORP., THE B'LASTER CORP, CRC INDUSTRIES, AND SAFETY-KLEEN SYSTEMS)

COMES NOW Plaintiffs, by their attorneys, The Dysart Law Firm, P.C., and the Saville

Law Firm, LLC and for their cause of action against these Defendants, and state:

64. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth

herein.

65. Defendants had a duty to Plaintiff and Decedent to refrain from willful and wanton acts or

omissions that would harm the Plaintiff and Decedent.

66. Defendants' conduct described in this Complaint show complete indifference to or conscious

disregard for the safety of others amounting to willful and wanton misconduct in that

Defendants failed to exercise ordinary care when a known and extraordinary danger, namely

benzene, was imminent or, Defendants through recklessness, regardless to the danger of

another, carelessly failed to discover the extraordinary and impending danger of benzene and

would have discovered it through the exercise of ordinary care.

67. Defendants breached their respective duties to Plaintiff and Decedent and engaged in one or

more of the following acts or omissions amounting to willful and wanton misconduct:

    a.  Intentionally or with reckless disregard for the safety of Plaintiff and Decedent, included benzene in their materials and/or products, even though they knew that persons such as Plaintiff and Decedent living and working with or around the same would inhale, ingest or otherwise absorb benzene;

    b.  Intentionally or with reckless disregard for the safety of Plaintiff and Decedent, included benzene in their materials and/or products when they knew that the benzene would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

    c.  Intentionally or with reckless disregard for the safety of Plaintiff and Decedent, included benzene in their materials and/or products when they knew adequate substitutes were available;

    d.  Intentionally or with reckless disregard for the safety of Plaintiff and Decedent, failed to provide any or adequate warnings to persons working with and around the benzene, materials and/or products of the dangers of inhaling, ingesting or otherwise absorbing benzene;

    e.  Intentionally or with reckless disregard for the safety of Plaintiff and Decedent, failed to provide any or adequate instructions concerning the safe methods of working with and around benzene and benzene-containing materials and/or products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the benzene in them;

    f.  Intentionally or with reckless disregard for the safety of the Plaintiff and Decedent, failed to conduct tests on their benzene and benzene containing materials and/or products in order to determine the hazards to which persons such as the Plaintiff and Decedent might be exposed while working with and around the same; and,

    g.  Intentionally or with reckless disregard for the safety of Plaintiff and Decedent, suppressed knowledge and information of the hazards of benzene.

68. Defendants knew that their acts and omissions created a substantial risk that persons such as

Plaintiff and Decedent would suffer illness as a result and, therefore, carried out the same

with complete indifference to, and/or conscious disregard for, the life, health and welfare of Plaintiff and Decedent.

69. That as a direct and proximate result of the foregoing willful and/or wanton acts or omissions on the part of the Defendants mentioned above, Plaintiff and Decedent were exposed to and inhaled, ingested or otherwise absorbed benzene in sufficient amounts to cause disease and/or other harm.

70. As a direct and proximate result of said exposure, inhalation, ingestion and/or absorption, the Decedent Bud Eaton developed Lymphoma which ultimately caused his death. Decedent was compelled to expend and became liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his benzene related disease and conditions and to alleviate the pain, suffering, mental anguish and physical disability caused by his injury; Decedent experienced great physical pain and mental anguish as a result of said exposure, inhalation, ingestion and absorption; that as a further result of his benzene-induced disease and conditions, that Decedent had a shortened life span; Decedent was hindered and prevented from pursuing his normal course of employment, thereby losing large sums of money which otherwise would have accrued to him.

71. As a direct and proximate result of said exposure, inhalation, ingestion and/or absorption, the Plaintiff Douglas Dickey developed AML. Plaintiff was compelled to expend and became liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his benzene related disease and conditions and to alleviate the pain, suffering, mental anguish and physical disability caused by his injury; Plaintiff experienced great physical pain and mental anguish as a result of said exposure, inhalation, ingestion and absorption; that as a further result of his benzene-induced disease and conditions, Plaintiff

was hindered and prevented from pursuing his normal course of employment, thereby losing large sums of money which otherwise would have accrued to him

WHEREFORE, Plaintiffs pray this Court to enter judgment in their favor and against Defendants, to award compensatory damages, costs incurred prosecuting this matter, plus interest in a fair and reasonable amount in excess of FIFTY THOUSAND DOLLARS ($50,000) and to grant such other and further relief as this Court deems appropriate.

**COUNT III—NEGLIGENCE**
**(PLAINTIFFS DOUGLAS DICKEY AND DECEDENT BUD EATON**
**AGAINST DEFENDANTS RADIATOR SPECIALTY AND UNITED STATES STEEL)**

COMES NOW Plaintiffs Douglas Dickey and, Joyce Eaton, individually and as Special Representative of the Estate of Walter "Bud" Eaton ("Decedent"), by their attorneys, Saville Law Firm, LLC., and The Dysart Law Firm, P.C., and for their cause of action against Defendants Radiator Specialty and United States Steel, and state:

72. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

73. At all times relevant herein, these Defendants had a duty to exercise reasonable care and caution for the safety of Plaintiff and Decedent and others working with and around their benzene -containing materials and/or products.

74. At all times relevant herein, Defendants manufactured, used, and/or distributed the benzene and/or benzene-containing, materials, and/or products at issue herein, including but not limited to Liquid Wrench.

75. At all times relevant herein, benzene-containing products contain a specific hazard in that they are have a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting, or otherwise absorbing them.

76. At all times herein, these Defendants failed to exercise ordinary care and caution for the safety of Plaintiff and Decedent in one or more of the following respects:

   a. Included benzene in its materials and/or products, even though it was completely foreseeable and could or should have been anticipated that persons such as Plaintiff and Decedent working with or around them would inhale, ingest, or otherwise absorb benzene;

   b. Included benzene in its materials and/or products when Defendants knew or should have known that said benzene would have a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing it;

   c. Included benzene in its materials and/or products when adequate substitutes were available;

   d. Failed to provide any or adequate instructions concerning the safe methods of working with and around the benzene, materials and/or products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing benzene;

   e. Failed to conduct tests on said benzene, materials and/or products in order to determine the hazards to which persons such as Plaintiff and Decedent might be exposed while working with and around the same;

   f. Failed to provide any or adequate warnings to persons working with and around their benzene, materials, and/or products of the dangers of inhaling, ingesting, or otherwise absorbing benzene; and

   g. Failed to provide Plaintiff and Decedent with its acquired knowledge concerning the hazards of benzene or actively suppressed knowledge and information concerning the hazards of benzene.

77. At all times herein, Plaintiff and Decedent employed the products provided by these Defendants in the manner and for the purposes for which they were reasonably expected and in the way that Defendants should expect.

78. The benzene and/or benzene containing products had a particular defect or hazard when put to the reasonably expected use and/or disposal thereof, in that Defendants had no reason to believe that the user would realize the danger posed by the product's defect or hazard and in fact failed to adequately warn users, including Plaintiff and Decedent, of the danger.

79. Defendants knew or should have known that the benzene contained in its materials, and/or products had a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting, or otherwise absorbing it.

80. That as a direct and proximate result of the unreasonably dangerous condition of Defendants' benzene, materials, and/or products, Plaintiff and Decedent were exposed to and inhaled, ingested, or otherwise absorbed benzene in sufficient amounts to cause, or contribute to cause, disease and/or other injury.

81. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff and Decedent were caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff to develop AML and Decedent developed Lymphoma causing his death

82. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff and Decedent were caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff and Decedent to incur medical bills, pain and suffering, a shortened life expectancy, and mental anguish and death.

83. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff and Decedent were caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiff and Decedent to miss work, and his career and ability to make a living has been severely and permanently damaged.

84. As a direct and proximate result of the unreasonably dangerous condition of the Defendants' benzene, materials, and/or products, Plaintiff and Decedent was caused to be exposed to,

inhaled, ingested, and/or otherwise absorbed benzene, thereby ensuring Plaintiff and Decedent will incur future medical bills, life-long medication and medical treatment, pain and suffering, a shortened life expectancy, and mental anguish.

WHEREFORE, Plaintiffs prays this Court to enter judgment in his favor and against Defendants, to award compensatory damages, costs incurred prosecuting this matter, plus interest in a fair and reasonable amount in excess of FIFTY THOUSAND DOLLARS ($50,000) and to grant such other and further relief as this Court deems appropriate.

### COUNT IV—CONSPIRACY
### (AGAINST DEFENDANTS BP AND PHILLIPS 66)

COMES NOW Plaintiffs, by their attorneys, The Dysart Law Firm, P.C., and the Saville Law Firm, LLC and for their cause of action against Defendants BP and Phillips 66, and states:

85. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

86. Defendants BP and Phillips 66 agreed to suppress knowledge of the hazards of benzene and benzene- containing materials and products. Said Defendants acted together for the purpose of accomplishing by concerted action an unlawful purpose by an unlawful means, a lawful purpose by unlawful means or an unlawful purpose by lawful means. Pursuant to said agreement, Defendants BP and Phillips 66 committed overt unlawful acts in furtherance of the conspiracy, knowingly and voluntarily participated in their common scheme to commit unlawful acts in an unlawful manner. Defendants BP and Phillips 66 understood the general objectives of the conspiratorial scheme, accepted the general objectives and agreed to do their part to further those objectives.

87. Defendants BP and Phillips 66 knowingly and voluntarily agreed to suppress or minimize knowledge of the hazards of benzene and benzene containing products, to market benzene and benzene containing products they knew to be dangerous to persons exposed thereto, to

mislead downstream handlers, government officials and the public as to the hazards of benzene and benzene containing products and to refrain from warning downstream handlers, government officials and the public as to the hazards of benzene and benzene containing products.

88. Defendants BP and Phillips 66 committed an overt act in furtherance of the conspiracy by knowingly and voluntarily engaging in uniform modes of operation, including, but not limited to, the following: marketing benzene and benzene-containing materials and products they knew to be dangerous to persons exposed thereto; failing and refusing to warn downstream handlers, government officials, and the public of the threat caused by benzene and benzene-containing materials and products; suppressing and understating information regarding the hazards of benzene and benzene-containing materials and products; systematically understating the risk of benzene exposure to individuals by excluding at-risk contract workers from cohort studies; and, ceasing chromosome analysis of potentially exposed workers,

89. Defendants BP and Phillips 66 committed an overt act in furtherance of the conspiracy by, knowingly and voluntarily engaging, individually, collectively and under the auspices of industry and trade organizations, including, but not limited to, the American Petroleum Institute ("API") and the Manufacturing Chemists Association ("MCA"), in various acts in furtherance of the Agreement, including, but not limited to, the following: forming joint task-forces and committees, including but not limited to the API's Benzene Task Force and the MCA's Benzene Panel for the purpose of misleading government decision-makers, industry laborers and the public of the hazards of benzene and benzene containing products, restricting the flow of information regarding the hazards of benzene and benzene-containing

materials and products; requiring each Defendant to inform the MCA of all inter-Defendant communications regarding the hazards of benzene; directing the activities of the API and MCA for the specific purpose of marketing benzene and benzene-containing materials and products they knew to be dangerous to persons exposed thereto; submitting false, misleading or incomplete information to the Occupational Safety and Health Administration ("OSHA") in order to suppress knowledge of the hazards of benzene; withholding from OSHA information showing the hazards of benzene; suppressing the activities of, harassing and terminating the employment of persons who provided opinions regarding the hazards of benzene contrary to the goals of their agreement.

90. Additionally, Defendants BP, Phillips 66 and others created the Shanghai Health Study designed to respond to allegations from a nationwide study of benzene exposed workers in over 50 industries conducted in Shanghai, China by researches from the United States National Cancer Institute and the Chinese Academy of Preventative Medicine that indicated, in pertinent part, that low levels of benzene exposure, less than 10 parts per million, could lead to the development of AML, Myelodysplastic Syndrome (MDS) and non-Hodgkin's Lymphoma (NHL). It was noted by members of the conspiracy that the findings of the National Cancer Institute and the Chinese Academy of Preventative Medicine could lead to:

    a. Litigation claiming benzene produced, stored, transported and subsequently leaked, spilled or emitted, caused AML, MDS or NHL resulting in millions of dollars of expenses to the conspirators.

    b. Demands for reductions in the amount of benzene in gasoline because of the benzene's cancer causing health effects leading to "massive financial impacts on petroleum refineries."

    c. Demands for greater benzene emissions controls from stationary "sources of benzene such as a refineries and marketing facilities."

     d.  Increased clean-up requirements for benzene and "petroleum contaminated media such as soil and water."

91. As a direct and proximate result of Defendants' agreement and the wrongful acts in furtherance thereof, Plaintiffs and Decedent were exposed to and inhaled, ingested or otherwise absorbed benzene in sufficient amounts to cause disease and/or other harm.

92. As a direct and proximate result of Defendants' agreement and the wrongful acts in furtherance thereof, Plaintiffs and Decedent was caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiffs to develop AML and Decedent developed Lymphoma resulting in his death.

93. As a direct and proximate result of Defendants' agreement and the wrongful acts in furtherance thereof, Plaintiffs and Decedent were caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiffs and Decedent to incur medical bills, pain and suffering, a shortened life expectancy, and mental anguish.

94. As a direct and proximate result of Defendants' agreement and the wrongful acts in furtherance thereof, Plaintiffs and Decedent were caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby causing Plaintiffs and Decedent to miss work, and their career and ability to make a living has been severely and permanently damaged.

95. As a direct and proximate result of Defendants' agreement and the wrongful acts in furtherance thereof, Plaintiffs and Decedent was caused to be exposed to, inhaled, ingested, and/or otherwise absorbed benzene, thereby ensuring Plaintiffs and Decedent incurring future medical bills, life-long medication and medical treatment, pain and suffering, a shortened life expectancy, and mental anguish.

    WHEREFORE, Plaintiffs prays this Court to enter judgment in their favor and against Defendants BP and Phillips 66, to award compensatory damages, costs incurred prosecuting this

matter, plus interest in a fair and reasonable amount in excess of FIFTY THOUSAND

DOLLARS ($50,000) and to grant such other and further relief as this Court deems appropriate.

**COUNT V**
**WRONGFUL DEATH**
**AGAINST ALL DEFENDANTS**

COMES NOW Plaintiff, Joyce Eaton, Individually, and as Special Representative of the

Estate of Walter "Bud" Eaton, by her attorneys, The Dysart Law Firm, P.C., and the Saville Law

Firm, LLC and for her cause of action against the Defendants, states:

96. Plaintiff incorporates by reference all paragraphs of this complaint as if fully referenced

herein.

97. At all relevant times in Illinois there existed a Wrongful Death Act, statutorily set forth at

740 ILCS 180/0.01, et seq.

98. At all times herein set forth, the Defendants' benzene, materials and/or products were being

employed in the manner and for the purposes for which they were intended and/or in a

manner reasonably foreseeable and anticipated by the Defendants.

99. The Decedent's exposure to and inhalation, ingestion or absorption of the benzene and

benzene fumes emanating from benzene and certain benzene-containing and/or benzene-

related materials and products were completely foreseeable and could or should have been

anticipated by the Defendants.

100. The Defendants knew or should have known that the benzene contained in their materials,

and/or products had a toxic, poisonous, and highly deleterious effect upon the health of

persons inhaling, ingesting or otherwise absorbing it.

101. At all relevant times the Defendants owed a duty to the public, including Decedent , to exercise reasonable care and caution for the safety of those working with and around benzene and/or benzene-containing materials and/or products of the Defendants.

102. The Defendants breached the duty they owed to the Decedent by including benzene in their products, failing to provide adequate warnings to persons working with or around their benzene materials and/or products, failing to provide adequate instructions concerning safe methods of working with and around benzene materials and/or products, and failing to conduct tests on said benzene materials and/or products in order to determine the hazards to persons such as decedent.

103. As a direct and proximate result of the Defendants' breach, Decedent was exposed to, inhaled, ingested and/or absorbed benzene and developed Lymphoma resulting in his death.

104. As a further result, the next of kin of the decedent have suffered great losses of a personal and pecuniary nature, including loss of companionship and society of the decedent, as well as grief, sorrow, and mental suffering subjecting the Defendants to liability.

WHEREFORE, Plaintiff, Joyce Eaton as Special Representative of the Estate of Walter "Bud" Eaton prays this Court to enter judgment in her favor and against these Defendants, jointly and severally, to award compensatory damages in excess of FIFTY THOUSAND DOLLARS ($50,000) and costs incurred prosecuting this matter, and to grant such other and further relief as this Court deems appropriate.

**COUNT VI**
**CONSORTIUM**
**(Against All Defendants)**

COMES NOW Plaintiff Aimee Eaton, by her attorneys, The Dysart Law Firm, P.C., and the Saville Law Firm, LLC and for her cause of action against Defendants, state:

105. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth

herein.

106. As a result of the injuries sustained by Plaintiff Matthew Eaton, Case 2017 L 00644,

Plaintiff Aimee Eaton, has suffered a loss of services, society, consortium, and

companionship arising out of their marital relationship.

WHEREFORE, Plaintiff prays this Court to enter judgment in her favor and against these

Defendants, jointly and severally, to award compensatory damages, plus interest, and costs

incurred prosecuting this matter, in a fair and reasonable amount in excess of FIFTY

THOUSAND DOLLARS ($50,000) and to grant such other and further relief as this Court

deems just and proper.

### COUNT VII
### CONSORTIUM
**(Against All Defendants)**

COMES NOW Plaintiff Dawn Dickey, by her attorneys, The Dysart Law Firm, P.C., and

the Saville Law Firm, LLC and for her cause of action against Defendants, state:

107. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth

herein.

108. As a result of the injuries sustained by Plaintiff Douglas Dickey, as described above,

Plaintiff Dawn Dickey, has suffered a loss of services, society, consortium, and

companionship arising out of their marital relationship.

WHEREFORE, Plaintiff prays this Court to enter judgment in her favor and against these

Defendants, jointly and severally, to award compensatory damages, plus interest, and costs

incurred prosecuting this matter, in a fair and reasonable amount in excess of FIFTY

THOUSAND DOLLARS ($50,000) and to grant such other and further relief as this Court

deems just and proper.

**SAVILLE LAW FIRM, L.L.C.**             **THE DYSART LAW FIRM, P.C.**

/s/ Richard L. Saville, Jr.              /s/ Christopher W. Dysart
Richard L. Saville, Jr. #6202868         Christopher W. Dysart, #06224351
801 Questover Lane                       16020 Swingley Ridge Rd., Ste. 340
St. Louis, Missouri 63141                Chesterfield, Missouri 63017
(618) 407-7981                           Phone: (314) 548-6298
rich@savillelawfirm.com                  Fax:    (314) 548-6230
                                         cdysart@dysart-law.com

*ATTORNEYS FOR PLAINTIFFS*

07.31.2020

***EFILED***
Case Number 2020L 001081
Date: 7/31/2020 4:36 PM
Mark Von Nida
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

### IN THE CIRCUIT COURT
### THIRD JUDICIAL CIRCUIT
### MADISON COUNTY, ILLINOIS

| | | |
|---|---|---|
| AIMEE EATON, | ) | |
| JOYCE EATON, individually and as Special | ) | |
| Representative of the Estate of WALTER "BUD" | ) | |
| EATON, DOUGLAS DICKEY and his wife | ) | |
| DAWN DICKEY | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.:    2020L 001081 |
| | ) | |
| vs. | ) | |
| | ) | |
| TURTLE WAX, INC., | ) | |
| | ) | |
| BP PRODUCTS NORTH AMERICA, INC., | ) | |
| | ) | |
| PHILLIPS 66 COMPANY, | ) | |
| | ) | |
| 3M COMPANY, a/k/a MINNESOTA MINING | ) | |
| AND MANUFACTURING, | ) | |
| | ) | |
| BERRYMAN PRODUCTS, INC. | ) | |
| | ) | |
| THE B'LASTER CORPORATION, | ) | |
| | ) | |
| CRC INDUSTRIES, INC., | ) | |
| | ) | |
| SAFETY-KLEEN SYSTEMS INC., | ) | |
| | ) | |
| RADIATOR SPECIALTY COMPANY | ) | |
| | ) | |
| UNITED STATES STEEL CORPORATION | ) | |
| | ) | |
| BAUMAN OIL DISTRIBUTORS, INC. | ) | |
| As Respondent in Discovery, Only | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY OF APPEARANCE

COME NOW Richard L. Saville, Jr. and Saville Law Firm, L.L.C. and Christopher W. Dysart and The Dysart Law Firm, P.C., and hereby enter their appearance as counsel for Plaintiffs Aimee Eaton, Joyce Eaton, Individually and as Special Representative of the Estate of Walter "Bud" Eaton, Douglas Dickey and Dawn Dickey.

Respectfully submitted,

**SAVILLE LAW FIRM, L.L.C.**

/s/ Richard L. Saville, Jr.
Richard L. Saville, Jr. #6202868
801 Questover Lane
St. Louis, Missouri 63141
(618) 407-7981
rich@savillelawfirm.com

**THE DYSART LAW FIRM, P.C.**

/s/ Christopher W. Dysart
Christopher W. Dysart, #06224351
16020 Swingley Ridge Rd., Ste. 340
Chesterfield, Missouri 63017
(314) 548-6298
(314) 548-6230 – facsimile
cdysart@dysart-law.com

***ATTORNEYS FOR PLAINTIFFS***

DATED: 07.31.2020

MISSOURI

E-FILED
Case Number: 2020L 001083
Date: 7/31/2020 4:36 PM
Mark Von Nida
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

## CERTIFICATION OF DEATH

DATE FILED: MARCH 4, 2019          STATE FILE NUMBER:   124-19-006001

DECEDENT NAME:  WALTER GRAY EATON                           SEX:  MALE

DATE OF
DEATH:   FEBRUARY 28, 2019     COUNTY
OF DEATH:   WASHINGTON

DATE OF                          MARITAL                   EVER IN
BIRTH:   AUGUST 5, 1938        STATUS:  MARRIED      ARMED FORCES:  NO

SOCIAL                           RESIDENCE
SECURITY NUMBER:  ████████      ADDRESS:    10150 GLENDALE STREET
                                            POTOSI, MISSOURI

SURVIVING SPOUSE:
(IF WIFE, MAIDEN NAME):   JOYCE    GRANGER
FUNERAL HOME:  MOORE FUNERAL HOMES                 **EXHIBIT A**
   UNDERLYING CAUSE (ICD CODE):          MANNER:  NATURAL
LARGE B CELL LYMPHOMA - >4 MONTHS

ISSUED ON BEHALF OF MO DEPT HEALTH & SENIOR SERVICES: WASHINGTON

THIS IS A TRUE CERTIFICATION OF NAME AND DEATH FACTS AS RECORDED BY THE BUREAU OF VITAL RECORDS, JEFFERSON CITY, MISSOURI.

DATE ISSUED:       MARCH 4, 2019

*Craig B Ward*
Craig B. Ward
State Registrar of Vital Statistics

THE REPRODUCTION OF THIS DOCUMENT IS PROHIBITED BY LAW.
ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATION.

THE DEPARTMENT OF HEALTH & SENIOR SERVICES OF MISSOURI

***EFILED***
Case Number 2020L 001081
Date: 7/31/2020 4:36 PM
Mark Von Nida
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

## IN THE CIRCUIT COURT
## THIRD JUDICIAL CIRCUIT
## MADISON COUNTY, ILLINOIS

| | | |
|---|---|---|
| AIMEE EATON, JOYCE EATON, individually and as Special Representative of the Estate of WALTER "BUD" EATON, DOUGLAS DICKEY and his wife DAWN DICKEY | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.:    2020L 001081 |
| vs. | ) ) ) | |
| TURTLE WAX, INC., | ) ) | |
| BP PRODUCTS NORTH AMERICA, INC., | ) ) | |
| PHILLIPS 66 COMPANY, | ) ) | |
| 3M COMPANY, a/k/a MINNESOTA MINING AND MANUFACTURING, | ) ) ) | |
| BERRYMAN PRODUCTS, | ) ) | |
| THE B'LASTER CORPORATION, | ) ) | |
| CRC INDUSTRIES, INC., | ) ) | |
| SAFETY-KLEEN SYSTEMS INC., | ) ) | |
| RADIATOR SPECIALTY COMPANY | ) ) | |
| UNITED STATES STEEL CORPORATION | ) ) | |
| BAUMAN OIL DISTRIBUTORS, INC. As Respondent in Discovery, Only | )) ) ) | |
| Defendants. | ) ) ) ) | |

Case No. 2020-L-_____

Page 1 of 3

## MOTION TO APPOINT SPECIAL REPRESENTATIVE

COME NOW Richard L. Saville, Jr. and Saville Law Firm, L.L.C. and Christopher W. Dysart and The Dysart Law Firm, P.C.., to suggest the death of Walter "Bud" Eaton and to hereby move this Honorable Court to appoint a Special Representative pursuant to 735 ILCS 5/13-209, 740 ILCS 180 and 755 ILCS 5/27-6. In support thereof, Movant states as follows:

1. That on or about February 28, 2019, Walter Eaton died. A copy of his Death Certificate is attached hereto as Exhibit "A."

2. That no Petition for Letters of Office for her estate have been filed, and no legal representative for his estate has been appointed.

3. That during the course of his life, he was exposed to and inhaled, ingested, or otherwise absorbed, large amounts of benzene fumes emanating from benzene and certain benzene- containing products he was working around, which were process, produced, manufactured, sold, distributed, marketed and/or otherwise used by the named defendants, ultimately leading or contributing to his death.

4. That as a result of the decedent's exposure to the products containing benzene, claims pursuant to 735 ILCS 5/27-6 and 740 ILCS 180/1 have arisen against the various manufacturers of those products.

5. That Joyce Eaton is the surviving spouse of the decedent, is under no legal disability, and is qualified and willing to act as Special Representative in the prosecution of the above claim.

6. That Joyce Eaton requests that she be allowed to file the Decedent's Complaint reflecting her as Special Representative in the prosecution of the above claims.

Case No. 2020-L-_____
Page 2 of 3

WHEREFORE, Movant prays that this Honorable Court grant its Motion to Appoint a

Special Representative, enter an order appointing Joyce Eaton as Special Representative, and further

grant Movant any and all other relief as this Court deems just and equitable.

**SAVILLE LAW FIRM, L.L.C.**

/s/ Richard L. Saville, Jr.
Richard L. Saville, Jr. #6202868
801 Questover Lane
St. Louis, Missouri 63141
(618) 407-7981
rich@savillelawfirm.com

**THE DYSART LAW FIRM, P.C.**

/s/ Christopher W. Dysart
Christopher W. Dysart, #06224351
16020 Swingley Ridge Rd., Ste. 340
Chesterfield, Missouri 63017
Phone: (314) 548-6298
Fax:    (314) 548-6230
cdysart@dysart-law.com

Dated 07.31.2020

Case No. 2020-L-_____
Page 3 of 3

**IN THE CIRCUIT COURT**
**THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

| | | |
|---|---|---|
| AIMEE EATON,<br>JOYCE EATON, individually and as Special<br>Representative of the Estate of WALTER "BUD"<br>EATON, DOUGLAS DICKEY and his wife<br>DAWN DICKEY | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 2020L 001081 |
| vs. | ) ) ) | |
| TURTLE WAX, INC., | ) ) | |
| BP PRODUCTS NORTH AMERICA, INC., | ) ) | |
| PHILLIPS 66 COMPANY, | ) ) | |
| 3M COMPANY, a/k/a MINNESOTA MINING<br>AND MANUFACTURING, | ) ) ) | |
| BERRYMAN PRODUCTS, | ) ) | |
| THE B'LASTER CORPORATION, | ) ) | |
| CRC INDUSTRIES, INC., | ) ) | |
| SAFETY-KLEEN SYSTEMS INC., | ) ) | |
| RADIATOR SPECIALTY COMPANY | ) ) | |
| UNITED STATES STEEL CORPORATION | ) ) | |
| BAUMAN OIL DISTRIBUTORS, INC.<br>As Respondent in Discovery, Only | ) ) ) | |
| Defendants. | ) ) | |

**ORDER**

Cause coming on to be heard on the Motion of Saville Law Firm, L.L.C and The Dysart Law Firm, P.C. to Appoint Special Representative, and the Court having considered the Motion and being fully advised in the premises, hereby orders as follows:

1.   That Joyce Eaton is appointed as Special Representative pursuant to 735 ILCS 5/13-209, 740 ILCS 180 and 755 ILCS 5/27-6.

2.   That Joyce Eaton as Special Representative is empowered to prosecute the above-entitled cause in the name and place of Walter Eaton, Deceased, with full powers to compromise and settle his respective claims.

3.   That Joyce Eaton is hereby empowered to file the Complaint of Decedent reflecting her appointment as Special Representative to prosecute the above claims.


DATED: _____    SO ORDERED:_____
                                                    Judge